Andrew T. Ryan, Esq. (SBN 227700)
THE RYAN LAW GROUP
317 Rosecrans Ave.
Manhattan Beach, CA 90266
Tel: (310) 321-4800
Fax: (310) 496-1435
Andrew.ryan@theryanlawgroup.com

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| SARA OCHOA, on behalf of herself and those similarly situated,<br><br>            Plaintiff,<br><br>       v.<br><br>ZEROO GRAVITY GAMES LLC, a Delaware limited liability company, and APPLOVIN CORP., a Delaware corporation;<br><br>            Defendant. | Case No.  2:22-cv-05896<br><br>**SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**<br><br>1. **Violation of California's Unfair Competition Law ("UCL")**<br>2. **Violation of California False Advertising Law ("FAL")**<br>3. **Violation of the California Consumer Legal Remedies Act ("CLRA")**<br>4. **Fraud**<br>5. **Negligent Misrepresentation**<br><br>**CLASS ACTION** |

On May 5, 2022, plaintiff Sara Ochoa ("Plaintiff") filed an action in the Superior Court of the State of California, County of Los Angeles, assigned case No. 22-STCV-14939.  On July 18, 2022, Plaintiff filed a First Amended Complaint ("FAC") in the Superior Court of the State of California, County of Los Angeles. On August 19, 2022, defendant Zeroo Gravity Games, LLC ("ZGG") removed this civil action from the Superior Court of the State of California, County of Los Angeles, to the United States District Court for the Central District of California, Western Division, alleging that this Court has jurisdiction under the Class Action Fairness Act ("CAFA"), 28 U.S.C. §1332(d).

The parties stipulated that Plaintiff may amend her complaint pursuant to Rule 15. Pursuant to Rule 15, Plaintiff, a citizen of Los Angeles County, hereby brings this Second Amended Complaint on behalf of herself and those similarly situated Against Defendant Zeroo Gravity Games, LLC, a Delaware limited liability company ("ZGG") and Defendant AppLovin Corporation, a Delaware corporation ("AC") (collectively "Defendants"). Plaintiff alleges as follows:

## INTRODUCTION

1.      This lawsuit is brought on behalf of Plaintiff and those similarly situated who have been deceived into making in-game purchases of deceptively marketed in-game items in the mobile application game called Jackpot Master Slots and other games distributed by Defendants having substantially the same false advertising. Defendants have falsely advertised price discounts and sales for in-game purchases to mislead and induce Plaintiff and those similarly situated into making in-game purchases.

2.      Defendants are developers and publishers of mobile games playable on various platforms, including iPhone and Android devices. Two

of Defendants' top games are Jackpot Master Slots and Cash Tornado. Consumers play these games on at least Apple iOS devices and Android Devices, which are distributed by Defendants pursuant to developer agreements with Apple Inc. and Google, LLC, entities headquartered in California.

3.      Jackpot Magic Slots and Cash Tornado are free for consumers to download and play.  Defendants reap massive profits by selling "in-app" bundles of virtual gold and other virtual items that range from $1.99 to $99.99. However, in their direct marketing to consumers (including representations made at the time of purchase), Defendants advertised false former prices and deals to induce players into believing they must act quickly to take advantage of a limited-time sale.

4.      Defendants used strikethrough pricing and statements communicating the existence of sales of short duration to trick consumers into believing they were benefitting from limited-time promotions that substantially increased the value of their in-game purchases. These purported savings were false, however, because the stricken "original" pricing and deals that these ads referenced were fabricated. Defendants also advertised in-game items using false and misleading statements indicating that there was a limited time sale or special, including a countdown timer to create a sense of urgency in consumers. But these sales were continuously offered with the countdown timer resetting.

5.      These purported special offers ran for months or longer. But these in-game items were not actually offered at the "original" stricken, non-discounted value within the three months prior to the promoted sales. The original deal that was stricken in the sales promotions was not the prevailing deal offered by Defendants. They just offered false presentations

of purported discounts from original prices and deals that never existed, and its players bought packs under the false impression that they were on "sale."

6. On information and belief,, the advertised "original" value presented in Jackpot Master Slots and Cash Tornado does not reflect the prevailing market retail pricing for these virtual in-game items within the three months preceding the displayed advertising.

7. Similarly, the limited time "sales" were not actually limited in time, but were continuously offered by Defendants in Jackpot Magic Slots and Cash Tornado. The countdown timers presented in connection with these limited time sales was false and misleading, because the offers never actually expired, but were perpetually offered with reset countdown timers.

8. The Federal Trade Commission ("FTC") describes as false former pricing schemes as deceptive: "One of the most commonly used forms of bargain advertising is to offer a reduction from the advertiser's own former price for an article. If the former price is the actual, bona fide price at which the article was offered to the public on a regular basis for a reasonably substantial period of time, it provides a legitimate basis for the advertising of a price comparison. Where the former price is genuine, the bargain being advertised is a true one. If, on the other hand, the former price being advertised is not bona fide but fictitious - for example, where an artificial, inflated price was established for the purpose of enabling the subsequent offer of a large reduction - the 'bargain' being advertised is a false one; the purchaser is not receiving the unusual value he expects." 16 CFR §233.1(a).

9. California statutory and regulatory law also expressly forbids such false discounted pricing schemes: "No price shall be advertised as a

former price of any advertised thing, unless the alleged former price was the prevailing market price as above defined within three months next immediately preceding the publication of the advertisement or unless the date when the alleged former price did prevail is clearly, exactly and conspicuously stated in the advertisement."  Cal. Bus. & Prof. Code §17501.

10.     Defendants knew, or should reasonably have known, that its comparative price advertising and statements regarding limited time sales were false, deceptive, misleading, and unlawful.

11.     Defendants fraudulently concealed from and intentionally failed to disclose to consumers the truth about its advertised discounts and purported limited time sales.

12.     Through this false and deceptive marketing, advertising, and pricing scheme, Defendants have violated California law prohibiting the advertisement of goods for sale as discounted from false former prices and prohibiting misleading statements about the existence and amount of price reductions.

13.     Plaintiff, individually and on behalf of all others similarly situated hereby seeks restitution, injunctive relief, punitive damages, attorneys' fees, and all other relief which the Court may deem appropriate.

## **PARTIES**

14.     Plaintiff Sara Ochoa is a citizen and resident of Los Angeles County, California.  In or around 2021-2022, she downloaded Jackpot Magic Slots on her iPhone from the Apple App Store in Los Angeles County.  She played Jackpot Master Slots in this County as a guest. She accessed the game's virtual store and saw the false advertising in that store in this County. She was induced by this false advertising to make in-

game purchases in this County from Defendants' in-game store of at least one virtual gold bundle valued at $1.99.

15.    On information and belief, Defendant Zeroo Gravity Games LLC ("ZGG") is a limited liability company organized and existing under the laws of Delaware. On information and belief, ZGG's principal place of business is at Building A South Hall, YingChuangDongLi Industrial Park, HaiDian District, Beijing, China.

16.    On information and belief, Defendant AppLovin Corporation ("AC") is a Delaware corporation. On information and belief, AC's principal place of business is 1100 Page Mill Road, Palo Alto, California 94304.

17.    On information and belief, according to its Form 10-Q of August 12, 2022, AC is a leader in the mobile app industry with a focus on building a software-based platform for mobile app developers to improve the marketing and monetization of their apps. AC also has a globally diversified portfolio of apps—free-to-play mobile games that it operates through its own or partner studios.

18.    On information and belief, according to its Form 10-Q of August 12, 2022, AC generates revenue from its mobile applications ("Apps revenue"). AC generates Apps revenue from both consumers and business clients. Consumer revenue is generated from in-app purchases ("IAP") made by users of AC's apps. Consumer revenue includes fees collected from users to purchase virtual goods to enhance their gameplay experience. According to AC's 10Q, "[u]sers make IAPs through AC's distribution partners. The transaction price is equal to the gross amount to the users because the Company [AC] is the principal in the transaction." AC categorizes its virtual goods as either consumable or durable. AC recognizes revenue from the sale of consumable virtual goods as the

goods are consumed. AC recognizes revenue from the sale of durable virtual goods ratably over the period of time the goods are available to the user.

19.    On information and belief, according to its Form 10-Q of August 12, 2022, AC's apps are generally free-to-play mobile games and generate consumer revenue through IAPs. IAPs consist of virtual goods used to enhance gameplay, accelerate access to certain features or levels, and augment other mobile game progression opportunities for the user. IAPs drive more engagement and better economics from AC's Apps. The vast majority of AC's IAP revenue flows through two app stores, Apple App Store and Google Play. Consumer revenue represented 66% of total Apps Revenue for AC in the three months that ended June 30, 2022.

20.    On information and belief, according to its Form 10-Q of August 12, 2022, over the past several years, AC's apps have been critical in providing first-party data and audiences for AC's "Software Platform" to enable AC to test, design, and scale its technologies.

21.    On information and belief, according to its Form 10-Q of August 12, 2022, AC relies on third-party platforms, such as the Apple App Store and Google Play Store, among others, to distribute games, collect payments made for IAPs, and target users with relevant advertising.

22.    According to AC's Q1 2021 shareholder letter, AC utilizes a "integrated business model." AC describes this business model as follows: "At our core, we're a marketing software company that helps mobile app developers attract new users and grow their businesses. In the last year, the AppLovin software platform helped app developers find over three billion new customers. Central to what makes our software powerful is our machine-learning engine, AXON, which processes over 6.5 trillion events

per day and over 3 trillion machine-learning predictions per day,1 and continuously improves with more data. In early 2018 we started our own content business that now generates substantial first-party data. Paired with AXON, the combination is a meaningfully differentiated engine for our software. We've always made money charging marketing software fees when clients pay us to advertise. Today, we also make money when our content grows and consumers pay us or advertisers buy ad space in our games. On top of that, our financial scale and vertically integrated cost structure allows us to more effectively acquire new users. Our integrated model is working well. As our content grows, so does our data advantage. In turn, our software improves, and we can drive more users to our content. All revenue streams grow. (As you may recall, this is our strategic flywheel as discussed during our IPO.) Integrating our software, content, and data gives us strong competitive advantages in our enormous $180+ billion TAM, and gives us plenty of room to grow."

23.    In the same shareholder letter, AC states: "We have a solid track record of growing the games we acquire, on average, achieving over 100% growth in the first year of ownership. Through our pre-existing client relationships, we can identify and partner with companies where we can grow their content much faster than any of these studios could on their own…Based on our track record of success in growing apps, we are confident that we will do the same for these titles in the coming quarters. We're also pleased to be working with these studios to help grow more of their games in the future."

24.    In its Annual Report filed March 11, 2022, AC states: "In 2018, given an opportunity to scale our own apps using our Software Platform, insights, and expertise in the mobile app ecosystem, we launched our first-

party content strategy, AppLovin Apps. Today, our Apps consist of a globally diversified portfolio of over 350 free-to-play mobile games across five genres, run by nineteen studios including studios that we own (Owned Studios) and others that we partner with (Partner Studios). Our Apps provide data and insights as users play games, thus improving our App Graph and AXON recommendation engine. Our studios generally focus on the development of easy to learn and play games, which appeal to a broad range of demographics, but also develop several games for other genres. The combination of our Core Technologies, Software Platform, and Apps forms a strategic flywheel that drives growth across our business and furthers our competitive advantages. As more developers use our Software Platform to market and monetize their mobile apps, we gain access to more users and more user engagement further strengthening our scaled distribution. As our distribution grows, we gain better insights for our App Graph and AXON recommendation engine, which then further enhances our Software Platform. This continuously improving flywheel helps developers that use our Software Platform to create and sustain successful businesses, growing both our own business and the mobile app ecosystem. We accelerate our capabilities and enhance our strategic position in the mobile app ecosystem by actively pursuing acquisitions and partnerships for new technologies and apps. Insights that we derive from our strategic position and flywheel allow us to proactively identify attractive acquisition and partnership opportunities across the mobile app ecosystem. From the beginning of 2018 through December 31, 2021, we have invested over $2.5 billion across 27strategic acquisitions and partnerships with app studios, games, and software platforms. In the case of new apps, we are able to deploy our Software Platform and expertise to accelerate revenue

growth, enabling us to target strong returns on investment. Strategic acquisitions and partnerships will continue to be a part of our growth strategy going forward."

25.    In that same report, AC further states: "How We Grow the Mobile App Ecosystem[.] We have built and invested in our Core Technologies and Software Platform, which expand the mobile app ecosystem by solving key developer growth challenges. We deliver value to mobile app developers by helping scale their businesses and maximize their revenue through our marketing and monetization technologies and expertise. Our Core Technologies and Software Platform combine marketing, monetization, and analytics into a single unified technology stack."

26.    In that same report, AC further states: "AppLovin Apps[.] Our Apps consist of a globally diversified portfolio of over 350 free-to-play mobile games run by nineteen studios with a deep bench of talented developers. Our diversified portfolio covers five gaming genres, the most frequent of which is casual games, and appeals to a broad global audience across different ages, genders, and locations. Our Owned Studios and Partner Studios utilize our Software Platform to market and monetize our Apps. When using our Software Platform, our Apps have an economic advantage, which benefits our business as a whole. The strategy of our studios is to allow developers to focus on creating great Apps, while leveraging our Software Platform and expertise to unlock the potential of those Apps."

27.    In that same report, AC further states: "Our Strategic Flywheel[.] The mutually reinforcing combination of our Software Platform's scaled distribution, our App's first- party content, and our Core Technologies'

recommendation engine creates a powerful flywheel effect that enhances each component and importantly improves our overall strategic position and capabilities. As our Software Platform improves and is able to deliver more effective ads to more relevant users, more developers use and integrate their apps with our Software Platform, growing our scaled distribution. This grows the number of users on and level of engagement with our Apps and third-party apps. With a larger number of users engaged with our Software Platform and our Apps, our App Graph gains more insights and data. The enhanced App Graph feeds our Core Technologies, including our AXON machine-learning recommendation engine, improving its insights and matching capabilities. As the insights generated by AXON improve, the effectiveness of our Software Platform is enhanced in real-time. Improvements to our Software Platform lead to more developer demand, restarting the virtuous cycle of our strategic flywheel. Our Software Platform benefits from more apps and users from both our Apps and those of third- party developers. Through more volume and strong underlying software, our Software Platform can better match and price the supply of advertising inventory and demand from advertisers, helping users discover the apps they love and delivering better returns for developers. Apps—whether third party or our own—benefit from the improved marketing and monetization capabilities of our Software Platform, driving growth in users and revenue. With greater scale and resources, developers can reinvest to create new apps, improve existing apps, and further invest in user acquisition, thereby growing the overall mobile app ecosystem. We derive highly strategic insights from our flywheel. As the largest user of our Software Platform, our Apps benefit from the expertise and cost savings of our Software Platform, leading to greater returns on user acquisition spend.

This allows our Apps to make significant investments in user acquisition, giving us further insights into the effectiveness of our tools and monetization strategies across the ecosystem."

28.    The following diagram in AC's annual report depicts AC's business:



29.    In the same annual report, AC states: "Our Owned Studios and Partner Studios leverage live ops to quickly iterate and increase in-game monetization by optimizing app economies and improving in-game conversion on items and offers. Our Software Platform and expertise provide analytical tools, testing capabilities, and other solutions such as distributed development, competitive insights, localizations resources, creative services to develop and test ads and resource centers to access design and development expertise. We also provide a set of services that help both our Apps and third-party developers optimize their games and leverage our expertise to better streamline their business operations."

## JURISDICTION AND VENUE

30.    This Court has jurisdiction over this action under the Class Action Fairness Act of 2005. Pursuant to 28 U.S.C. §§1332(d)(2), this Court has original jurisdiction because the aggregate claims of the putative class members exceed $5 million, exclusive of interest and costs, and at least one of the members of the proposed classes is a citizen of a different state

than Defendant.

31.    This Court has personal jurisdiction over AC, because AC is headquartered in California, conducts professional and commercial activities in California on a substantial, continuous, and systematic basis and therefore AC is subject to the general jurisdiction of the courts of this state.

32.    This Court has personal jurisdiction over ZGG, because it conducts substantial business and directs its activities into this District, including activities that form the basis for the claims here, and a substantial part of the acts and omissions complained of occurred in this District.

33.    Plaintiff further allege, upon information and belief, that the claims asserted in this complaint arise out of or are related to Defendants' professional and commercial activities within California, and therefore the Defendants are subject to the specific jurisdiction of the courts of this state. Specifically, Defendants publish, distribute and profit from the Jackpot Master Slots and Cash Tornado and direct activities for these games specifically from and into California.

34.    For example, Defendants generate the majority of their revenues through the publishing, distribution and monetization of mobile apps through contractual relationships with California entities, including Apple and Google.

35.    Venue is proper in this court because at all relevant times Plaintiff resided in the County of Los Angeles, California and the claims asserted in this complaint arise out of acts, transactions, and conduct that occurred in whole or in part within the County of Los Angeles, California.

## **FACTS**

36.    Jackpot Master Slots ("Game") is a mobile application casino-style game developed and distributed by Defendant. The Game is available

on iPhone and Android devices through the Apple App Store and Google Play platforms, respectively. On information and belief, the Game is one of the top casino games available on iPhone and Android devices.

37.    Users of the Game receive a certain amount of virtual gold for use in the Game when they first download the Game. Users can also purchase bundles of in-game items ranging in price from $1.99 to $99.99.

38.    The Game's in-game store displays stricken original deals with purported "sale" deals. The advertisement of these bundles purportedly on sale are false, deceptive and intended to mislead plays into making in-app purchases that they otherwise would not have made. Defendant falsely promotes these bundles as being on sale or discounted by misrepresenting that such bundles normally offer substantially less value than the advertised deal.

39.    Defendant's false strikethrough ads display an amount of virtual gold, with a strikethrough line, and then in larger, bold-faced font, a larger amount of gold, implying that the bundle normally contains a smaller amount of gold for the same price. For example, a $1.99 bundle may have 60,0000 gold pieces with a strikethrough line over that number and display in bigger, bolder numbers showing 120,000 gold pieces as the current sale deal.  The intended message is that the bundle typically contains 60,000 units of gold for that price but is now being offered with more units of gold at the same price. An example of such a display for the Game is shown below:



40.    The false strikethrough ads are used to sell bundles in the Game on a daily basis. The false strikethrough ads apply across multiple price point in the Game from $1.99.

41.    On information and belief, the strikethrough advertising presented by Defendants is false and misleading. On information and belief, in the stricken gold quantities do not represent the prevailing deal offered by Defendants in the Game in the three months preceding the presentation to Plaintiff and other consumers.

42.    Further, months after being presented with these advertisements and making her in-game purchase, Plaintiff continues to be presented with similarly misleading strikethrough advertising:



43.    Plaintiff and those similarly situated are also presented with false limited time sales that include a misleading countdown timer, an example of which is shown below:



44.    This advertising is false and misleading, because, on information and belief, the sale is continuously available in the Game and is not limited in time at all, as the countdown perpetually resets with the same sale being offered.

45.    Defendants had actual knowledge that the false strikethrough ads and false limited time sales contained false or misleading misrepresentations as to their prior values and as to their duration. Defendants designed and promoted these advertisements while having actual knowledge that these quantitative representations of sale values were false.

46.    These virtual items are critical to the Game, as they are necessary for the players to continue playing the casino-style slot machine games once they inevitably lose all of their virtual gold on a given day.

47.    Defendants promoted these advertisements to create a false sense of urgency in its players thereby inducing those players into purchasing the gold bundles. Defendants did so while knowing that the bundles contained quantitative misrepresentations with respect to the

comparative value of the gold displayed and with respect to the duration of the availability of those deals.

48.    The amount of chips or gold included in a bundle, and whether the bundle being offered for sale represents a good value and outsized amount of gold a player is receiving for his or her purchase with the corresponding bundle, is a material consideration when a player decides whether to purchase a bundle.

49.    Similarly, the urgency and duration of a purported sale for in-game items is material to a consumer's purchase decision.

50.    Plaintiff and those similarly situated reasonably relied on the "strikethrough" pricing and limited time specials when purchasing bundles promoted through false strikethrough ads. Had Plaintiff and those similarly situated known the "strikethrough" pricing and limited time specials were false, Plaintiff and those similarly situated would not have purchased some or all of the bundles promoted through false strikethrough ads.

51.    Defendants' advertising of in-game items, therefore, are violative of 16 CFR §233.1(a) because the former, stricken, deals displayed are not "actual, bona fide price at which the article was offered to the public on a regular basis for a reasonably substantial period of time."  Rather, the false strikethrough ads display former bundles that are "fictitious" and with "an artificial, inflated price" for the purpose of creating the false perception to the consumer "of a large reduction."  The false strikethrough ads promote a false bargain where "the purchaser is not receiving the unusual value he expects."  *Id.*

52.    The false strikethrough ads are also violative of Cal. Bus. & Prof. Code §17501, because the former bundle and price advertised were never "the prevailing market price … within three months next immediately

preceding the publication of the advertisement."  Nor do the False

Strikethrough Ads "clearly, exactly and conspicuously stated in the

advertisement" when such former prices were prevailing.

53.     On information and belief, Jackpot Master Slots and Cash

Tornado are virtually identical games, both offering slot machine games on

mobile devices. On information and belief, Defendants distribute and sell

in-game items to consumers using virtually identical false advertising in

Cash Tornado as that used in Jackpot Master Slots. Below are screen

shots from Cash Tornado that have the same false strikethrough

advertising and false limited time sales as used in Jackpot Master Slots:





## **APPLICABLE LAW**

54.     Plaintiff is a citizen and resident of Los Angeles County,

California. She downloaded and played the Game in California. She made

purchases form the Game store in California.

55. California's substantive laws may be constitutionally applied to the claims of Plaintiff under the Due Process Clause, 14th Amend. §1, and the Full Faith and Credit Clause, Art. IV §1 of the U.S. Constitution. California has significant contacts, or significant aggregation of contacts, to the claims asserted by Plaintiff, thereby creating state interests that ensure that the choice of California state law is not arbitrary or unfair.

56. The application of California laws is also appropriate under California's choice of law rules because California has significant contacts to the claims of Plaintiff, and California has a greater interest in applying its laws here than any other interested state.

57. The application of California law is also appropriate, because AppLovin is headquartered in California and distributes its games through developer agreements with California entities, including Apple and Google.

## **CLASS ALLEGATIONS**

58. Plaintiff brings this action on her own behalf and on behalf of a Class and one Subclass, pursuant to Cal. Code. Civ. Proc. §382, Cal. Civ. Code §1781, and Cal. Bus. & Prof. Code §17203, defined as below:

The Class:

All individuals located within the United States who, during the applicable limitations period, made a purchase of virtual gold in Jackpot Master Slots and Cash Tornado using real-world currency.

The California Subclass:

All individuals located within the state of California, who, during the applicable limitations period, made a purchase of virtual gold in Jackpot Master Slots and Cash Tornado using real-world currency.

59.    Excluded from the Class and Subclass are Defendants, their affiliates, parents, subsidiaries, employees, officers, agents and directors. Also excluded are any judicial officers presiding over this matter and the members of their immediate families and judicial staffs.

60.    This case is appropriate for class treatment because Plaintiff can prove the elements of her claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

61.    **Adequacy**. Plaintiff will fairly and adequately represent and protect the interests of the other members of the Class and Subclass (collectively, the "Class").  Plaintiff has retained counsel with substantial experience in prosecuting complex litigation and class actions.  Plaintiff and her counsel are committed to vigorously prosecuting this action on behalf of the other Class and Subclass members, and have the financial resources to do so.  Neither Plaintiff nor her counsel have any interest adverse to those of the other members of the Class or Subclass.

**62.    Numerosity**. The members of the Class and Subclass are so numerous that joinder of all members would be unfeasible and not practicable. The membership of the Class and Subclass is unknown to Plaintiff at this time; however, it is estimated both the Class and Subclass number in the hundreds, if not thousands.  The identity of such membership is readily ascertainable via inspection of Defendant's books and records or other approved methods.  Similarly, Class members may be notified of the pendency of this action by mail, email, internet postings, publications and/or in-game messaging.

63.    **Common Questions of Law or Fact:** There are common questions of law and fact as to Plaintiff and all other similarly situated

persons, which predominate over questions affecting only individual Class members, including, without limitation:

a.    Whether Defendant engaged in the conduct alleged in the Complaint;

b.    Whether Defendant violated the applicable statutes alleged herein;

c.    Whether Defendant designed, advertised, marketed, distributed, sold, or otherwise placed Jackpot Master Slots and Cash Tornado into the stream of commerce in the United States and California;

d.    Whether Defendant engaged in conduct directed to the State of California;

e.    Whether Defendant's presentation of stricken values in its advertising of in-game purchases are misleading to a reasonable consumer;

f.    Whether Defendant's presentation of limited time sales for in-game purchases are misleading to a reasonable consumer;

g.    Whether Plaintiff and members of the Classes were injured and harmed directly by Defendant's false advertising;

h.    Whether Plaintiff and members of the Classes are entitled to damages due to Defendant's conduct as alleged in this Complaint, and if so, in what amounts;

i.    Whether Plaintiffs and members of the Classes are entitled to equitable relief, including, but not limited to, restitution or injunctive relief as requested in this Complaint.

64.    **Typicality:** Plaintiff's claims are typical of the claims of the other members of the Classes because, among other things, Plaintiff and all Class members were comparably injured through Defendants'

misconduct described above.  As alleged herein, Plaintiff, like the members
of the Class and Subclass, was deprived of monies that rightfully belonged
to them by Defendants.  Further, there are no defenses available to
Defendants that are unique to Plaintiff.

65.  **Superiority:** The nature of this action and the laws available to
Plaintiff and members of the Classes make the class action format a
particularly efficient and appropriate procedure to redress the violations
alleged herein. If each Class member were required to file an individual
lawsuit, Defendants would necessarily gain an unconscionable advantage
since it would be able to exploit and overwhelm the limited resources of
each individual plaintiff with its vastly superior financial and legal resources.
Moreover, the prosecution of separate actions by the individual Class
members, even if possible, would create a substantial risk of inconsistent or
varying verdicts or adjudications with respect to the individual Class
members against Defendants, and which would establish potentially
incompatible standards of conduct for Defendant and/or legal
determinations with respect to individual Class members which would, as a
practical matter, be dispositive of the interest of the other Class members
not parties to adjudications or which would substantially impair or impede
the ability of the Class members to protect their interests. Further, the
claims of the individual members of the Class are not sufficiently large to
warrant vigorous individual prosecution considering all of the concomitant
costs and expenses attending thereto.

///

///

///

# FIRST CLAIM FOR RELIEF

## Violation of California's Unfair Competition Law ("UCL")

## Cal. Bus. & Profession Code §17200 *et seq.*

66.    Plaintiff incorporates by reference all allegations in this Complaint and restates them as if fully set forth herein.

67.    The UCL defines unfair business competition to include any "unlawful, unfair or fraudulent" act or practice, as well as any "unfair, deceptive, untrue or misleading" advertising. Cal. Bus. & Prof. Code §17200.

68.    A business act or practice is "unlawful" under the UCL if it violates any other law or regulation.

69.    A business act or practice is "unfair" under the UCL if the reasons, justifications, and motives of the alleged wrongdoer are outweighed by the gravity of the harm to the alleged victims. A business act or practice is "fraudulent" under the UCL if it is likely to deceive members of the consuming public.

70.    Defendants have violated the "unlawful" prong under the UCL and has engaged in "unfair, deceptive, untrue or misleading" advertising.

71.    The Federal Trade Commission Act prohibits "unfair or deceptive acts or practices in or affecting commerce" (15 U.S.C. §45(a)(1)) and specifically prohibits false advertisements. 15 U.S.C. §52(a). FTC Regulations describe false former pricing schemes-similar to Defendant's False Sale Packs and False Gold Strikethrough Packs in all material respects-as deceptive practices that would violate the FTC Act.

72.    16 C.F.R. §233.1 states:

(a) One of the most commonly used forms of bargain advertising is to offer a reduction from the advertiser's

own former price for an article. If the former price is the actual, bona fide price at which the article was offered to the public on a regular basis for a reasonably substantial period of time, it provides a legitimate basis for the advertising of a price comparison. Where the former price is genuine, the bargain being advertised is a true one. If, on the other hand, the former price being advertised is not bona fide but fictitious - for example, where an artificial, inflated price was established for the purpose of enabling the subsequent offer of a large reduction - the "bargain" being advertised is a false one; the purchaser is not receiving the unusual value he expects. In such a case, the "reduced" price is, in reality, probably just the seller's regular price.

 (b) A former price is not necessarily fictitious merely because no sales at the advertised price were made. The advertiser should be especially careful, however, in such a case, that the price is one at which the product was openly and actively offered for sale, for a reasonably substantial period of time, in the recent, regular course of his business, honestly and in good faith - and, of course, not for the purpose of establishing a fictitious higher price on which a deceptive comparison might be based. And the advertiser should scrupulously avoid any implication that a former price is a selling, not an asking price (for example, by use of such language as, "Formerly sold at $___"), unless substantial sales at that price were actually

made.

73.    California law also prohibits false former pricing schemes.

Cal. Bus. Code. §17501 entitled "Value determinations; Former price advertisements," states:

For the purpose of this article the worth or value of anything advertised is the prevailing market price, wholesale if the offer is at wholesale, retail if the offer is at retail, at the time of publication of such advertisement in the locality wherein the advertisement is published.

No price shall be advertised as a former price of any advertised thing, unless the alleged former price was the prevailing market price as above defined within three months next immediately preceding the publication of the advertisement or unless the date when the alleged former price did prevail is clearly, exactly and conspicuously stated in the advertisement.

74.    California's False Advertising Law also prohibits a business from "[a]dvertising goods or services with intent not to sell them as advertised," Cal. Civ. Code §1770(a)(9), and prohibits a business from "[m]aking false or misleading statements of fact concerning reasons for, existence of, or amounts of price reductions." *Id.* §(a)(13).

75.    Defendants' false strikethrough ads and false limited time specials violate the unlawful prongs of the UCL since they violate 16 C.F.R. §233.1, Cal. Bus. Prof. Code §1750, Cal. Civ. Code §§1770(a)(9) and (a)(13).

76.    Defendants also violated the "unfair" prong of the UCL by

falsely representing that its consumers received a discount from a referenced "original" former price show in its false strikethrough ads. In fact, Defendant displayed an arbitrary price for the goods contained in these bundles and then falsely pretended the bundles had been offered for sale at a value less than their "limited time sale" contents.

77. Defendants also violated the "unfair" prong of the UCL by falsely representing to consumers that certain specials or sales were limited in time, when in fact such specials and sales are offered continuously.

78. The gravity of the harm to Plaintiff and the Class members resulting from these unfair acts and practices outweighs any conceivable reasons, justifications, or motives that Defendant may have had for engaging in such deceptive acts and practices.

79. Additionally, Defendants violated the "fraudulent" prong of the UCL because its marketing and advertising materials included false "original" prices in its false strikethrough ads and false countdown timers in its limited time sale ads.

80. Defendants' acts and practices deceived Plaintiff and the Class members. Specifically, Plaintiff and the putative Classes relied on these misleading and deceptive representations regarding the limited-time bonuses they could expect to receive in the packs. Each of these representations and deceptions played a substantial role in Plaintiff's and Class members' decisions to purchase the virtual gold packs, and Plaintiff and the Class members would not have done do, in whole or in part, in the absence of such representations.

81. As a result of these violations under each of the fraudulent, unfair, and unlawful prongs of the UCL, Defendant has been unjustly enriched at the expense of Plaintiff and the putative Class. Specifically,

Defendants have been unjustly enriched by obtaining revenues and profits

that it would not otherwise have obtained absent its false, misleading, and

deceptive conduct.

82.    Through its unfair acts and practices, Defendants improperly

obtained money from Plaintiff and Class members. As such, Plaintiff, on

behalf of herself and the putative Class, requests that this Court cause

Defendants to restore this money to Plaintiff and the Class members, and

to enjoin Defendants from continuing to violate the UCL, and/or from

violating the UCL in the future. Otherwise, Plaintiff and members of the

Class may be irreparably harmed and/or denied an effective and complete

remedy if such an order is not granted.

## **SECOND CLAIM FOR RELIEF**

### **Violation of California False Advertising Law ("FAL")**

### **Cal. Business & Professional Code §17500 *et seq.***

83.    Plaintiff incorporates by reference all allegations in this

Complaint and restates them as if fully set forth herein.

84.    The  FAL  prohibits unfair, deceptive, untrue, or misleading

advertising, including, but not limited to, false statements as to worth, value,

and former price.

85.    Furthermore, the FAL provides that: "No price shall be

advertised as a former price of any advertised thing, unless the alleged

former price was the prevailing market price as above defined within three

months next immediately preceding the publication of the advertisement or

unless the date when the alleged former price did prevail is clearly, exactly

and conspicuously stated in the advertisement." Cal. Bus. & Prof. Code

§17501.

86.    The false strikethrough ads and false limited time special ads

misrepresent the existence of a sale whereby players can allegedly purchase more gold or gems from a bundle than they normally could for the same price.

87.     Through its unfair acts and practices, Defendants have improperly obtained money from Plaintiff and members of the Class. As such, Plaintiff, on behalf of herself and the putative Class, requests that this Court cause Defendants to restore this money to Plaintiff and the Class members, and to enjoin Defendants from continuing to violate the FAL, and/or from violating the FAL in the future. Otherwise, Plaintiff and members of the Class may be irreparably harmed and/or denied an effective and complete remedy if such an order is no granted.

## THIRD CLAIM FOR RELIEF

### Violation of the California Consumer Legal Remedies Act ("CLRA")

### Cal. Civ. Code. §1750 *et seq.*

88.     Plaintiff incorporates by reference all allegations in this Complaint and restate them as if fully set forth herein.

89.     Plaintiff is a consumer within the meaning of Cal. Civ. Code §1761(d) and have engaged in a transaction within the meaning of Cal. Civ. Code §§1761(e) and 1770.

90.     Defendants are each a "person" within the meaning of Cal. Civ. Code §§1761(c) and 1770 and sells "goods or services" within the meaning of Cal. Civ. Code §§1761(b) and 1770.

91.     Jackpot Magic Slots and Cash Torndao are each a "service" within the meaning of Cal. Civ. Code. §§1761(a) and (b). The purchase of in-game gold for these games is transaction of accessing those services.

92.     Defendants have violated §1770(a)(13)'s proscription against

making false or misleading statements of fact concerning reasons for, existence of, or amounts of, price reductions by misrepresenting the existence of gold discounts via false strikethrough ads.

93.     Plaintiff and the putative Class suffered actual damages as a direct and proximate result of Defendants' actions, concealment, and/or omissions in the advertising, marketing, and promotion of its bait apps, in violation of the CLRA, as evidenced by the substantial sums Defendants pocketed.

94.     On June 9, 2022, Plaintiff's counsel wrote to Defendant ZGG enclosing a copy of her original complaint and seeking resolution of her claims. ZGG never responded.

95.     Plaintiff, on behalf of herself and the Class and Subclass, demands judgment against Defendants for damages, injunctive relief and attorney's fees.

## FOURTH CLAIM FOR RELIEF

### Fraud

96.     Plaintiff incorporates by reference all allegations in this Complaint and restate them as if fully set forth herein.

97.     Defendants represented to Plaintiff and Class members that various in-game purchases were on sale in that they gave a higher amount of gold or gems. Defendants also represented to Plaintiff and Class members that certain in-game purchases were subject to a limited time sale.

98.     These representations were false because the bundles were not offered at the purported "normal" amount of gold and the sales were not actually limited in duration.

99.     Defendants designed the graphical images on the

advertisements in a way that intentionally attracted Plaintiff and Class members to the enticing but false claims regarding gold amounts and the duration of sales.

100.   Plaintiff and the putative Class reasonably relied upon the claims made in the advertisements in deciding purchase the aforementioned bundles.

101.   Upon purchasing the bundles, Plaintiff and the putative Class members were harmed because, had Plaintiff and Class members known the claims were false, they would not have made some or all of those purchases.

102.   Plaintiff's and Class members' reliance on Defendants' misrepresentations in its bundle advertisements was a substantial factor in causing harm to Plaintiff and the putative Class.

103.   Defendants' conduct has therefore caused and is causing immediate and irreparable injury to Plaintiff and Class members and will continue to both damage Plaintiff and the Class members and deceive the public unless enjoined by this Court.

## FIFTH CLAIM FOR RELIEF

### Negligent Misrepresentation

104.   Plaintiff incorporate by reference all allegations in this Complaint and restate them as if fully set forth herein.

105.   Defendants represented to Plaintiff and the putative Class that various purchased bundles were on sale in that they gave a higher amount of gold than normal and that special event or "sale" versions of the packs were available for only a limited time.

106.   These representations were false because the bundles were continuously offered at the sale deal.

107.  Defendants designed the graphical images on the advertisements in a way that intentionally attracted Plaintiff and the putative Class to the enticing but false claims regarding gold amounts and the existence of sales.

108.  Defendants' conduct has therefore caused and is causing immediate and irreparable injury to Plaintiff and the putative Class, and will continue to both damage Plaintiff and the putative Class and deceive the public unless enjoined by this Court.

## PRAYER FOR RELIEF

Plaintiff prays for relief and judgment against Defendant as follows:

A. Certifying the proposed Class and Subclass defined herein;

B. Appointing Plaintiff as Class Representative;

C. Appointing counsel for Plaintiff as Class Counsel;

D. Declaring Defendants' conduct to be unlawful;

E. Awarding Plaintiff and Class members compensatory damages and actual damages in an amount to be determined by proof;

F. Awarding Plaintiff and Class members actual and statutory damages;

G. Disgorging Defendant of its unjust profits;

H. For punitive damages;

I. For civil penalties;

J. For declaratory and equitable relief, including restitution and disgorgement;

K. For an order enjoining Defendant from continuing to engage in the wrongful acts and practices alleged herein;

L. Awarding Plaintiff the costs of prosecuting this action, including expert witness fees;

M. Awarding Plaintiff reasonable attorney's fees and costs as allowable

by law;

N. Awarding pre-judgment and post-judgment interest; and

O. Granting any other relief as this Court may deem just and proper.

DATED: October 14, 2022    THE RYAN LAW GROUP

_____
       Andrew T. Ryan
       Attorney for Plaintiff

SECOND AMENDED COMPLAINT

## **<u>JURY DEMAND</u>**

Plaintiff hereby demands a jury trial on all issues and claims so triable.


DATED: October 14, 2022          THE RYAN LAW GROUP

_____
                                 Andrew T. Ryan
                                 Attorney for Plaintiff

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**Ochoa v. Zeroo Gravity Games, LLC**

Case No. 2:22-cv-05896

**CERTIFICATE OF SERVICE**

I, Andrew T. Ryan, certify that I am an attorney licensed to practice

before all Courts in the State of California and United States District Court

for the Central District of California. On this date, I served the foregoing

documents (s):

**PLAINTIFF'S SECOND AMENDED COMPLAINT**

A true and correct copy of the above entitled document(s) was sent via
electronic mail to the email addresses listed below:

Michael A. Berta
Email: michael.berta@arnoldporter.com
Joseph Farris
Email: joseph.farris@arnoldporter.com
Estayvaine Bragg
Email: estayvaine.bragg@arnoldporter.com
Arnold & Porter Kaye Scholer LLP
Three Embarcadero Center, 10th Floor
San Francisco, CA 94111-4024
Telephone: (415) 471-3100
Facsimile: (415) 471-3400

Attorneys for Defendant
ZEROO GRAVITY GAMES LLC

I declare the foregoing to be true and correct under penalty of perjury

under the laws of the United States and the State of California.

Dated: October 13, 2022

_____

Andrew T. Ryan