1  Andrew T. Ryan, Esq. (SBN 227700)
   THE RYAN LAW GROUP
2  317 Rosecrans Ave.
   Manhattan Beach, CA 90266
3  Tel: (310) 321-4800
   Fax: (310) 496-1435
4  Andrew.ryan@theryanlawgroup.com
5
   Attorneys for Plaintiffs
6

7

8            UNITED STATES DISTRICT COURT

9        FOR THE CENTRAL DISTRICT OF CALIFORNIA

10                 WESTERN DIVISION

11

12
   SARA OCHOA and KIMBERLY          Case No.  2:22-cv-05896-GHW-AS
13 BROWN, on behalf of themselves
   and those similarly situated,    **FOURTH AMENDED CLASS
14                                   ACTION COMPLAINT FOR
           Plaintiffs,              DAMAGES AND INJUNCTIVE
15                                   RELIEF**
16     v.
                                     1. **Violation of California's Unfair
17 ZEROO GRAVITY GAMES LLC,             Competition Law ("UCL")**
   a Delaware limited liability       2. **Violation of California False
18 company,                              Advertising Law ("FAL")**
19         Defendant.                 3. **Violation of the California
                                         Consumer Legal Remedies
20                                       Act ("CLRA")**
21                                    4. **Fraud**
                                      5. **Negligent Misrepresentation**
22                                    6. **Violation of Arkansas
                                         Deceptive Trade Practices Act**
23                                    7. **Unjust Enrichment**
24

25

26

27

28

On May 5, 2022, plaintiff Sara Ochoa ("Ms. Ochoa") filed an action in the Superior Court of the State of California, County of Los Angeles, assigned case No. 22-STCV-14939.  On July 18, 2022, Ms. Ochoa filed a First Amended Complaint ("FAC") in the Superior Court of the State of California, County of Los Angeles. On August 19, 2022, defendant Zeroo Gravity Games, LLC ("ZGG") removed this civil action from the Superior Court of the State of California, County of Los Angeles, to the United States District Court for the Central District of California, Western Division, alleging that this Court has jurisdiction under the Class Action Fairness Act ("CAFA"), 28 U.S.C. §1332(d). On October 13, 2022, Ms. Ochoa filed a Second Amended Complaint ("SAC") against ZGG and AppLovin Corp. ("AC").

On February 3, 2023, the Court granted, without prejudice, motions filed by ZGG and AC to dismiss the SAC. The Court granted Ms. Ochoa leave to amend, including leave to add a plaintiff. Ms. Ochoa, a citizen of Los Angeles County, and Kimberly Brown ("Ms. Brown"), a citizen of the State of Arkansas (collectively, "Plaintiffs") filed a Third Amended Complaint ("TAC") on behalf of themselves and those similarly situated against ZGG and AC on February 27, 2023. On May 25, 2023, the Court denied-in-part and granted-in-part a motion to dismiss by ZGG and AC and granted plaintiffs leave to amend. Plaintiffs bring this Fourth Amended Complaint on behalf of themselves and those similarly situated and allege as follows:

## **INTRODUCTION**

1.    ZGG develops, distributes and operates the mobile games Jackpot Master Slots-Casino ("Jackpot Master") and Cash Tornado Slots-Casino ("Cash Tornado") (collectively, "Games") that compete in the so-

called "social casino" market.

2.    The Games provide users with virtual slot machines that are played with virtual gold coins. Users bet the coins and win or lose those coins based on the randomized outcomes of the Games' slot machines and other games of chance.

3.    When a user's coin quantity drops below the minimum requirements to play the Games' slot machines, he or she is unable to continue playing. At that time, the Games present users with pop-up ads encouraging them to purchase more virtual coins in exchange for real world money to continue their gameplay. These pop-ups often purport to offer significant sales and discounts for the purchase of virtual coins with misleading price and coin quantity comparisons.

4.    The Ninth Circuit has held that earlier versions of Big Fish Casino, a mobile game that also offers virtual slot machines, "constitutes illegal gambling under Washington law." *Kater v. Churchill Downs Inc.*, 886 F.3d 784, 785 (9th Cir. 2018). The Games here likewise constitute illegal gambling under Washington law. The Games also violate California, and Arkansas gambling laws.

5.    This lawsuit is brought on behalf of Plaintiffs and those similarly situated who have had their money taken from the Games' illegal slot machines and who have been deceived into making in-game purchases of deceptively marketed coins in those Games.

6.    ZGG develops and publishes the Games, which are playable on various platforms, including iPhone and Android devices.

7.    On information and belief, the Games are distributed by ZGG pursuant to developer agreements with Apple Inc. ("Apple") and Google, LLC ("Google").

8.      On information and belief, Apple and Google are entities headquartered in California.

9.      The Games can be downloaded for free from the Apple App Store and Google Play store. The Games' simulated slot machines are akin to those found in real world casinos. The Games give new players an initial balance of virtual items, including coins allowing access to gameplay.

10.     After consumers lose their initial allotment of coins, the Games aggressively attempt to sell those consumers additional coins through multiple pop-up windows advertising misleading sales and discounts on the virtual coins. Without additional coins, consumers cannot play the Games' slot machines.

11.     Freshly topped off with additional coins, consumers wager to win more coins in the Games' slot machines. The coins won by consumers playing the Games' slot machines are identical to the coins that are sold.

12.     The Games' coins are used to place bets in the Games' slot machine to extend players' ability to play those slot machines.

13.     On information and belief, despite purporting to be free-to-play, Defendants reap massive profits by selling bundles of virtual coins in the Games. Just as with casino operators, mobile game developers rely on a small portion of their players to provide the majority of their profits.

14.     In addition to the addictive nature of the slot machine games themselves, in order to induce users to make in-game purchases, in its direct marketing to consumers (including representations made at the time of purchase), the Games advertise sale deals for virtual coins that are false and misleading. Many of these advertisements provide comparisons to fictitious coin quantities and prices for coin bundles and misleadingly communicated the limited duration of the advertised sales.

**The Games Are Illegal Gambling Under Various State Laws**

15. The Games violate the gambling laws of multiple states, including Washington, California and Arkansas.

16. Defendant has violated California's gambling laws, including the law prohibiting slot machines, lotteries and operating controlled games without a license. In so doing, Defendants have illegally profited from thousands of consumers.

17. California Penal Code §330b prohibits slot machines. Subsection (a) states that "[i]is unlawful for any person to manufacture, repair, own, store, possess, sell, rent, lease, let on shares, lend or give away, transport, or expose for sale or lease…any slot machine or device, as defined in this section." Cal. PEN §330b(a).

18. ZGG manufactures, repairs, owns, rents, leases or gives away the Games and their slot machines.

19. California Penal Code §330b(a) further provides that "[i]t is unlawful for any person to make or to permit the making of an agreement with another person regarding any slot machine or device, by which the user of the slot machine or device, as a result of the element of hazard or chance or other unpredictable outcome, may become entitled to receive money, credit, allowance, or other thing of value or additional chance or right to use the slot machine or device, or to receive any check, slug, token, or memorandum entitling the holder to receive money, credit, allowance, or other thing of value."

20. On information and belief, ZGG made or permitted the making of agreements with others regarding the Games, including with AC, AppLovin Cyprus Limited, Apple, Google and players of the Games.

21.    Users of the Games, as a result of the element of chance, may become entitled to receive virtual coins, which are a credit, token, allowance, other thing of value or an additional chance or right to use the Games' slot machines. Specifically, players of the Games' slot machines receive virtual coins that provide players with the additional chance or right to continue playing slot machines in the Games. The virtual coins are also credits, tokens and allowances. The virtual coins are also things of value. The slot machines in the Games are games of chance.

22.    California Penal Code 330b(d) provides: "For purposes of this section, 'slot machine or device' means a machine, apparatus, or device that is adapted, or may readily be converted, for use in a way that, as a result of the insertion of any piece of money or coin or other object, or by any other means, the machine or device is caused to operate or may be operated, and by reason of any element of hazard or chance or of other outcome of operation unpredictable by him or her, the user may receive or become entitled to receive any piece of money, credit, allowance, or thing of value, or additional chance or right to use the slot machine or device..."

23.    The Games fall within the definition of slot machine or device under section 330b(d). The Games operating together with ZGG servers are a machine, apparatus or device. Further, user's mobile devices are adapted by the Games to create a slot machine or device. Users play the Games and purchase virtual coins from the games through hardware features of the mobile devices on which the Games operate.

24.    Users exchange real money for virtual coins in the Games. Users do so by entering payment information, passcodes and passwords through their mobile device hardware components. User's payments for

and receipt of virtual coins are processed, in part, by computers and
servers owned and operated by ZGG.

25.     The Games' slot machines are games of chance in which the
user may receive or lose additional virtual coins. Virtual coins are a credit,
allowance, thing of value or an additional chance to use the slot machines
in the Games.

26.     The Ninth Circuit has found that virtual coins similar to those in
the Games constitute a thing of value under Washington's gambling law:
"The virtual chips, as alleged in the complaint, permit a user to play the
casino games inside the virtual Big Fish Casino. They are a credit that
allows a user to place another wager or re-spin a slot machine. Without
virtual chips, a user is unable to play Big Fish Casino's various games.
Thus, if a user runs out of virtual chips and wants to continue playing Big
Fish Casino, she must buy more chips to have the privilege of playing the
game. Likewise, if a user wins chips, the user wins the privilege of playing
Big Fish Casino without charge. In sum, these virtual chips extend the
privilege of playing Big Fish Casino." *Kater v. Churchill Downs Inc.*, 886
F.3d 784, 787 (9th Cir. 2018). The same is true for the Games here.

27.     The Games also violate other provisions of California and
Arkansas gambling laws, as detailed below.

**The Games Engage in False and Misleading Advertising**

28.     The Games present numerous false and misleading advertising
that are most acutely directed to new users of the Games to induce those
players into spending money within the Games early in their interaction with
the Games. On information and belief, by inducing new players into
spending money in the Games as early as possible in their interaction with
the Games, ZGG maximizes the amount of money those players spend

within the Games.

29.    Some of these sale advertisements in the Games were misleading by offering for sale a particular coin quantity for a listed price with a comparison to a lower stricken coin quantity or a higher stricken price for the offered coin quantity. Consumers reasonably understood the stricken coin quantity or stricken dollar amount in these advertisements to represent the ordinary or prevailing deal for coins formerly offered to users of the Games. Instead, the stricken values presented to new users were fictitious in that they did not represent the ordinary or prevailing deal offered to other users of the Games. In so doing, the Games misled consumers into believing that the offered sales were providing an outsized value as compared to the ordinary or prevailing deal offered by the Games. This false belief was a material consideration for consumers to make in-game purchases and consumers reasonably relied on that belief in their purchase decision.

30.    Other sale advertisements in the Games were false and misleading because they purported to be offers available for only a limited duration of time. These offers included a countdown timer that reasonable consumers understood to mean the deal would only be available for the specified amount of time (*e.g.*, 4 hours). In truth, the sale would be offered repeatedly whenever a user logged into the game, exited the Games' store, or needed more coins. Users, and in particular new users unfamiliar with the Games' scheme, were thereby misled into a false sense of urgency regarding the availability of these sale offers, not knowing that they would have countless such sales offers (or better ones) in the future. This false sense of urgency was a material factor in players' decisions to make in-game purchases, particularly their early purchases.

31.     For certain advertisements, the Games used both false value comparisons and false indications of the sale's limited duration.

32.     Once these players had spent money in the Games, they were more likely to continue playing and spending in the Games, as they had already sunk costs into the Games and felt invested. In this way, the Games' false advertising scheme was designed to trick new users and trap them in the Games' addictive casino gameplay.

33.     The Federal Trade Commission ("FTC") describes various forms of false price comparison schemes as deceptive: "One of the most commonly used forms of bargain advertising is to offer a reduction from the advertiser's own former price for an article. If the former price is the actual, bona fide price at which the article was offered to the public on a regular basis for a reasonably substantial period of time, it provides a legitimate basis for the advertising of a price comparison. Where the former price is genuine, the bargain being advertised is a true one. If, on the other hand, the former price being advertised is not bona fide but fictitious - for example, where an artificial, inflated price was established for the purpose of enabling the subsequent offer of a large reduction - the 'bargain' being advertised is a false one; the purchaser is not receiving the unusual value he expects." 16 CFR §233.1(a). "The advertiser should be especially careful, however, in such a case, that the price is one at which the product was openly and actively offered for sale, for a reasonably substantial period of time, in the recent, regular course of his business, honestly and in good faith - and, of course, not for the purpose of establishing a fictitious higher price on which a deceptive comparison might be based." 16 CFR §233.1(b). "Other illustrations of fictitious price comparisons could be given. An advertiser might use a price at which he never offered the article at all;

he might feature a price which was not used in the regular course of business, or which was not used in the recent past but at some remote period in the past, without making disclosure of that fact; he might use a price that was not openly offered to the public, or that was not maintained for a reasonable length of time, but was immediately reduced. 16 CFR §233.1(d)

34.    California statutory and regulatory law also expressly forbids false discounted pricing schemes: "No price shall be advertised as a former price of any advertised thing, unless the alleged former price was the prevailing market price as above defined within three months next immediately preceding the publication of the advertisement or unless the date when the alleged former price did prevail is clearly, exactly and conspicuously stated in the advertisement."  Cal. Bus. & Prof. Code §17501.

35.    Since about May 2021, ZGG had control and knowledge over the pricing and advertisement of coins in the Games across their users and therefore knew, or should reasonably have known, that its comparative quantity and price advertising and statements regarding sale duration were false, deceptive, misleading, and unlawful.

36.    ZGG fraudulently concealed from and intentionally failed to disclose to consumers the truth about its advertised discounts and purported limited time sales.

37.    Through this false and deceptive marketing, advertising, and pricing scheme, ZGG has violated California law prohibiting the advertisement of goods for sale as discounted from false former prices and prohibiting misleading statements about the existence and amount of price reductions.

## PARTIES

38.   Plaintiff Sara Ochoa is a citizen and resident of Los Angeles County, California. She downloaded Jackpot Master on her iPhone from the Apple App Store in Los Angeles County. She played Jackpot Master in this County as a guest. She accessed the game's virtual store and saw Jackpot Master's false advertising in this County. She was induced by this false advertising into making an in-game purchase in this County from Jackpot Master's in-game store. She made a purchase from Jackpot Master through her Apple iPhone and Apple payment account.

39.   Plaintiff Kimberly Brown is a citizen and resident of the State of Arkansas. She downloaded Cash Tornado on her iPhone from the Apple App Store. She played Cash Tornado and accessed the game's virtual store and made purchases from that store through her Apple iPhone and Apple payment account.

40.   On information and belief, Defendant Zeroo Gravity Games LLC is a limited liability company organized and existing under the laws of Delaware. On information and belief, ZGG's principal place of business is located at 1100 Page Mill Road, Palo Alto, California 94304.

41.   On information and belief, ZGG is a wholly owned subsidiary of AC. On information and belief, AppLovin Corporation is a Delaware corporation. On information and belief, AC's principal place of business is 1100 Page Mill Road, Palo Alto, California 94304.

## JURISDICTION AND VENUE

42.   This Court has jurisdiction over this action under the Class Action Fairness Act of 2005. Pursuant to 28 U.S.C. §§1332(d)(2), this Court has original jurisdiction because the aggregate claims of the putative class members exceed $5 million, exclusive of interest and costs, and at least

one of the members of the proposed classes is a citizen of a different state than Defendants.

43.    This Court has personal jurisdiction over Defendant, because it has its principal place of business in California, conducts substantial business and directs its activities from and into California and this District, including activities that form the basis for the claims here, and a substantial part of the acts and omissions complained of occurred in this District.

44.    Plaintiffs further allege, upon information and belief, that the claims asserted in this complaint arise out of or are related to Defendant's professional and commercial activities within California, and therefore Defendant is subject to the specific jurisdiction of the courts of this state. Specifically, ZGG publishes, advertises, distributes and profits from the Games and directs activities for these Games from California, through California entities and into California.

45.    On information and belief, ZGG generates the majority of the Games' revenue through the publishing, distribution and monetization of the Games through contractual relationships with California entities, including Apple and Google.

46.    Further, ZGG advertises the Games through Facebook and Instagram accounts, platforms owned and operated by Meta Platforms Inc., an entity headquartered in California.

47.    Venue is proper in this court because at all relevant times Ochoa resided in the County of Los Angeles, California and the claims asserted in this complaint arise out of acts, transactions, and conduct that occurred in whole or in part within the County of Los Angeles, California.

## **FACTS**

48.    The proliferation of internet-connected mobile devices has led

to the growth of what are known in the industry as "free-to-play"

videogames. The term is a misnomer. It refers to a model by which the

initial download of the game is free, but companies reap huge profits by

selling thousands of "in-app" items that start at $0.99 but can quickly

escalate to hundreds or even thousands of dollars.

49.    The in-app purchase model has become particularly attractive

to developers of games of chance (e.g., poker, blackjack, and slot machine

mobile videogames, amongst others), because it allows them to generate

huge profits. In 2022, the global social casino games market reached $6.83

billion and is projected to grow to $8.7 billion in 2026.[1]

50.    Academics have also studied the socioeconomic effect games

that rely on in-app purchases have on consumers. In one study, the

authors compiled several sources analyzing casino games and stated that:

"[Researchers] found that casino gamers share many similar

sociodemographic characteristics (e.g., employment, education, income)

with online gamblers. Given these similarities, it is perhaps not surprising

that a strong predictor of online gambling is engagement in casino games.

Putting a dark line under these findings, over half (58.3%) of disordered

gamblers who were seeking treatment stated that social casino games

were their first experiences with gambling…According to [another study],

---

[1] *Global Social Casino Games Market Report 2022-2026 Featuring
Caesars Entertainment, Aristocrat Leisure, Zynga, Playtika, Scientific
Games Corp and DoubleU Games*, Research and Markets (April 26, 2022),
available at: https://www.globenewswire.com/en/news-
release/2022/04/26/2428795/28124/en/Global-Social-Casino-Games-
Market-Report-2022-2026-Featuring-Caesars-Entertainment-Aristocrat-
Leisure-Zynga-Playtika-Scientific-Games-Corp-and-DoubleU-Games.html
(last accessed February 6, 2023).

the purchase of virtual credits or virtual items makes the activity of casino

gaming more similar to gambling. Thus, micro-transactions may be a

crucial predictor in the migration to online gambling, as these players have

now crossed a line by paying to engage in these activities. Although, only

1–5% of casino gamers make micro-transactions, those who purchase

virtual credits spend an average of $78. Despite the limited numbers of

social casino gamers purchasing virtual credits, revenues from micro-

transactions account for 60% of all casino gaming revenue. Thus, a

significant amount of revenue is based on players' desire to purchase

virtual credits above and beyond what is provided to the player in seed

credits." Hyoun S. Kim, Michael J. A. Wohl, et al., *Do Social Casino

Gamers Migrate to Online Gambling? An Assessment of Migration Rate

and Potential Predictors, Journal of gambling studies / co-sponsored by the

National Council on Problem Gambling and Institute for the Study of

Gambling and Commercial Gaming* (Nov. 14, 2014), available at

http://link.springer.com/content/pdf/10.1007%2Fs10899-014-9511-0.pdf

(citations omitted).

51.    Many of the players of these social casino games likely have

psychological addictions to playing. See August 1, 2018 letter from

Natasha Dow Schüll, Ph.D. to Washington State Gambling Commission

(available at https://www.wsgc.wa.gov/sites/default/files/public/news/big-

fish/Dr.%20Schull%20Comments.pdf).

52.    In response to the Ninth Circuit decision in *Kater*, several

"social casino" games adjusted their design to comply with gambling laws.

For example, Big Fish Casino allows players to continue spinning its slot

machines for free even when they have run out of virtual currency, without

requiring the viewing of ad or other prolonged interruptions. The class

settlement in *Kater* required Big Fish Casino to "change game mechanics for the Big Fish Casino and Jackpot Magic Slots Applications to ensure that players who run out of sufficient virtual chips to continue to play the game they are playing will be able to continue to play games within the Application they are playing without needing to purchase additional virtual chips or wait until they would have otherwise received free additional virtual chips in the ordinary course." The Games here have not made such efforts to comply with gambling laws.

53.    In support of its motion for sanctions, ZGG submitted the declaration of Zongsheng Li. Mr. Li represented to the Court that he was the "CEO of Zeroo Gravity Games LLC." This was a false. In its initial disclosures, ZGG has since confirmed that Mr. Li is not the CEO of ZGG and is not even an employee of ZGG. ZGG continues to maintain that Mr. Li has knowledge of the operation of the Games since their launch.

54.    Mr. Li stated in his declaration that "[t]he mechanics of these promotions [in the Games], including the presentation of strikethrough values and time-limited sales, are fixed by the underlying code for the apps and these mechanics do not vary from version to version of the games."

55.    Mr. Li further stated that "I have provided several screenshots of gameplay in this Declaration. In each case, the screenshot is from a current version of the game, but the depiction is also a true and accurate representation of how the game has always worked in all versions with respect to the functioning of the promotional mechanics being described… The specific graphical elements and the pricing baselines (or coin counts, for example) of the promotions described here may vary from user-to-user and over time depending on the version of the game and the other factors, including users' progression in the game—but in all cases these

screenshots and the description I provide truly and accurately reflect how these sales mechanics have always worked."

56.     Mr. Li further stated that "since launching, the relevant in-game promotions in Jackpot Master have always worked the same way."

57.     Mr. Li further stated that "Cash Tornado offers users a different gameplay experience Jackpot Master, the mechanics behind these promotional offers function in the exact same way… And since launching, the First Purchase Bonus Offer and Super Sale Offer have always functioned the same way in that game too."

**Brief Overview of Jackpot Master**

58.     Jackpot Master is a mobile application casino-style game developed and distributed by ZGG. The game is available on iPhone and Android devices through the Apple App Store and Google Play platforms, respectively.

59.     On information and belief, Jackpot Master was first released in the Google Play Store in July 2021 and in the Apple App Store in August 2021.

60.     On information and belief, since launching in July 2021 through November 2022, the relevant in-game promotions in Jackpot Master have always worked the same way.

61.     Jackpot Master provides users with a variety of slot machines on their mobile device. Below is an example of one such slot machine in Jackpot Master:

//

//

//

//



62.    In order to play the slot machines in Jackpot Master, users must bet virtual coins, as can be seen at the bottom left in the image above where it says "TOTAL BET." The slot machines in Jackpot Master require a minimum bet, such that if a user's coin balance is below that minimum, the user cannot play the slot machine. For example, in the slot machine depicted above, the minimum bet allowed is 120,000 coins. Other slot machine games in Jackpot Master may have other minimum bet requirements.

63.    The slot machines in Jackpot Master have all the same trappings as real-world slot machines, including flashing graphics and sound effects. The slot machines in Jackpot Master are games of chance. The outcome of any given spin is random and not dependent on the user's inputs or skills. Users can set the slot machines to "auto-spin" for up to 500 consecutive spins to reduce or eliminate the need to interact with the game.

64.    Users are encouraged by Jackpot Master to make as large a bet as possible through various user interfaces. For example, a "reward" a player obtains as he or she spends more time playing is an increase in the "MAX BET" he or she can make in the slot machines. Other interfaces

communicate that the user will get more and better rewards if he or she increases their bet.

65.    Users are allotted an amount of coins when they first download and play the game. They may be awarded more coins through playing the slot machine games or other games of chance in Jackpot Master. When a user runs out of coins or attempts to spin a slot machine for a bet amount exceeding their balance of virtual coins, they are presented with one or more pop-up advertisements offering the sale of additional virtual coins in exchange for real world currency. While users may obtain additional coins by viewing advertisements (often for other mobile casino games) or waiting for a periodic reward of coins, in order to continue playing the slot machines without interruption for an extended period after they have lost their coins, users must purchase more coins.

66.    The virtual coins purchased by a user for real world money is used to extend their ability to play the slot machines in Jackpot Master. These purchased virtual coins are identical to those bet in the slot machines and subject to the chance of winning or losing of those slot machines. Further, purchasing coins in lieu of viewing ads renders the coins a thing of value, as it allows users an uninterrupted period of playing. The value of avoiding ads may be measured by the money Defendants receive from ad views. Further, certain sale offers in Jackpot Master advertise the removal of ads, further indicating the value of purchased coins.

67.    Jackpot Master also includes other games of chance, such as "coin pusher games."

//



68.    Jackpot Master also includes functions and encourages users
to gamble among each other through social media connections and the
formation of gambling "teams" as show in the screen shot below:



69.    Jackpot Master also includes mandatory features that place
users in competition among each other based largely on the amount they
gamble, such as "league" gambling competitions. All users are placed in
these gambling competitions without an option to out-out. Below is screen

FOURTH AMENDED COMPLAINT

shot of a league board in Jackpot Master:



70.    Jackpot Master also includes a "lotto" game:





71.    Certain slot machines in Jackpot Master also include progressive jackpots, indicating that the amount of virtual coins potentially won by the user is a function of the wagers made by them and other players. This can be seen in the screenshot below, where the "Grand,"

"Major," "Minor" and "Mini" jackpot values increment upwards as users wager their coins in the slot machine.



**Ms. Ochoa's Use of Jackpot Master**

72.    Ms. Ochoa found Jackpot Master in the Apple App Store. In the absence of any disclaimers or warnings to the contrary, she reasonably believed Jackpot Master complied with the law. Had Ms. Ochoa known that Jackpot Master was engaged in illegal gambling, she would not have downloaded and began playing it.

73.    On or about March 2022 she was presented with an advertisement in Jackpot Master for a "Super Sale" that had a presentation the same or substantially similar to the image below:



74.    The Super Sale ad included a 4-hour countdown timer. Ms. Ochoa reasonably understood this advertisement to communicate that the

offered sale would be available for only 4 hours and that if she did not take advantage of that offer within those 4 hours, the same sale would not be available again soon.

75.    The Super Sale ad included the phrase the same or substantially similar to: "WAS $49.99 NOW FOR $1.99." Ms. Ochoa reasonably understood this to communicate that the ordinary, normal and prevailing price formerly offered by Defendant to users of Jackpot Master for 60 million coins was $49.99.

76.    At the same time, Jackpot Master's in-game store was displaying to Ms. Ochoa a sale offer labeled "Double Bonus for 1st Purchase!" having a presentation the same or substantially similar to the image below:



77.    The "Double Bonus for 1st Purchase" advertisement above depicts a sale offer at $49.99 for 120 million coins with 60 million coins stricken below. Ms. Ochoa reasonably understood from the Double Bonus for 1st Purchase ad together with the Super Sale ad, that the ordinary, normal and prevailing price formerly offered by Jackpot Master for 60 million coins was $49.99.

78.    To the best of her recollection, Ms. Ochoa purchased a coin pack from Jackpot Master for $1.99 on or around March 26, 2022 through a

Super Sale ad the same or substantially similar to that depicted above in paragraph 58. A copy of Ms. Ochoa's receipt for this purchase is attached as Exhibit A.

79.    Ms. Ochoa's reasonable understanding that the Super Sale would expire within 4 hours and not be offered again soon, and her reasonable understanding that coin quantity she was receiving for $1.99 represented a value far better than the $49.99 price Jackpot Master normally offered its users were material factors in her decision to make her in-game purchase.

80.    Had Ms. Ochoa known that the ordinary price for that same (or larger) coin pack in Jackpot Master was routinely offered at a price much less than $49.99 and that other players of Jackpot Master were being offered far better deals, she would not have made her purchase.

81.    Had Ms. Ochoa known that there was no true urgency for taking advantage of the advertised "Super Sale," she would not have made her purchase.

82.    Ms. Ochoa continued to play Jackpot Master and its games of chance until she lost all her coins, at which time she was again prompted to purchase more coins purportedly on sale.

83.    Months after making her March 2022 purchase, Ms. Ochoa was again presented with a "Double Bonus for 1st Purchase!" advertisement in Jackpot Master as depicted below:

//

//

//

//

//

**Jackpot Master's Advertisements Are False and Misleading**

84.     On information and belief based on counsel's investigation, contrary to Ms. Ochoa's reasonable understanding of Jackpot Master's advertisements, Super Sales of the same or better value in Jackpot Master are made available repeatedly and frequently beyond the indicated 4-hour countdown timer.

85.     On information and belief based on counsel's investigation, contrary to Ms. Ochoa's reasonable understanding of Jackpot Master's advertisements, Super Sales of the same or better value in Jackpot Master are unavailable for only trivial periods of time.

86.     On information and belief based on counsel's investigation, the Super Sales in Jackpot Master are presented over and over with new reset timers for weeks or longer, including whenever a user logs into the game, exits the game's store or needs more coins to place a bet and extend game play. The series of screen shots below were taken from Jackpot Master from the same device between September 19, 2022 at 11:19 AM PST and October 30, 2022 with the date and time stamp (in Pacific time) for each screen shot shown at the top. These screen shots show the same Super Sale offer in Jackpot Master being presented repeatedly over the course of weeks and well beyond the 4-hour time limit indicated:





FOURTH AMENDED COMPLAINT

87.     On information and belief based on counsel's investigation, the operation of the Super Sale offers depicted in the screenshots above was the same or substantially similar at the time of Ms. Ochoa's purchase. This is confirmed by Mr. Li's declaration.

88.     On information and belief and based on counsel's investigation, contrary to Ms. Ochoa's reasonable understanding of Jackpot Master's advertisements, the ordinary, prevailing or standard price for the coin quantity offered to Ms. Ochoa (*e.g.*, 60 million coins) normally offered by Jackpot Master to its users was not truly $49.99. In reality, Jackpot Master regularly offered coin packs to Jackpot Master users at significantly better values than presented in the first Super Sale shown to Ms. Ochoa.

89.     For example, the screenshot below shows a First Purchase Bonus offer made to a different user of Jackpot Master on November 12, 2022 at 9:33p PST:

//

//

//

//

1
2
3
4
5
6
7



8   90.   In the image above, the user is being offered 240 million coins
9   for $49.99, with 120 million coins stricken below as the purported "ordinary"
10  deal. Comparing that to the Super Sale offer shown in paragraph 58, which
11  communicated that $49.99 was the prevailing price for 60 million coins
12  demonstrates that the reference prices and coin quantities shown in
13  paragraphs 58 and 61 were fictitious.
14  91.   The screenshot below shows offers being made on November
15  12, 2022 at 9:33p PST (the same time as the image in paragraph 72) to
16  another user who had been playing for several months without making a
17  purchase:
18
19



20
21
22
23
24
25  92.   As can be seen, the coin values being offered to the latter user
26  are significantly higher than those represented to the user in paragraph 72
27  as the "ordinary" value. The user in paragraph 74 is being offered 5.4 billion
28

coins for $49.99 (with 1.8 billion stricken as the purported "ordinary" value)
compared to the user in paragraph 72 being offered 240 million coins for
$49.99 (with 120 million coins stricken as the purported "ordinary" value).

93.     As another example, below is a screen shot of a Super Sale
offer to yet another user:



94.     This user is also being offered 1.8 billion coins for $1.99 and
being told the ordinary price for that coin quantity is $49.99, demonstrating
that the presentation shown in paragraph 58 communicating that $49.99
ordinarily buys you only 60 million coins is false and misleading.

95.     On information and belief, the initial presentation of the stricken
values in the "Super Sale" and "Double Bonus for 1st Purchase!"
advertisements presented to the new user of Jackpot Master are false,
because other users of Jackpot Master were being presented with
prevailing offers that were significantly better values at the same time and
in the 90 days preceding the presentation to the new user.

96.     On information and belief, the stricken values in the "Super
Sale" and "Double Bonus for 1st Purchase!" advertisements presented to
the new user of Jackpot Master are false, because they do not truthfully
represent the "ordinary" or "normal" deal formerly offered by Jackpot
Master for coin packs, but rather they are fictitious values presented by
Jackpot Master to induce users into making purchases as early as possible
upon first playing Jackpot Master and at lower values.

97.    Accordingly, Jackpot Master's advertisements of these coin bundles that were purportedly on sale were false, deceptive and intended to mislead players into making in-app purchases that they otherwise would not have made. ZGG falsely promoted these bundles as being on sale or discounted by misrepresenting that such bundles normally offer substantially less value than the advertised deal.

98.    The advertising, pricing and quantity of coins in Jackpot Master is within ZGG's knowledge and control.

99.    ZGG had actual knowledge that the false strikethrough ads and false limited time sales contained false or misleading misrepresentations as to their prior values and as to their duration. ZGG designed and promoted these advertisements while having actual knowledge that these quantitative representations of sale values were false.

100.   ZGG promoted these advertisements to create a false sense of urgency in its players to induce those players into purchasing the gold bundles. ZGG did so while knowing that the bundles contained quantitative misrepresentations with respect to the comparative value of the gold displayed and with respect to the duration of the availability of those deals.

101.   The amount of gold included in a bundle, and whether the bundle being offered for sale represents a good value and outsized amount of gold a player is receiving for his or her purchase with the corresponding bundle, is a material consideration when a player decides whether to purchase a bundle.

102.   Similarly, the urgency and duration of a purported sale for in-game items is material to a consumer's purchase decision.

103.   These pricing and advertising practices reflecting high-pressure fake sales are patently deceptive. They are intended to mislead customers

into believing that they are getting a bargain by buying virtual coins on sale and at a substantial and deep discount.

**Brief Overview of Cash Tornado**

104.   Cash Tornado is a mobile application casino-style game developed and distributed by ZGG. The game is available on iPhone and Android devices through the Apple App Store and Google Play platforms, respectively.

105.   On information and belief, Cash Tornado was first released in the Google Play Store in May 2019, and in the Apple App Store in March 2020. On information and belief, since launching through November 2022, the promotional offers in Cash Tornado have functioned the same way.

106.   Cash Tornado provides users with a variety of slot machines on their mobile device. Below is an example of one such slot machine in Cash Tornado:



107.   In order to play the slot machines in Cash Tornado, users must bet virtual coins. The slot machines in Cash Tornado require a minimum bet, such that if a user's coin balance is below that minimum, the user cannot play the slot machine. For example, in the slot machine depicted above, the minimum bet allowed is 90,000 coins. Other slot machine games in Jackpot Master may have other minimum bet requirements.

108.   The slot machines in Cash Tornado have all the same trappings as real-world slot machines, including flashing graphics and

sound effects. The slot machines in Cash Tornado are games of chance. The outcome of any given spin is randomized and not dependent on the user's inputs or skills. Users can set the slot machines to "auto-spin" for up to 500 consecutive spins to reduce or eliminate the need to interact with the game.

109.  Users are encouraged by Cash Tornado to make as large a bet as possible through various user interfaces. For example, a "reward" a player obtains as he or she spends more time playing is an increase in the "MAX BET" he or she can make on a given spin. Other interfaces communicate that the user will get more and better rewards if he or she increases their bet.

110.  Users are allotted an amount of coins when they first download and play the game. They may be awarded more coins through playing the slot machine games or other games of chance in Cash Tornado and through periodic promotions. When a user runs out of coins or attempts to spin a slot machine for a bet amount exceeding their balance of virtual coins, they are presented with a pop-up advertisement offering the sale of additional virtual coins in exchange for real world currency.

111.  On information and belief, unlike Jackpot Master, users of Cash Tornado are not given the option to view advertisements to obtain virtual coins when they run out of coins. At times, the only option available to players of Cash Tornado to extend their play of the slot machines is by purchasing more virtual coins using real world money. Users can be barred from playing Cash Tornado's slot machines for hours or longer if they do not purchase more virtual coins.

112.  The virtual coins purchased by a user for real world money are used to extend their ability to play the slot machines in Cash Tornado.

These purchased virtual coins are identical to those bet in the slot machines and subject to the chance of winning or losing of those slot machines.

113.  Cash Tornado has functions and encourages users to gamble among each other through social media connections and creation of gambling "teams" as shown in the screen shot below:



114.  Cash Tornado also includes other games of chance, including a "lottery" as depicted in the below screenshots:





FOURTH AMENDED COMPLAINT



115.   The "Grand Prize" in the Cash Tornado lottery game increments upwards rapidly, indicating that its value is a function of users' participation in the lottery. The Grand Prize in the Cash Tornado lottery game is awarded to a user among Cash Tornado's users. Cash Tornado users are entered into the lottery automatically.

116.   In response to the question "What's the expected value of the Grand Prize[?]," the Cash Tornado lottery information tab states that the "[c]oin values of all prizes are converted at the exchange rate against US dollars in the Coin Store.":

//
//
//
//

FOURTH AMENDED COMPLAINT



117.  Certain slot machines in Cash Tornado also include progressive jackpots, indicating that the amount of virtual coins potentially won by the user is a function of the wagers made by them and other players. This can be seen in the screenshots below, where the jackpot values increment upwards as users wager their coins in the slot machine and the game states "HIGHER BET HIGHER CHANGE TO WIN":

118.  Cash Tornado also includes other games of chance, including scratch off games:

//

//

1

2

3

4

5

6

7

8



9

10

**Ms. Brown's Use of Cash Tornado**

11

    119.  Ms. Brown found Cash Tornado in the Apple App Store. In the

12

absence of any disclaimers or warnings to the contrary, she reasonably

13

believed Cash Tornado complied with the law. Had Ms. Brown known that

14

Cash Tornado was engaged in illegal gambling, she would not have

15

downloaded and began playing it.

16

    120.  Upon beginning to play Cash Tornado, Ms. Brown was

17

presented with an advertisement for a "Super Sale" offer for virtual coins in

18

Cash Tornado. On information and belief, Ms. Brown was presented with a

19

Super Sale in Cash Tornado substantially similar to the one below in or

20

about June 2021:

21



22

23

24

25

26

27

    121.  Similar to Jackpot Master, Super Sale promotions in Cash

28

Tornado include a 4-hour countdown timer. Ms. Brown reasonably

understood the Super Sale offer to communicate that the offered sale would be available for only 4 hours and that if she did not take advantage of that offer within those 4 hours, the same sale would not be available again soon.

122.  The Super Sale also included the phrase the same or similar to "GET IT NOW FOR $99.99" in advertising the sale for coins alongside the lower offered price. Ms. Brown reasonably understood this to communicate that the ordinary, normal and prevailing price formerly offered by Cash Tornado for the listed coin amount was $99.99 and that the Super Sale was presenting a unique and outsized value of limited duration, thereby requiring urgent action on her part to take advantage of the deal.

123.  Ms. Brown made a purchase from Cash Tornado via a Super Sale pop-up for $1.99 on or around June 5, 2021.

124.  Ms. Brown's reasonable understanding that the Super Sale she was presented would expire within 4 hours and not be offered again soon, and her reasonable understanding that she was receiving a sale price far better than the $99.99 price Cash Tornado normally offered its users for the same quantity of coins were material factors in her decision to make her in-game purchase.

125.  Had Ms. Brown known that the Super Sale she was offered in Cash Tornado would be presented frequently and repeatedly and that the stricken price presented was fictitiously high as compared the prevailing offer Cash Tornado was making to other users, she would not have made her initial purchase in Cash Tornado.

126.  Ms. Brown continued to play Cash Tornado and its various games of chance until she lost all her virtual coins and made additional purchases of virtual coins from Cash Tornado to be able to continue

playing. A copy of receipts of Ms. Brown's purchases from Cash Tornado
from June 2021 are attached hereto as Exhibit B.

**Cash Tornado's Sale Advertisements Are False and Misleading**

127.   On information and belief and based on counsel's investigation,
contrary to Ms. Brown's reasonable understanding of Cash Tornado's
advertisements, Super Sales of the same or better value in Cash Tornado
are made available repeatedly and frequently beyond the indicated 4-hour
countdown timer, including whenever a user logs in, exits the game's store
or runs out of coins.

128.   On information and belief and based on counsel's investigation,
the Super Sale offers in Cash Tornado are presented over and over with
new timers for weeks or longer. The series of screen shots below were
taken from Cash Tornado with the date and time stamp (in Pacific time) for
each screen shot shown at the top. These screen shots show the same
Super Sale offer in Cash Tornado being presented repeatedly over the
course of weeks and well beyond the 4-hour time limit indicated, similar to
Jackpot Master:



129.   On information and belief and based on counsel's investigation,

contrary to Ms. Brown's reasonable understanding of Cash Tornado's advertisements at the time of her first purchase, Super Sales of the same or better value in Cash Tornado would be made available repeatedly and frequently beyond the indicated 4-hour countdown timer.

130.   On information and belief and based on counsel's investigation, Super Sale offers in Cash Tornado are presented over and over with new timers for weeks or longer. In this way, the 4-hour timer presented with the Super Sale offers misleadingly induced Ms. Brown and other consumers to believe that the availability of such Super Sales in Cash Tornado were of more limited duration than in reality.

131.   On information and belief and based on counsel's investigation, $99.99 was not the ordinary, prevailing or standard offer for the coin pack offered to Ms. Brown in the initial Super Sale she was presented. On information and belief, the stricken dollar amounts in the Super Sale presentations in Cash Tornado are fictitiously inflated when presented to new users.

132.   As shown in the screen shot from Cash Tornado below, other users receive offers for coins in Cash Tornado far exceeding the purported ordinary, normal or prevailing offer for coins communicated to the ads in paragraphs 97 and 105:

//

//

//

//

//

//

//



133.  This user is being offered a Super Sale for 1.8 billion coins for 99 cents with a purported normal price of $99.99 - greater than ten times more coins that the ads in paragraphs 97 and 105 are saying is the normal, prevailing and ordinary former price for $99.99 in Cash Tornado.

134.  Accordingly, Cash Tornado's advertisements of these coin bundles that were purportedly on sale were false, deceptive and intended to mislead players into making in-app purchases that they otherwise would not have made. ZGG falsely promoted these bundles as being on sale or discounted by misrepresenting that such bundles normally offer substantially less value than the advertised deal.

135.  On information and belief and based on counsel's investigation, the operation of the Super Sale offers was the same or substantially similar at the time of Ms. Brown's purchase. This is confirmed by Mr. Li's declaration.

136.  The advertising, pricing and quantity of coins in Cash Tornado is within ZGG's knowledge and control. ZGG had actual knowledge that the false strikethrough ads and false limited time sales contained false or misleading misrepresentations as to their prior values and as to their

duration. ZGG designed and promoted these advertisements while having actual knowledge that these quantitative representations of sale values were false.

137.   ZGG promoted these advertisements to create a false sense of urgency in its players thereby inducing those players into purchasing the gold bundles. ZGG did so while knowing that the bundles contained quantitative misrepresentations with respect to the comparative value of the gold displayed and with respect to the duration of the availability of those deals.

138.   The amount of gold included in a bundle, and whether the bundle being offered for sale represents a good value and outsized amount of gold a player is receiving for his or her purchase with the corresponding bundle, is a material consideration when a player decides whether to purchase a bundle.

139.   Similarly, the urgency and duration of a purported sale for in-game items is material to a consumer's purchase decision.

140.   These pricing and advertising practices reflecting high-pressure fake sales are patently deceptive. They are intended to mislead customers into believing that they are getting a bargain by buying virtual coins on sale and at a substantial and deep discount.

**The Games Violate California Gambling Laws**

141.   The Games violate various California gambling laws, including California Penal Code §330b, which prohibits slot machines.

142.   California courts have observed that the plain text of this statute sets forth three key elements: payment, chance, and prize. *See People ex rel. Green v. Grewal*, 61 Cal.4th 544, 564, 189 Cal.Rptr.3d 686, 699, 352 P.3d 275, 286 (2015) (quoting *Trinkle v. Stroh*, 60 Cal.App.4th 771, 782, 70

Cal.Rptr.2d 661, 667 (1997). First, the machine or device must be activated
by "the insertion of money or [some] other object." *Trinkle v. Cal. State
Lottery*, 105 Cal.App.4th 1401, 1410, 129 Cal.Rptr.2d 904, 910 (2003).
Second, "the operation of the machine [must be] unpredictable and
governed by chance." *Id*. Third, "by reason of the chance operation of the
machine, the user may become entitled to receive a thing of value." *Id*.

143.  Virtual currency in a mobile game, purchased with real money,
has been found to be the insertion of money or some other object under
§330b. *Soto v. Sky Union, LLC*, 159 F.Supp.3d 871, 878-89 (N.D. Ill. 2016)
("the plain language of section 330b(d)…provides that in addition to
machines or devices that require the insertion of money or coins, the term
'slot machine or device' includes devices that may be operated 'by any
other means.' Cal. Penal Code § 330b(d)…it would make little sense to
read the broad language of section 330b(d) to capture games operated by
insertion of purchased physical tokens while excluding games operated by
insertion of purchased virtual gems…it does not matter that gems are
imaginary currency.").

144.  ZGG manufactures, repairs, owns, rents, leases or gives away
the slot machines in the Games. ZGG develops the software for the
Games. ZGG provides updates to the Games' software to fix bugs and
otherwise update the Games' slot machines. ZGG offers and distributes the
Games for free through iOS and Android mobile storefronts. ZGG owns the
Games. ZGG provides the software for the Games to Apple and Google for
players to download on their mobile devices.

145.  On information and belief, ZGG makes agreements with other
people regarding the Games, including AC, AppLovin Cyprus Ltd., Apple,
Google and players of the Games, by which users of the Games' slot

machines, as a result of the element of hazard or chance or other unpredictable outcome, may become entitled to receive credit, allowance, or other thing of value or additional chance or right to use the Games' slot machines.

146. On information and belief, ZGG enters into agreements with Apple and Google to distribute the Games and process payments by players of the Games for the purchase of virtual coins in the Games in exchange for real money.

147. On information and belief, ZGG enters into agreements with players of the Games for the sale of virtual coins in the Games in exchange for real money.

148. The outcomes of the slot machines in the Games are the result of the element of chance. Depending on the outcome of a slot machine spin in the Games, a user may receive or lose virtual coins. That outcome is random and not determined by the player's skill.

149. Virtual coins in the Games are a credit, token, allowance, other thing of value or an additional chance or right to use the slot machines in the Games.

150. On information and belief, the Games are not located upon or are being transported by a vessel regularly operated and engaged in interstate or foreign commerce.

151. On information and belief, Defendants do not conduct their business activities with respect to the Games in accordance with the terms of a license issued by a tribal gaming agency pursuant to the tribal-state gaming compacts entered into in accordance with the Indian Gaming Regulatory Act (18 U.S.C. Sec. 1166 to 1168, inclusive, and 25 U.S.C. Sec. 2701 et seq.).

152.  Each Game is an apparatus under §330b. Alternatively, the Game operating in connection to servers owned or controlled by ZGG is an apparatus under §330b. Alternatively, mobile devices operating the Games are a machine, device or apparatus under §330b. Alternatively, mobile devices operating the Games together with servers are together a machine, device or apparatus under §330b.

153.  The software for the Games modifies mobile phones devices, such as iPhones and Android devices, into slot machines as defined by the California Penal Code.

154.  The Games' software operating on a mobile device, such as an iPhone or Android smartphone, is a machine, device or apparatus.

155.  In order to download the Games onto their mobile devices, users must interact with the hardware features of their mobile devices, including using the touch screen and hard buttons to enter account information, password pin code and other button sequences required to confirm and execute the download.

156.  Further, in order to make purchases within the Games, users must interact with the hardware elements of their phones, including the touchscreen and hard buttons. Users must enter payment information into their mobile devices using hardware features, including a keyboard. Users must also enter a password or pin code, press buttons and provide other identifying information through their phone's hardware elements, such as the keyboard, camera or fingerprint reader, in order to purchase virtual coins from the Games.

157.  The Games are downloaded onto users' devices through servers owned, operated and/or controlled by ZGG. These servers have hardware components. When a user plays the Games through their mobile

device, servers owned, operated and/or controlled by ZGG communicate with the user's mobile device. That communication between the servers owned, operated and/or controlled by ZGG and a user's mobile device takes place through hardware, including routers, switches, cables, and cell phone towers. Communication with the servers owned, operated or controlled by ZGG is required in order to provide users with the slot machines in the Games, update and repair the slot machines in the Games, complete purchases of virtual coins used to play the slot machines in the Games and to record players' balance of virtual coins needed to play the slot machines in the Games.

158.  Users operate the Games through the hardware features of their mobile device, including the touch screen.

159.  The Games adapt mobile phones into a device for use in a way that, as a result of the payment of money for virtual coins, the device is caused to be operated by reason of an element of chance in which the user may receive or become entitled to receive a thing of value or additional chance or right to use the Games.

160.  California Penal Code §319 provides: "A lottery is any scheme for the disposal or distribution of property by chance, among persons who have paid or promised to pay any valuable consideration for the chance of obtaining such property or a portion of it, or for any share or any interest in such property, upon any agreement, understanding, or expectation that it is to be distributed or disposed of by lot or chance, whether called a lottery, raffle, or gift enterprise, or by whatever name the same may be known." The Games are illegal lotteries as defined by California Penal Code 319. Cal. Penal Code §§319, 322, 323, 326.

161.   The Games are a scheme for the disposal or distribution of property by chance among persons who have paid valuable consideration for the chance of obtaining such property. Specifically, players of the Games spend money to buy virtual coins. The Games dispose of those virtual coins by chance.

162.   The virtual coins in the Games are "property" under §319. Section 7 of the Penal Code provides that "the word 'property' includes both real and personal property" and "the words 'personal property' include money, goods, chattels, things in action, and evidences of debt." These definitions are not exclusive of anything else properly coming within the terms defined. "A thing in action is a right to recover money or other personal property by a judicial proceeding." Civil Code, §953. "Property" is further defined in the Civil Code as a "thing of which there may be ownership." Civil Code, §654. There may be ownership, among other things, "of all obligations." Civil Code, §655. "An obligation is a legal duty by which a person is bound to do or not to do a certain thing." Civ. Code §1427. An obligation may arise from contract. Civ. Code §1428.

163.   ZGG's duty as the operator of the Games is to permit users to play further games in exchange for virtual coins. This is an obligation arising from contract and the right of the player in the matter is personal property and a thing in action. Cal. Civ. Code §663, §953.

164.   The May 2020 terms of service for Jackpot Master stated that "you may be provided an opportunity to purchase a limited license to Virtual Goods and Game Currency using real-world money at prices established by the Company in its sole discretion…" Ex. C. at 4. The May 2020 terms of service for Jackpot Master further stated that "Game Currency are virtual tokens that we license and each virtual token represents contractual

permission from Company to access certain features of the Platform." Ex. C at 4. Virtual coins in the Games, therefore, are property within the meaning of California Penal Code §319.

165.  On information and belief, ZGG receives money, directly or indirectly, from the Games.

166.  The Ninth Circuit has found that virtual coins used to play mobile casino games similar to those in the Games constitute a thing of value under Washington's gambling law. *Kater v. Churchill Downs Inc.*, 886 F.3d 784, 787 (9th Cir. 2018). California courts have held that a reward of extended play by a video game for winning is a thing of value within the meaning of the Penal Code definition. *See Merandette v. City & Cty. of San Francisco*, 88 Cal.App.3d 105, 114, 151 Cal.Rptr. 580, 586 (1979).

167.  To the extent Games operating on mobile devices and in connection to servers are not illegal slot machines and do not include an illegal lottery, the Games violate California Penal Code §337j as unlicensed controlled games. California Penal Code § 337j(a) provides:

> (a) It is unlawful for any person, as owner, lessee, or employee, whether for hire or not, either solely or in conjunction with others, to do any of the following without having first procured and thereafter maintained in effect all federal, state, and local licenses required by law:
>
> (1) To deal, operate, carry on, conduct, maintain, or expose for play in this state any controlled game.
>
> (2) To receive, directly or indirectly, any compensation or reward or any percentage or share

of the revenue, for keeping, running, or carrying on any controlled game.

(3) To manufacture, distribute, or repair any gambling equipment within the boundaries of this state, or to receive, directly or indirectly, any compensation or reward for the manufacture, distribution, or repair of any gambling equipment within the boundaries of this state.

168.   On information and belief, ZGG has not procured and thereafter maintained in effect all federal, state, and local licenses required by law to operate a controlled game.

169.   ZGG operates, carries on, conducts, maintains and exposes for play in California a controlled game through the Games. ZGG receives, directly or indirectly, compensation or reward of the revenue for keeping, running and carrying on the Games. ZGG manufactures, distributes and repairs the Games within the boundaries of California.

170.   California Penal Code §337j(e)(1) states that "[a]s used in this section, 'controlled game' means any poker or Pai Gow game, and any other game played with cards or tiles, or both, and approved by the Department of Justice, and **any game of chance, including any gambling device, played for currency, check, credit, or any other thing of value that is not prohibited and made unlawful by statute or local ordinance**." *Id.* (emphasis added).

171.   To the extent the Games operating on mobile devices are not illegal under California's Penal Code (including §330b and §319), the Games are a controlled game under §337j(e)(1), because they are a game

of chance played for credit or a thing of value not prohibited and made
unlawful by statute of local ordinance.

172.  The virtual coins in the Games are a credit to continue playing
the Games' slot machines. The virtual coins in the Games are also a thing
of value as held in *Kater*.

173.  Certain courts have found that in-game purchases in free-to-
play mobile games that sell "loot boxes" are not things of value under
California law, because the loot boxes and the virtual items they contain
merely enhance gameplay and have no value outside of the game itself.
*See, e.g. Soto v. Sky Union, LLC*, 159 F.Supp.3d 871 (N.D.Ill. 2016); *Mai v.
Supercell OY*, Case No. 20-cv-05573-EJD, Doc. 62 (N.D.Cal. Jan. 3,
2023); *Coffee v. Google LLC*, No. 20-cv-03901, 2022 WL 94986, at *9
(N.D. Cal. Jan. 10, 2022); *Taylor v. Apple, Inc.*, No. 20-cv-03906-RS, 2022
WL 35601, at *2 (N.D. Cal. Jan. 4, 2022). In these cases, the courts found
the virtual items in the loot boxes were not things of value, because they
were not used to extend gameplay, but rather were mere enhancements to
games, where the games themselves were truly free to play.

174.  The virtual coins at issue here in the Games are distinguishable
from those cases, because the virtual coins in these Games are used, and
at times are necessary, for players to extend their gameplay. In *Soto*, *Mai*,
*Coffee* and *Taylor*, the underlying gameplay was playable without any
purchase. The purchases at issue were for randomized packs of virtual
goods (loot boxes) that were not used to extend gameplay, but merely
provided virtual items that enhanced that gameplay. Further, those games
were ones of skill with the purported game of chance being a secondary
feature.

175.  In contrast, the Games here have a primary gameplay

mechanic that is itself a game of chance - slot machines. The purchase of virtual coins is used to extend that gameplay, not merely to enhance it. For these reasons, the Ninth Circuit *Kater* decision is more applicable than the District Court decisions in *Soto*, *Mai*, *Coffee* and *Taylor*. Therefore, the virtual coins here are things of value and provide an additional chance to play the Games' slot machines.

176.  For these same reasons, the Games violate other California gambling laws as set forth below.

177.  In addition to being used to extend gameplay, the coins in the Games are tokens and things of value under California law.

178.  While the Games periodically provides free coins to users and Jackpot Master allows users to view ads to obtain coins, that does not render those coins valueless.

179.  The offering of free coin rewards in the Games is only periodic and limited. Accordingly, these free coins do not allow players to play the Games' slot machines continuously for an unlimited amount of time.

180.  Further, the requirement to view ads in Jackpot Master to obtain coins interrupts user's gameplay for 30 seconds or longer and only provides them a modest amount of chips. Users cannot play Jackpot Master's slot machines while the ad is running. The avoidance of that interruption, available only through the purchase of coins, is valuable. That value may be measured by the money paid by the advertisers. A further demonstration of that value is Jackpot Master's promotion of "no ads" in its Super Sale, as can be seen in paragraph 58.

181.  The Games are advertised and distributed through the App Store and Play Store alongside other social casino games that do not violate California gambling laws. The Games are also advertised on AC's

and ZGG's respective websites.

182.   The Games' descriptions in these advertisements and storefronts do not disclose that they violate California's or other state's gambling laws. Plaintiffs and other consumers reasonably rely on this omission to believe that the Games offer legal services. This belief is a material factor in their decision to download and play the Games, as opposed to another social casino game that does comply with gambling laws.

183.   The above representations are false and misleading. Jackpot Master does offer the opportunity to win a thing of value by playing their slot machines, namely virtual coins.

184.   The May 2020 terms of service for Jackpot Master allowed children 13 or older to play. Ex. C at 1.

185.   The May 2020 terms of service for Jackpot Master stated that the game is "the property of the Company and its licensors." Ex. C at 4.

**The Games Violate Arkansas Gambling Laws**

186.   The Arkansas gambling statute provides that "(a) It is unlawful for a person to set up, keep, or exhibit any gaming table or gambling device, commonly called "A. B. C.", "E. O.", roulette, or rouge et noir, any faro bank, or any other gaming table or gambling device, or bank of the like or similar kind, or of any other description although not named in this section, regardless of the name or denomination, either: (1) Adapted, devised, or designed for the purpose of playing any game of chance; or (2) At which any money or property may be won or lost." Ark. Code § 5-66-104 (emphasis added).

187.   The Games operating on mobile devices together with servers constitute gambling devices under Arkansas law, because they are

devices adapted, devised and designed for the purposes of playing a
game of chance, namely slot machines.

188.   The virtual coins are also property that may be won or lost in
the Games' slot machines. Arkansas law defines property to mean
"severed real property or tangible or intangible personal property, including
money or any paper or document that represents or embodies anything of
value." Ark. Code. §5-36-101.

189.   Arkansas law also prohibits keno games, providing that "[i]f a
person sets up or exhibits, causes to be set up or exhibited, or aids or
assists in setting up or exhibiting in the state any gaming device commonly
known and designated as 'keno' or any similar device by any other name
or without a name, upon conviction the person is guilty of a violation…."
Ark. Code §5-66-110. The Games include keno games, including lottery
games as described above.

190.   Arkansas law also prohibits lotteries, providing that "[a]ny
person who in this state, directly or indirectly, sets up, promotes, engages
in, or in any manner participates in any plan, scheme, device, or other
means…, either alone or in concert with any other person, firm, or
corporation, either within or without the State of Arkansas, in which goods,
property, or any other thing of value is sold to any person, firm, or
corporation for any consideration, either cash or otherwise, and upon the
further consideration that the purchaser agrees to obtain one (1) or more
persons to participate in the plan, scheme, device, or other means by
making a similar purchase and a similar agreement to secure one (1) or
more other persons to participate in the plan, scheme, device, or other
means in the same manner, each purchaser being given the right to obtain
money, credits, goods, or some other thing of value, depending upon the

number of persons joining in or participating in the plan, scheme, device, or other means, is declared to have set up, promoted, engaged in, or participated in a lottery, which is declared to be unlawful." Ark. Code. §5-66-119.

191.   ZGG sets up, promotes, engages in, and participates in the Games. Virtual coins in the Games are property or a thing of value. Virtual coins in the Games are sold to users for consideration. Users are offered further consideration to obtain other users to participate in the Games. Users are given the right to obtain virtual coins, which are credits or some other thing of value, depending upon the number of persons joining in or participating in the Games.

192.   For example, users are given virtual coins in the Games to join a team, wherein the team further receives additional rewards in the form of virtual coins based, in part, on the amount of virtual coins team members wager in the Games and their participation in the Games' various games of chance.

**The Games' Advertisements Violate The Law**

193.   ZGG's advertising of virtual coins in the Games violates 16 CFR §233.1(a) because the stricken deals displayed are not "actual, bona fide price at which the article was offered to the public on a regular basis for a reasonably substantial period of time."  Rather, the stricken coin values and dollar amounts in the Super Sale offers of the Games are "fictitious" and with "an artificial, inflated price" for the purpose of creating the false perception to the consumer "of a large reduction."  The false strikethrough ads promote a false bargain where "the purchaser is not receiving the unusual value he expects."

194.   These advertisements are also violative of Cal. Bus. & Prof.

Code §17501, because the stricken coin values and dollar amounts were not "the prevailing market price … within three months next immediately preceding the publication of the advertisement."  Nor do the Super Sale offers "clearly, exactly and conspicuously state[] in the advertisement" when such former prices were prevailing.

195.  The effectiveness of ZGG's deceitful advertising scheme is supported by longstanding scholarly research. In the seminal article entitled *Comparative Price Advertising: Informative or Deceptive?* (cited in *Hinojos v. Kohl's Corp.*, 718 F.3d 1098, 1106 (9th Cir. 2013), Professors Dhruv Grewal and Larry D. Compeau write that, "[b]y creating an impression of savings, the presence of a higher reference price enhances subjects' perceived value and willingness to buy the product." Dhruv Grewal & Larry D. Compeau, *Comparative Price Advertising: Informative or Deceptive?*, 11 J. Pub. Pol'y & Mktg. 52, 55 (Spring 1992). Thus, "empirical studies indicate that, as discount size increases, consumers' perceptions of value and their willingness to buy the product increase, while their intention to search for a lower price decreases." *Id*. at 56 (emphasis added). For this reason, the Ninth Circuit in *Hinojos* held that a plaintiff making a claim of deceptive pricing (strikingly similar to the claim at issue here) had standing to pursue his claim against the defendant retailer. In doing so, the Court observed that "[m]isinformation about a product's 'normal' price is . . . significant to many consumers in the same way as a false product label would be." *Hinojos*, 718 F.3d at 1106.

196.  Professors Compeau and Grewal reached similar conclusions in a 2002 article: "decades of research support the conclusion that advertised reference prices do indeed enhance consumers' perceptions of the value of the deal." Dhruv Grewal & Larry D. Compeau, *Comparative*

*Price Advertising: Believe It Or Not*, J. of Consumer Affairs, Vol. 36, No. 2, at 287 (Winter 2002). The professors also found that "[c]onsumers are influenced by comparison prices even when the stated reference prices are implausibly high." *Id*. (emphasis added).

197.  In another scholarly publication, Professors Joan Lindsey-Mullikin and Ross D. Petty concluded that "[r]eference price ads strongly influence consumer perceptions of value . . . . Consumers often make purchases not based on price but because a retailer assures them that a deal is a good bargain. This occurs when . . . the retailer highlights the relative savings compared with the prices of competitors . . . [T]hese bargain assurances (BAs) change consumers' purchasing behavior and may deceive consumers." Joan Lindsey-Mullikin & Ross D. Petty, *Marketing Tactics Discouraging Price Search: Deception and Competition*, 64 J. of Bus. Research 67 (January 2011).

198.  Similarly, according to Professors Praveen K. Kopalle and Joan Lindsey-Mullikin, "research has shown that retailer-supplied reference prices clearly enhance buyers' perceptions of value" and "have a significant impact on consumer purchasing decisions." Praveen K. Kopalle & Joan Lindsey-Mullikin, *The Impact of External Reference Price On Consumer Price Expectations*, 79 J. of Retailing 225 (2003).

199.  The results of a 1990 study by Professors Jerry B. Gotlieb and Cyndy Thomas Fitzgerald, came to the conclusion that "reference prices are important cues consumers use when making the decision concerning how much they are willing to pay for the product." Jerry B. Gotlieb & Cyndy Thomas Fitzgerald, *An Investigation Into the Effects of Advertised Reference Prices On the Price Consumers Are Willing To Pay For the Product*, 6 J. of App'd Bus. Res. 1 (1990). This study also concluded that

"consumers are likely to be misled into a willingness to pay a higher price for a product simply because the product has a higher reference price." *Id*.

200.   The unmistakable inference to be drawn from this research and the Ninth Circuit's opinion in *Hinojos* is that the deceptive advertising through the use of false reference pricing employed here by ZGG is intended to, and does in fact, influence customer behavior—as it did Plaintiffs' purchasing decisions here—by artificially inflating customer perceptions of a given item's value and causing customers to spend money they otherwise would not have, purchase items they otherwise would not have, and/or spend more money than they otherwise would have absent the deceptive advertising.

201.   On information and belief, the Games and the false advertising presented to new users are designed to trap players in what is referred to in academia as a "compulsion loop." A compulsion loop is defined as habitual behavior that a human will repeat to gain a neurochemical reward: a feeling of pleasure and/or a relief from pain. Not doing the behavior causes discomfort. *Compulsion Loops: Compulsive Behavior As Mass Media* by Adam Crowe and Richard Buchanon (available at https://www.slideshare.net/adamcrowe/compulsion-loops#btnNext).

202.   On information and belief, mobile games such as Cash Tornado and Jackpot Master maximize their profits by inducing players to enter into a compulsion loop. The Games here engage in misleading value and price comparison advertising to induce players into entering a compulsion loop of spending early in their interaction with the Games.

203.   On information and belief, once games such as Cash Tornado and Jackpot Master are successful at deceiving users into believing they are receiving outsized values, those users are more likely to continue

maintaining that belief despite evidence to the contrary. Man-Pui Sally Chan, et al, *Debunking: A Meta-Analysis of the Psychological Efficacy of Messages Countering Misinformation*, 28 Psychol. Sci. 1531, 1531 (2017), https://cite.law/U5QS-2NF4 (meta-analysis focusing on "false beliefs … [that] occur when the audience initially believes misinformation and that misinformation persists or continues to exert psychological influence after it has been rebutted").

204. Another cognitive bias exploited by the Games is known as "sunk cost" bias. Sunk cost bias describes a decision-making heuristic where an individual escalates his or her commitment to a previously chosen, but unsuccessful course of action to justify the prior "investments" in purchasing coins. Thus, but inducing players into making purchases in the Games through deceptive advertisements, ZGG creates a higher likelihood that those players will be committed to the Games and continue spending money in the Games.

205. A phenomenon known as "chasing" (continuing to gamble to recoup losses) is "one of the central characteristics of pathological gamblers." Chasing is "widely regarded as a defining feature in disordered gambling," is "the most commonly endorsed item in screening tools for disordered gambling," and its presence "establishes and maintains a downward spiral of negative consequences for the gambler's finances, relationships, and mental well-being." Ke Zhang and Luke Clark, *Loss-chasing in gambling behaviour: neurocognitive and behavioural economic perspectives*, Current Opinion in Behavioral Sciences, 31:1-7 (Feb. 2020). Therefore, by inducing players into making early purchases in the Games through misleading sale advertisements, the Games increase impact of their gambling mechanics to push players into an addictive "chasing"

1  phenomenon.

2      206.  Further, by creating a false sense of urgency in their Super

3  Sale offers, the Games increase the likelihood that players will make an

4  impulse purchase.

5  **ZGG's Conduct Is Ongoing**

6      207.  ZGG has not materially changed the operation of the illegal

7  games of chance and Super Sale offers in the Games since the filing of this

8  lawsuit.

9      208.  Since the filing of this lawsuit, ZGG has continued and

10  expanded its violations of gambling and false advertising laws at the

11  expense of consumers. Approximately three months ago, ZGG launched a

12  new mobile casino game called Jackpot Friends Slots Casino. Jackpot

13  Friends includes the same illegal gambling and false advertising as the

14  Games, including misleading Super Sale Offers.

15      209.  Jackpot Friends provides slot machines similar to those of the

16  Games:



24      210.  Jackpot Friends also uses virtual coins that are wagered in

25  games of chance. Users must bet a minimum amount of virtual coins (see

26  bottom right of above screenshot) to play the slot machines. The virtual

27  coins are won or lost in the slot machines based on chance.

28

211.  When users run out of virtual coins, they are presented with multiple offers for purchasing virtual coins, including Super Sale Offers that include false former prices and misleading countdown timers:



212.  Users can be prohibited from playing the slot machines for several hours if they do not purchase additional virtual coins. Accordingly, the winning of virtual coins extends user's gameplay and the virtual coins are things of value, credits and tokens.

213.  The Super Sale Offers in Jackpot Friends are misleading in substantially similar ways as Jackpot Master and Cash Tornado. They include a countdown timer. The timer shown above has fifty-one seconds remaining. A trivial amount of time after the countdown timer expires (minutes or less), a better Super Sale Offer presented:



FOURTH AMENDED COMPLAINT

214.  Immediately after the expiration of the four minutes and fifteen seconds shown in the Super Sale Offer above, Jackpot Friends shows the same Super Sale Offer again with a new misleading countdown timer. The screenshot below was taken from Jackpot Friends on the same device five minutes after the above screen shot:



215.  Similar to the Super Sale offers in the Games, the Super Sale offers in Jackpot Friends misleads users as to the ordinary and prevailing price for virtual coins and further misleads users as to the duration and scarcity of Super Sale offers. Super Sale offers are unavailable for only trivial periods of time in Jackpot Friends.

216.  ZGG's introduction of a new game with these same misleading and illegal features together with its continuing use of these same misleading and illegal features in the Games demonstrates that absent public injunctive relief, ZGG will continue to expose the public to these types of illegal, unfair and fraudulent business practices. Plaintiffs, members of the class and the general public continue to use their mobile devices to explore new applications and therefore have an ongoing interest in ZGG discontinuing its illegal, unfair and fraudulent business practices.

## **APPLICABLE LAW**

217.  Ms. Ochoa is a citizen and resident of Los Angeles County,

California. She downloaded and played Jackpot Master in Los Angeles

County. She made purchases from Jackpot Master in Los Angeles County.

Her purchases were processed by Apple, an entity headquartered in

California.

218.  Ms. Brown made purchases from Cash Tornado through Apple,

an entity headquartered in California.

219.  On information and belief, Defendants have their principal place

of business in California.

220.  California's substantive laws may be constitutionally applied to

the claims of Plaintiffs under the Due Process Clause, 14th Amend. §1, and

the Full Faith and Credit Clause, Art. IV §1 of the U.S. Constitution.

California has significant contacts, or significant aggregation of contacts, to

the claims asserted by Plaintiffs, thereby creating state interests that

ensure that the choice of California state law is not arbitrary or unfair.

221.  The application of California laws is also appropriate under

California's choice of law rules because California has significant contacts

to the claims of Plaintiffs, and California has a greater interest in applying

its laws here than any other interested state.

222.  On information and belief, Defendant voluntarily subjects itself

to the application of California law.

223.  California law may be used on a class-wide basis, because the

interests of other states do not outweigh California's interest in having its

law applied.

224.  California has a unique interest in having its laws apply to this

case, including to non-residents. Defendant is headquartered in California.

The Games are advertised and distributed primarily through the Apple and

Google mobile stores. These mobile stores are owned and operated by

Apple and Google, respectively, both companies having headquarters in California. The Games are also advertised on Facebook, also a company headquartered in California.

225.  On information and belief, in distributing its games through the Apple and Google stores, ZGG entered into developer agreements with Apple and Google governing the development and distribution of the Game. Those agreements, which ZGG entered into for the purpose of distributing the Games in the United States apply California law.

226.  Consumers execute their transaction for the in-game chips in the Game with Apple and Google payment systems.

227.  Plaintiffs and other consumers enter into end user agreements with Apple and Google, which require the application of California law.

228.  To the extent Ms. Brown lacks standing to bring claims under California law, Ms. Brown brings claims under Arkansas law as set forth below. Arkansas' common law may be applied on a class-wide basis, because there are no material differences between Arkansas common law and other state's common law that are relevant to establishing the causes of action alleged herein.

## **CLASS ALLEGATIONS**

229.  Plaintiffs bring this action on behalf of themselves and all persons similarly situated pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure and seeks certification of the following class:

> All individuals located within the United States who, during the applicable limitations period, made a purchase of virtual gold in Jackpot Master or Cash Tornado using real-world currency.

230.  The above-described class of persons shall hereafter be
referred to as the "Class." The following people are excluded from the
Class: (1) any Judge or Magistrate Judge presiding over this action and
members of their families; (2) Defendant, Defendants' subsidiaries,
parents, successors, predecessors, and any entity in which the Defendants
or their parents have a controlling interest and their current or former
employees, officers and directors; (3) persons who properly execute and
file a timely request for exclusion from the Class; (4) persons whose claims
in this matter have been finally adjudicated on the merits or otherwise
released; (5) Plaintiff's counsel and Defendants' counsel; and (6) the legal
representatives, successors, and assigns of any such excluded persons.

231.  In the alternative, Ms. Ochoa seeks certification of the following
class pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules
of Civil Procedure:

>   All individuals located within the United States who, during
>   the applicable limitations period, made a purchase of virtual
>   gold in Jackpot Master using real-world currency.

232.  The above-described class of persons shall hereafter be
referred to as the "Jackpot Master Sub-Class." The following people are
excluded from the Jackpot Master Sub-Class: (1) any Judge or Magistrate
Judge presiding over this action and members of their families; (2)
Defendant, Defendants' subsidiaries, parents, successors, predecessors,
and any entity in which the Defendants or their parents have a controlling
interest and their current or former employees, officers and directors; (3)
persons who properly execute and file a timely request for exclusion from
the Class; (4) persons whose claims in this matter have been finally
adjudicated on the merits or otherwise released; (5) Plaintiff's counsel and

Defendants' counsel; and (6) the legal representatives, successors, and
assigns of any such excluded persons.

233.  In the alternative, Ms. Ochoa seeks certification of the following
class pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules
of Civil Procedure:

> All individuals located within the State of California who,
> during the applicable limitations period, made a purchase of
> virtual gold in Jackpot Master using real-world currency.

234.  The above-described class of persons shall hereafter be
referred to as the "Jackpot Master California Sub-Class." The following
people are excluded from the Jackpot Master California Sub-Class: (1) any
Judge or Magistrate Judge presiding over this action and members of their
families; (2) Defendant, Defendants' subsidiaries, parents, successors,
predecessors, and any entity in which the Defendants or their parents have
a controlling interest and their current or former employees, officers and
directors; (3) persons who properly execute and file a timely request for
exclusion from the Class; (4) persons whose claims in this matter have
been finally adjudicated on the merits or otherwise released; (5) Plaintiff's
counsel and Defendants' counsel; and (6) the legal representatives,
successors, and assigns of any such excluded persons.

235.  In the alternative, Ms. Brown seeks certification of the following
pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of
Civil Procedure:

> All individuals located within the United States who, during the
> applicable limitations period, made a purchase of virtual gold in
> Cash Tornado using real-world currency.

236.   The above-described class of persons shall hereafter be referred to as the "Cash Tornado Sub-Class." The following people are excluded from the Cash Tornado Sub-Class: (1) any Judge or Magistrate Judge presiding over this action and members of their families; (2) Defendant, Defendants' subsidiaries, parents, successors, predecessors, and any entity in which the Defendants or their parents have a controlling interest and their current or former employees, officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiff's counsel and Defendants' counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

237.   In the alternative, Ms. Brown seeks certification of the following pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure:

> All individuals located within the State of Arkansas who, during the applicable limitations period, made a purchase of virtual gold in Cash Tornado using real-world currency.

238.   The above-described class of persons shall hereafter be referred to as the "Cash Tornado Arkansas Sub-Class." The following people are excluded from the Arkansas Sub-Class: (1) any Judge or Magistrate Judge presiding over this action and members of their families; (2) Defendant, Defendants' subsidiaries, parents, successors, predecessors, and any entity in which the Defendants or their parents have a controlling interest and their current or former employees, officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have

been finally adjudicated on the merits or otherwise released; (5) Plaintiff's counsel and Defendants' counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

239. In the alternative, Plaintiffs seek certification of the following sub-class pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure:

> All individuals located within the United States who, during the applicable limitations period, made a purchase of virtual gold through a Super Sale offer in Jackpot Master or Cash Tornado using real-world currency.

240. The above-described class of persons shall hereafter be referred to as the "Super Sale National Sub-Class." The following people are excluded from the Super Sale National Sub-Class: (1) any Judge or Magistrate Judge presiding over this action and members of their families; (2) Defendant, Defendants' subsidiaries, parents, successors, predecessors, and any entity in which the Defendants or their parents have a controlling interest and their current or former employees, officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiff's counsel and Defendants' counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

241. In the alternative, Ms. Ochoa seeks certification of the following sub-class pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure:

> All individuals located within the United States who, during the applicable limitations period, made a purchase of virtual gold

through a Super Sale offer in Jackpot Master using real-world currency.

242.   The above-described class of persons shall hereafter be referred to as the "Super Sale Jackpot Master Subclass." The following people are excluded from the Super Sale Jackpot Master Subclass: (1) any Judge or Magistrate Judge presiding over this action and members of their families; (2) Defendant, Defendants' subsidiaries, parents, successors, predecessors, and any entity in which the Defendants or their parents have a controlling interest and their current or former employees, officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiff's counsel and Defendants' counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

243.   In the alternative, Ms. Ochoa seeks certification of the following sub-class pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure:

> All individuals located within the State of California who, during the applicable limitations period, made a purchase of virtual gold through a Super Sale offer in Jackpot Master using real-world currency.

244.   The above-described class of persons shall hereafter be referred to as the "Super Sale Jackpot Master California Subclass." The following people are excluded from the Super Sale Jackpot Master Subclass: (1) any Judge or Magistrate Judge presiding over this action and members of their families; (2) Defendant, Defendants' subsidiaries, parents, successors, predecessors, and any entity in which the Defendants

or their parents have a controlling interest and their current or former employees, officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiff's counsel and Defendants' counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

245.  In the alternative, Ms. Brown seeks certification of the following sub-class pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure:

> All individuals located within the United States who, during the applicable limitations period, made a purchase of virtual gold through a Super Sale offer in Cash Tornado using real-world currency.

246.  The above-described class of persons shall hereafter be referred to as the "Super Sale Cash Tornado Subclass." The following people are excluded from the Super Sale Arkansas Class: (1) any Judge or Magistrate Judge presiding over this action and members of their families; (2) Defendant, Defendants' subsidiaries, parents, successors, predecessors, and any entity in which the Defendants or their parents have a controlling interest and their current or former employees, officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiff's counsel and Defendants' counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

247.  In the alternative, Ms. Brown seeks certification of the following sub-class pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure:

> All individuals located within the State of Arkansas who, during the applicable limitations period, made a purchase of virtual gold through a Super Sale offer in Cash Tornado using real-world currency.

248.  The above-described class of persons shall hereafter be referred to as the "Super Sale Cash Tornado Arkansas Subclass." The following people are excluded from the Super Sale Cash Tornado Arkansas Subclass: (1) any Judge or Magistrate Judge presiding over this action and members of their families; (2) Defendant, Defendants' subsidiaries, parents, successors, predecessors, and any entity in which the Defendants or their parents have a controlling interest and their current or former employees, officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiff's counsel and Defendants' counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

249.  The Class and Sub-Classes set forth above are collectively referred to herein as "Classes." Plaintiffs reserve the right to expand, limit, modify, or amend the class definitions stated above, including the addition of one or more subclasses, in connection with a motion for class certification, or at any other time, based upon, among other things, changing circumstances, or new facts obtained during discovery.

250.  This case is appropriate for class treatment because Plaintiffs can prove the elements of her claims on a class-wide basis using the same

evidence as would be used to prove those elements in individual actions alleging the same claims.

251. **Adequacy**. Plaintiffs will fairly and adequately represent and protect the interests of the other members of the Classes. Plaintiffs have retained counsel with substantial experience in prosecuting complex litigation and class actions. Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the other members of the Classes, and have the financial resources to do so. Neither Plaintiffs nor their counsel have any interest adverse to those of the other members of the Classes.

**252. Numerosity**. The members of the Classes are so numerous that joinder of all members would be unfeasible and not practicable. The membership of the Classes is unknown to Plaintiffs at this time; however, it is estimated the Classes number in the hundreds, if not thousands. The identity of such membership is readily ascertainable via inspection of Defendant's or third-party books and records or other approved methods. Similarly, Members of the Classes may be notified of the pendency of this action by mail, email, internet postings, social media, publications and/or in-game messaging.

253. **Common Questions of Law or Fact:** There are common questions of law and fact as to Plaintiffs and all other similarly situated persons, which predominate over questions affecting only individual class members, including, without limitation:

a.     Whether ZGG designed, advertised, marketed, distributed, sold, or otherwise placed Jackpot Master Slots and Cash Tornado into the stream of commerce in the United States and California;

b.    Whether the operation and presentation of Super Sale Offers was the same or substantially similar for all users of the Games;

c.    Whether the Super Sale offers in the Games are false or misleading to a reasonable consumer;

d.    Whether a reasonably consumer would reasonably rely on the false representations in Super Sale offers in the Games;

e.    Whether the false representations in Super Sale offers

f.    Whether ZGG's conduct emanated from State of California;

g.    Whether the Games' presentation of stricken values in its advertising of in-game purchases are misleading to a reasonable consumer;

h.    Whether the Games' presentation of purported limited time sales for in-game purchases are misleading to a reasonable consumer;

i.    Whether Plaintiffs and members of the Classes were injured and harmed directly by the Games;

j.    Whether Plaintiffs and members of the Classes were injured and harmed directly by the Games' false advertising;

k.    Whether Plaintiffs and members of the Classes are entitled to damages due to Defendants' conduct as alleged in this Complaint, and if so, in what amounts;

l.    Whether the Games violate the gambling laws of California, Arkansas or other states.

m.    Whether Plaintiffs and members of the Classes are entitled to equitable relief, including, but not limited to, restitution or injunctive relief as requested in this Complaint.

254.  **Typicality:** Plaintiffs' claims are typical of the claims of the other members of the Classes because, among other things, Plaintiffs and

all members of the Classes were comparably injured through Defendants' misconduct described above.  As alleged herein, Plaintiffs, like the members of the Classes, made purchases they would not have otherwise made and were deprived of monies that rightfully belonged to them by Defendants.  Further, there are no defenses available to Defendants that are unique to Plaintiffs.

255.  **Superiority:** The nature of this action and the laws available to Plaintiffs and members of the Classes make the class action format a particularly efficient and appropriate procedure to redress the violations alleged herein. If each class member were required to file an individual lawsuit, Defendants would necessarily gain an unconscionable advantage since it would be able to exploit and overwhelm the limited resources of each individual plaintiff with its vastly superior financial and legal resources. Moreover, the prosecution of separate actions by the individual class members, even if possible, would create a substantial risk of inconsistent or varying verdicts or adjudications with respect to the individual class members against Defendants, and which would establish potentially incompatible standards of conduct for Defendant and/or legal determinations with respect to individual class members which would, as a practical matter, be dispositive of the interest of the other class members not parties to adjudications or which would substantially impair or impede the ability of the class members to protect their interests. Further, the claims of the individual members of the Classes are not sufficiently large to warrant vigorous individual prosecution considering all of the concomitant costs and expenses attending thereto.

## FIRST CLAIM FOR RELIEF
### Violation of California's Unfair Competition Law ("UCL")
### Cal. Bus. & Profession Code §17200 *et seq.*
### Ms. Ochoa - Unlawful, Unfair and Fraudulent Advertising

256.  Plaintiffs incorporate by reference all allegations in this Complaint and restates them as if fully set forth herein.

257.  Ms. Ochoa brings this claim for relief on behalf of herself and all Classes.

258.  The UCL defines unfair business competition to include any "unlawful, unfair or fraudulent" act or practice, as well as any "unfair, deceptive, untrue or misleading" advertising. Cal. Bus. & Prof. Code §17200.

259.  A business act or practice is "unlawful" under the UCL if it violates any other law or regulation.

260.  A business act or practice is "unfair" under the UCL if the reasons, justifications, and motives of the alleged wrongdoer are outweighed by the gravity of the harm to the alleged victims. A business act or practice is "fraudulent" under the UCL if it is likely to deceive members of the consuming public.

261.  ZGG has violated the "unlawful" prong under the UCL and has engaged in "unfair, deceptive, untrue or misleading" advertising.

262.  The Federal Trade Commission Act prohibits "unfair or deceptive acts or practices in or affecting commerce" (15 U.S.C. §45(a)(1)) and specifically prohibits false advertisements. 15 U.S.C. §52(a). FTC Regulations describe false former pricing schemes-similar to those used in the Games' Super Sale offers in all material respects-as deceptive practices that would violate the FTC Act.

263.  16 C.F.R. §233.1 states:

(a) One of the most commonly used forms of bargain advertising is to offer a reduction from the advertiser's own former price for an article. If the former price is the actual, bona fide price at which the article was offered to the public on a regular basis for a reasonably substantial period of time, it provides a legitimate basis for the advertising of a price comparison. Where the former price is genuine, the bargain being advertised is a true one. If, on the other hand, the former price being advertised is not bona fide but fictitious - for example, where an artificial, inflated price was established for the purpose of enabling the subsequent offer of a large reduction - the "bargain" being advertised is a false one; the purchaser is not receiving the unusual value he expects. In such a case, the "reduced" price is, in reality, probably just the seller's regular price.

(b) A former price is not necessarily fictitious merely because no sales at the advertised price were made. The advertiser should be especially careful, however, in such a case, that the price is one at which the product was openly and actively offered for sale, for a reasonably substantial period of time, in the recent, regular course of his business, honestly and in good faith - and, of course, not for the purpose of establishing a fictitious higher price on which a deceptive comparison might be based. And the advertiser should scrupulously avoid any implication that a former price is a selling, not an asking price (for example, by use of such language as, "Formerly sold at $____"), unless substantial sales at that price were actually made.

(c) The following is an example of a price comparison based on a fictitious former price. John Doe is a retailer of Brand X fountain pens, which cost him $5 each. His usual markup is 50 percent over cost; that is, his regular retail price is $7.50. In order subsequently to offer an unusual "bargain", Doe begins offering Brand X at $10 per pen. He realizes that he will be able to sell no, or very few, pens at this inflated price. But he doesn't care, for he maintains that price for only a few days. Then he "cuts" the price to its usual level - $7.50 - and advertises: "Terrific Bargain: X Pens, Were $10, Now Only $7.50!" This is

obviously a false claim. The advertised "bargain" is not genuine.

(d) Other illustrations of fictitious price comparisons could be given. An advertiser might use a price at which he never offered the article at all; he might feature a price which was not used in the regular course of business, or which was not used in the recent past but at some remote period in the past, without making disclosure of that fact; he might use a price that was not openly offered to the public, or that was not maintained for a reasonable length of time, but was immediately reduced.

(e) If the former price is set forth in the advertisement, whether accompanied or not by descriptive terminology such as "Regularly," "Usually," "Formerly," etc., the advertiser should make certain that the former price is not a fictitious one. If the former price, or the amount or percentage of reduction, is not stated in the advertisement, as when the ad merely states, "Sale," the advertiser must take care that the amount of reduction is not so insignificant as to be meaningless. It should be sufficiently large that the consumer, if he knew what it was, would believe that a genuine bargain or saving was being offered. An advertiser who claims that an item has been "Reduced to $9.99," when the former price was $10, is misleading the consumer, who will understand the claim to mean that a much greater, and not merely nominal, reduction was being offered.

264.  California law also prohibits false former pricing schemes. Cal. Bus. Code. §17501 entitled "Value determinations; Former price advertisements," states:

For the purpose of this article the worth or value of anything advertised is the prevailing market price, wholesale if the offer is at wholesale, retail if the offer is at retail, at the time of publication of such advertisement in the locality wherein the advertisement is published.

No price shall be advertised as a former price of any advertised thing, unless the alleged former price was the prevailing market price as above defined within three months next immediately preceding the publication of the

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

advertisement or unless the date when the alleged
former price did prevail is clearly, exactly and
conspicuously stated in the advertisement.

265.  California's False Advertising Law also prohibits a business

from "[a]dvertising goods or services with intent not to sell them as

advertised," Cal. Civ. Code §1770(a)(9), and prohibits a business from

"[m]aking false or misleading statements of fact concerning reasons for,

existence of, or amounts of price reductions." *Id*. §(a)(13).

266.  Jackpot Master's strikethrough graphics and comparative

values, for example, in Super Sale offers, violate the unlawful prongs of the

UCL, because they violate 16 C.F.R. §233.1, Cal. Bus. Prof. Code §1750,

Cal. Civ. Code §§1770(a)(9) and (a)(13).

267.  Defendant also violated the "unfair" prong of the UCL by falsely

representing that its consumers received a discount from a referenced

"original" former price show in its Super Sale offers. In fact, ZGG displayed

to new users a fictitious stricken reference price for a quantity of virtual

coins in Jackpot Master, where other users of Jackpot Master were being

offered far better deals than the fictitious reference price.

268.  Defendant also violated the "unfair" prong of the UCL by falsely

representing to consumers that Super Sale offers were limited in time,

when in fact such offers would be presented repeatedly and frequently.

269.  The gravity of the harm to Ms. Ochoa and members of the

Classes resulting from these unfair acts and practices outweighs any

conceivable reasons, justifications, or motives that ZGG may have had for

engaging in such deceptive acts and practices.

270.  Additionally, ZGG violated the "fraudulent" prong of the UCL

because its marketing and advertising materials included prices that

reasonable consumers understood to represent original, ordinary,

prevailing or normal prices for virtual coins in Jackpot Master, whereas
those prices were fictious and inflated as compared to the prevailing offers
Jackpot Master made to other users.

271.  Additionally, ZGG violated the "fraudulent" prong of the UCL
because its Super Sale offers included countdown timers that reasonable
consumers, including Ms. Ochoa, understood to mean that the offers would
be available for only limited duration. In reality, the same or better Super
Sale offers would be offered in Jackpot Master repeatedly and frequently.

272.  Ms. Ochoa and members of the Classes suffered cognizable
harm as a result of these unfair acts and practices. Ms. Ochoa and
members of the Classes reasonably understood the strikethrough graphics
in Jackpot Master described herein as communicating the ordinary, normal,
prevailing former pricing or value for virtual coins in Jackpot Master. In
reality, the stricken values were fictitious. Ms. Ochoa and members of the
Classes reasonably relied on their understanding in their decision to make
in-game purchases in Jackpot Master. But for ZGG's misleading and false
advertising and Ms. Ochoa' and class members' reasonable reliance
thereon, Ms. Ochoa and members of the Classes would not have made
some or all of their purchases in Jackpot Master.

273.  In addition, Ms. Ochoa and members of the Classes reasonably
understood that Super Sale offers in Jackpot Master would be available for
only a limited duration of time. In reality, Super Sale offers of the same or
better value were offered repeatedly and frequently. Ms. Ochoa and
members of the Classes reasonably relied on their understanding of the
duration and urgency regarding Super Sale offers in their decision to make
in-game purchases in Jackpot Master. But for ZGG's misleading and false
advertising and Ms. Ochoa's and class members' reasonable reliance

thereon, Ms. Ochoa and members of the Classes would not have made some or all of their purchases in Jackpot Master.

274.  As a result of these violations under each of the fraudulent, unfair, and unlawful prongs of the UCL, ZGG has been unjustly enriched at the expense of Ms. Ochoa and the Classes. Specifically, ZGG has been unjustly enriched by obtaining revenues and profits that it would not otherwise have obtained absent its false, misleading, and deceptive conduct.

275.  Ms. Ochoa enjoys playing mobile games and is continuously in the market for lawful mobile games. As such, she is likely to continue to encounter Defendant's unlawful Games absent injunctive relief.

276.  ZGG is continuing to expose the general public to its false advertising. Plaintiffs, members of the class and the general public continue to use their mobile devices to explore new applications and therefore have an ongoing interest in ZGG discontinuing its illegal, unfair and fraudulent business practices.

277.  Through its unfair acts and practices, ZGG improperly obtained money from Ms. Ochoa and members of the Classes. As such, Plaintiffs, on behalf of themselves and the putative Classes, request that this Court cause ZGG to restore this money to Ms. Ochoa and the members of the Classes, and to enjoin ZGG from continuing to violate the UCL, and/or from violating the UCL in the future. Otherwise, Ms. Ochoa and members of the Classes may be irreparably harmed and/or denied an effective and complete remedy if such an order is not granted.

## SECOND CLAIM FOR RELIEF
### Violation of California's Unfair Competition Law ("UCL")
### Cal. Bus. & Profession Code §17200 *et seq.*
### Ms. Ochoa - Illegal Gambling

278.  Ms. Ochoa incorporates by reference all allegations in this Complaint and restates them as if fully set forth herein.

279.  Ms. Ochoa brings this claim for relief on behalf of themselves and all Classes.

280.  The UCL defines unfair business competition to include any "unlawful, unfair or fraudulent" act or practice, as well as any "unfair, deceptive, untrue or misleading" advertising. Cal. Bus. & Prof. Code §17200.

281.  A business act or practice is "unlawful" under the UCL if it violates any other law or regulation.

282.  As a result of engaging in the conduct alleged in this Complaint, Defendant has violated the UCL's proscription against engaging in "unlawful" conduct by virtue of its violations of the following laws:

**(a) California's Gambling Control Act (Cal. Bus. & Prof. Code §§ 19800, *et seq.*)**: Sections 19801 and 19850 of the Gambling Control Act provide that unless licensed, state law prohibits commercially operated gambling facilities; that no new gambling establishment may be opened except upon affirmative vote of the electors; that all gambling operations and persons having significant involvement therein shall be licensed, registered, and regulated; and that all persons involved in dealing, operating, carrying on, conducting, maintaining or exposing for play any gambling game shall apply for and obtain a valid state gambling license. The Games and their coins constitute a "gambling game" because they are a "controlled game," which is "any game of chance, including any gambling

device…played for currency, check, credit, or any other thing of value that
is not prohibited and made unlawful by statute or local ordinance." Cal.
Penal Code § 337j(1). As alleged herein, ZGG operates, carries on,
conducts, maintains, and exposes for play gambling activities. On
information and belief, ZGG has not applied for or obtained any state
gambling license, and therefore violates California's Gambling Control Act.

**(b) California Penal Code § 330a:** Titled "Possession or
keeping of slot or card machine or card dice," section 330a declares that
"[e]very person, who has in his or her possession or under his or her
control…or who permits to be placed, maintained, or kept in any room,
space, inclosure, or building owned, leased, or occupied by him or her, or
under his or her management or control, any slot or card machine,
contrivance, appliance or mechanical device, upon the result of action of
which money or other valuable thing is staked or hazarded, and which is
operated, or played, by placing or depositing therein any coins, checks,
slugs, balls, or other articles or device, or in any other manner and by
means whereof, or as a result of the operation of which any merchandise,
money, representative or articles of value, checks, or tokens, redeemable
in or exchangeable for money or any other thing of value, is won or lost, or
taken from or obtained from the machine, when the result of action or
operation of the machine, contrivance, appliance, or mechanical device is
dependent upon hazard or chance…is guilty of a misdemeanor."
Defendants violate section 330a because as alleged, Defendants each
possess, have under their control, or permit illegal slot machines where
tokens or things of value are won or lost upon chance.

**(c) California Penal Code § 330b:** Titled "Possession or
keeping of slot machines or devices," section 330b declares that "[i]t is

unlawful for any person to manufacture, repair, own, store, possess, sell, rent, lease, let on shares, lend or give away, transport, or expose for sale or lease, or to offer to repair, sell, rent, lease, let on shares, lend or give away, or permit the operation, placement, maintenance, or keeping of, in any place, room, space, or building owned, leased, or occupied, managed, or controlled by that person, any slot machine or device, as defined in this section." It is also "unlawful for any person to make or permit the making of an agreement with another person regarding any slot machine or device, by which the user of the slot machine or device, as a result of the element of hazard or chance or other unpredictable outcome, may become entitled to receive money, credit, allowance, or other thing of value or additional chance or right to use the slot machine or device…" As alleged, ZGG makes, repairs, owns and gives away the Games' slot machines. Further, as alleged, ZGG has made agreements with Apple, Google, Plaintiffs, members of the Classes and others regarding slot machines or devices and permits the operation, placement, maintenance, or keeping of a slot machine or device as defined by Penal Code § 330b(d). Still further, as alleged, AC has made or permitted the making of an agreement with AppLovin Cyprus Ltd., ZGG, Madness Limited, Apple, Google, Plaintiffs, members of the Classes and others regarding slot machines or devices.

**(d) California Penal Code §§ 330.1 et seq.**: Titled "Manufacture, possession, or disposition of slot machines or device," section 330.1(a) declares that "Every person who manufactures, owns, stores, keeps, possesses, sells, rents, leases, lets on shares, lends or gives away, transports, or exposes for sale or lease, or offers to sell, rent, lease, let on shares, lend or give away or who permits the operation of or permits to be placed, maintained, used, or kept in any room, space, or

building owned, leased, or occupied by him or her or under his or her

management or control, any slot machine or device as hereinafter defined,

and every person who makes or permits to be made with any person any

agreement with reference to any slot machine or device as hereinafter

defined, pursuant to which agreement the user thereof, as a result of any

element of hazard or chance, may become entitled to receive anything of

value or additional chance or right to use that slot machine or device, or to

receive any check, slug, token, or memorandum, whether of value or

otherwise, entitling the holder to receive anything of value, is guilty of a

misdemeanor." Defendants violate section 330.1 because as alleged,

Defendants have made agreements with others regarding slot machines or

devices, or otherwise possess or permit illegal slot machines or devices

where things of value are won as a result of chance "irrespective of

whether it may, apart from any element of hazard or chance, also sell,

deliver, or present some…entertainment, or other thing of value" (Cal.

Penal Code § 330.1(f)). The virtual coins that may be won by paying to play

the slot machines in the Games are a "token" or "thing of value" as used in

section 330.1 and as defined by section 330.2.

    **(e) California Penal Code § 337j(a)(1)**: By "operat[ing],

carry[ing] on, conduct[ing], maintain[ing], or expos[ing] for play" unlicensed

gambling in this state, ZGG violates Penal Code § 337j(a)(1).

    **(f) California Penal Code § 337j(a)(2)**: By "receiv[ing], directly

or indirectly, any compensation or reward or any percentage or share of the

revenue, for keeping, running, or carrying on any controlled game,"

Defendants each violate Penal Code § 337j(a)(2).

    **(g) California Penal Code § 337j(a)(3)**: Through the

"manufacture, distribut[ion], or repair [of] any gambling equipment within

the boundaries of this state" or "receiv[ing], directly or indirectly, any compensation or reward for the manufacture, distribution, or repair of any gambling equipment within the boundaries of this state" Defendants each violate Penal Code § 337j(a)(3).

**(h) California Penal Code §319:** "A lottery is any scheme for the disposal or distribution of property by chance, among persons who have paid or promised to pay any valuable consideration for the chance of obtaining such property or a portion of it, or for any share or any interest in such property, upon any agreement, understanding, or expectation that it is to be distributed or disposed of by lot or chance, whether called a lottery, raffle, or gift enterprise, or by whatever name the same may be known." The Games are illegal lotteries as defined by California Penal Code 319. Cal. Penal Code §§319, 322, 323, 326.

283.  Defendants have violated the "unlawful" prong under the UCL. Defendants have violated the above-identified California Penal Code sections by making, selling, distributing, entering into agreements relating to and profiting from the Games. Defendants have further violated the above-identified California Penal Code sections through the sale of virtual coins in the Games.

284.  Because Defendants' profiting from the sale of virtual coins in the Games is illegal, Ms. Ochoa and members of the Classes, who by definition purchased such illegal virtual coins, have suffered a cognizable harm under UCL. *Debernardis v. IQ Formulations, LLC*, 942 F.3d 1076, 1086 (11th Cir. 2019); *Allergan U.S. v.Imprimis Pharm., Inc.*, 2019 U.S. Dist. LEXIS 163228, at *27 n.9 (C.D. Cal. Mar. 27, 2019); *Franz v. Beiersdorf, Inc.*, 745 F. App'x 47, 48 (9th Cir. 2018)).

285.  A business act or practice is "unfair" under the UCL if the

1  reasons, justifications, and motives of the alleged wrongdoer are
2  outweighed by the gravity of the harm to the alleged victims. A business act
3  or practice is "fraudulent" under the UCL if it is likely to deceive members of
4  the consuming public.

5  286.  The sale of virtual coins in the Games is unfair and fraudulent
6  under the UCL, because Defendants failed to disclose they are illegal
7  under California's gambling laws. That omission was a material factor in
8  Ms. Ochoa's decision to download, play and expend money purchasing
9  virtual coins in Jackpot Master. Had Ms. Ochoa that Jackpot Master
10 violated California's gambling laws, she would not have downloaded and
11 began playing it or spending money in Jackpot Master.

12 287.  As a result of these violations under each of the fraudulent,
13 unfair, and unlawful prongs of the UCL, ZGG has been unjustly enriched at
14 the expense of Ms. Ochoa and the putative class members. Specifically,
15 ZGG has been unjustly enriched by obtaining revenues and profits it would
16 not otherwise have obtained absent its false, misleading, and deceptive
17 conduct. ZGG will continue to unjustly enrich from the Games from
18 members of the putative class and other consumers if its conduct is not
19 enjoined.

21 288.  Ms. Ochoa enjoys playing mobile games and is continuously in
22 the market for lawful mobile games. As such, she is likely to continue to
23 encounter Defendant's unlawful Games absent injunctive relief.

24 289.  Ms. Ochoa, on behalf of herself, the putative Classes and the
25 general public, request that this Court enjoin ZGG from violating the UCL
26 and California gambling laws with respect to Jackpot Master and any other
27 game it develops and publishes now or in the future, including without
28 limitation Cash Tornado and Jackpot Friends. Otherwise, Ms. Ochoa and

the public will be irreparably harmed and/or denied an effective and complete remedy if such an order is not granted. ZGG has demonstrated its willingness to continue violating California gambling laws. Ms. Ochoa and members of the public continue to use their mobile devices to download mobile applications and therefore have a continuing interest in ensuring that the applications available on the Apple and Google mobile stores are not misleadingly distributing illegal, unlicensed and addictive games of chance.

**THIRD CLAIM FOR RELIEF**
**Violation of California False Advertising Law ("FAL")**
**Ms. Ochoa - Cal. Business & Professional Code §17500 *et seq*.**

290.  Plaintiffs incorporate by reference all allegations in this Complaint and restates them as if fully set forth herein.

291.  The  FAL  prohibits unfair, deceptive, untrue, or misleading advertising, including, but not limited to, false statements as to worth, value, and former price.

292.  Furthermore, the FAL provides that: "No price shall be advertised as a former price of any advertised thing, unless the alleged former price was the prevailing market price as above defined within three months next immediately preceding the publication of the advertisement or unless the date when the alleged former price did prevail is clearly, exactly and conspicuously stated in the advertisement." Cal. Bus. & Prof. Code §17501.

293.  The false strikethrough ads and false limited time special ads misrepresent the existence of a sale whereby players can allegedly purchase more gold than they normally could for the same price.

294.  Ms. Ochoa enjoys playing mobile games and is continuously in the market for lawful mobile games. As such, she is likely to continue to

1  encounter Defendant's unlawful Games absent injunctive relief.

2      295.  ZGG is continuing to expose the general public to its false

3  advertising. Plaintiffs, members of the class and the general public continue

4  to use their mobile devices to explore new applications and therefore have

5  an ongoing interest in ZGG discontinuing its illegal, unfair and fraudulent

6  business practices.

7      296.  Through its unfair acts and practices, ZGG has improperly

8  obtained money from Ms. Ochoa and members of the Classes. As such,

9  Ms. Ochoa, on behalf of herself and the putative Classes, request that this

10  Court cause ZGG to restore this money to her and the members of the

11  Classes, and to enjoin ZGG from continuing to violate the FAL, and/or from

12  violating the FAL in the future. Otherwise, Ms. Ochoa and members of the

13  Classes may be irreparably harmed and/or denied an effective and

14  complete remedy if such an order is no granted.

15              **FOURTH CLAIM FOR RELIEF**
16  **Violation of the California Consumer Legal Remedies Act ("CLRA")**
    **Cal. Civ. Code. §1750 *et seq.***
17  **Ms. Ochoa - False and Misleading Sales**

18      297.  Plaintiffs incorporate by reference all allegations in this

19  Complaint and restate them as if fully set forth herein.

20      298.  Ms. Ochoa and members of the Classes are consumers within

21  the meaning of Cal. Civ. Code §1761(d) and have engaged in a transaction

22  within the meaning of Cal. Civ. Code §§1761(e) and 1770.

23      299.  ZGG is a "person" within the meaning of Cal. Civ. Code

24  §§1761(c) and 1770 and sells "goods or services" within the meaning of

25  Cal. Civ. Code §§1761(b) and 1770.

26      300.  Jackpot Master is a "service" within the meaning of Cal. Civ.

27  Code. §§1761(a) and (b). Specifically, Jackpot Master provides online

28

gaming services. The purchase of in-game gold in Jackpot Master is a transaction for accessing those services. The purpose of the in-game gold is to access the gameplay services offered by Jackpot Master and the purchase of in-game gold is used to access those services.

301.  ZGG's May 2020 terms of service for Jackpot Master defines is as "Services." ZGG's October 2022 terms of service for Jackpot Master states that ZGG "provide[s] a service in the form of access to games."

302.  ZGG has violated §1770(a)(13)'s proscription against making false or misleading statements of fact concerning reasons for, existence of, or amounts of, price reductions by misrepresenting the existence of discounts for the purchase of gold coins via false strikethrough ads.

303.  Ms. Ochoa and the putative Classes suffered actual damages as a direct and proximate result of ZGG's actions, concealment, and/or omissions in the advertising, marketing, and promotion of the Games, in violation of the CLRA, as evidenced by the substantial sums ZGG has pocketed.

304.  On June 9, 2022, Ms. Ochoa's counsel wrote to ZGG enclosing a copy of her original complaint and seeking resolution of her claims. ZGG never responded.

305.  Ms. Ochoa's First Amended Complaint set forth a CLRA cause of action that sought only injunctive relief. Paragraph 38 of the Ms. Ochoa's First Amended Complaint, within the Third Claim Relief pursuant to CLRA, states: "Plaintiff, on behalf of herself and the Class and Subclass, demands judgment against Defendant **for injunctive relief and attorney's fees**." ECF No. 2-1 at 16 (emphasis added). This claim for relief was specific to the CLRA claim and deliberately excluded damages. While Ms. Ochoa's First Amended Complaint included in its Prayer for Relief a general request

damages (*Id.* at 18), that general prayer for relief was not intended to apply
to the CLRA claim, which included its own specific claim for relief that was
limited to injunctive relief and attorneys' fees.

306.   More than thirty days after serving her FAC on Defendant, Ms.
Ochoa filed and served her Second Amended Complaint. Paragraph 95 of
the Second Amended Complaint changed the claim for relief for the CLRA
claim to specifically add damages, which was absent in the corresponding
sentence in the FAC: "Plaintiff, on behalf of herself and the Class and
Subclass, demands judgment against Defendants for **damages, injunctive
relief and attorney's fees**." SAC at ¶95 (emphasis added). This
demonstrates Ms. Ochoa's intent to limit the relief sought under CLRA
claim in the FAC to only injunctive relief. Ms. Ochoa's addition of a
damages claim under CLRA in the SAC and in this Third Amended
Complaint is therefore permissible under California Civil Code §1782(d).

307.   Even if it is found the original Complaint and First Amended
Complaint inadvertently and impermissibly made a claim for damages
under CLRA, Courts have found that the appropriate remedy is not
dismissal, but to strike the prior damages claim with leave to amend
pursuant to §1782(d). *Deitz v. Comcast Corp.*, No. C 06-06352 WHA, 2006
WL 3782902, at *6 (N.D. Cal. Dec. 21, 2006) (dismissing with leave to
amend CLRA claim "[g]iven that the legislature specifically contemplated
that an action seeking injunctions can be amended to include a damages
claim after the thirty days have run."); *Werdebaugh v. Blue Diamond
Growers*, No. 12-CV-02724-LHK, 2013 WL 5487236, at *17 (N.D. Cal. Oct.
2, 2013) (holding plaintiff was not required to seek leave to amend under
Rule 15 in order to add his claim for CLRA money damages); *Seifi v.
Mercedes-Benz USA, LLC*, No. C12-5493 THE, 2013 WL 5568449 at *6

(N.D. Cal. Oct. 9, 2013).

308.  Ms. Ochoa enjoys playing mobile games and is continuously in the market for lawful mobile games. As such, she is likely to continue to encounter Defendant's unlawful Games absent injunctive relief.

309.  ZGG is continuing to expose the general public to its false advertising. Plaintiffs, members of the class and the general public continue to use their mobile devices to explore new applications and therefore have an ongoing interest in ZGG discontinuing its illegal, unfair and fraudulent business practices.

310.  Plaintiffs, on behalf of themselves and the Classes, demand judgment against ZGG for injunctive relief and attorney's fees and to the extent permitted by the Court, damages.

## FIFTH CLAIM FOR RELIEF
### Violation of the California Consumer Legal Remedies Act ("CLRA")
### Cal. Civ. Code. §1750 *et seq.*
### Ms. Ochoa - Illegal Gambling

311.  Plaintiffs incorporate by reference all allegations in this Complaint and restate them as if fully set forth herein.

312.  Ms. Ochoa and members of the Classes are consumers within the meaning of Cal. Civ. Code §1761(d) and have engaged in a transaction within the meaning of Cal. Civ. Code §§1761(e) and 1770.

313.  ZGG is a "person" within the meaning of Cal. Civ. Code §§1761(c) and 1770 and sells "goods or services" within the meaning of Cal. Civ. Code §§1761(b) and 1770.

314.  The Games are each a "service" within the meaning of Cal. Civ. Code. §§1761(a) and (b). Specifically, the Games each provide online gaming services. The purchase of in-game gold for these games is a transaction for accessing those services. The only purpose of the in-game

gold is to access the gameplay services offered by the Games and the
purchase of in-game gold is necessary to access those services when
players run out of such gold.

315.  ZGG states in its terms of use for the Games that ZGG
"provide[s] a service in the form of access to games."

316.  By engaging in the conduct described herein, ZGG has violated
subdivision (a)(14) of California Civil Code §1770 by: "Representing that a
transaction confers or involves rights, remedies, or obligations that it does
not have or involve, or that are prohibited by law." Under this provision,
omissions are actionable.

317.  ZGG has advertised the Games while omitting that the Games
are engaged in illegal gambling.

318.  By engaging in the conduct described herein, ZGG has also
violated subdivision (a)(26) of California Civil Code §1770 by "Advertising,
offering for sale, or selling a financial product that is illegal under state or
federal law…."

319.  ZGG advertises the Games and their illegal financial products
on ZGG's website, through social media and through the App Store and
Play Store. ZGG also advertises, offers for sale and sells virtual coins in the
Games that are illegal financial products.

320.  ZGG violated the CLRA by representing to or omitting from Ms.
Ochoa and members of the Classes that the transactions involving virtual
coins in Jackpot Master confer or involve rights to potentially valuable
prizes, when in fact these transactions constitute unlawful gambling
transactions that are prohibited by law, foster compulsive and addictive
behavior, and are a predatory form of duplicitously profiting from others.
These omissions are material because a reasonable consumer would

FOURTH AMENDED COMPLAINT

deem them important in determining how to act in the transaction at issue and, if prohibited by law, should not have been permitted to purchase virtual coins. Further, the omissions about virtual coins are misleading in light of other facts that ZGG did disclose.

321.  ZGG's violations of the CLRA proximately caused injury in fact to Ms. Ochoa and the members of the Classes.

322.  Ms. Ochoa and the members of the Classes transacted with the Jackpot Master on the belief that the transaction was lawful. Indeed, a reasonable consumer believes in the lawfulness of his or her transactions.

323.  Ms. Ochoa enjoys playing mobile games and is continuously in the market for lawful mobile games. As such, she is likely to continue to encounter Defendant's unlawful Games absent injunctive relief.

324.  ZGG is continuing to expose the general public to its illegal gambling. Plaintiffs, members of the class and the general public continue to use their mobile devices to explore new applications and therefore have an ongoing interest in ZGG discontinuing its illegal, unfair and fraudulent business practices.

325.  Pursuant to Cal. Civ. Code § 1782(d), Ms. Ochoa, individually and on behalf of the other members of the Classes, seek a Court order enjoining the above-described wrongful acts and practices of ZGG and attorneys' fees.

326.  Plaintiffs, individually and on behalf of the other members of the Classes, do not presently seek damages for this claim for relief, but reserve the right to seek leave to amend pursuant to §1782(d) to add a claim for relief for damages.

FOURTH AMENDED COMPLAINT

## SIXTH CLAIM FOR RELIEF
### California Common Law Fraud
### Ms. Ochoa – Illegal Gambling

327.  Plaintiffs incorporate by reference all allegations in this Complaint and restate them as if fully set forth herein.

328.  ZGG advertised Jackpot Master to Ms. Ochoa and members of the Classes and omitted that Jackpot Master violated California's gambling laws.

329.  ZGG presented Jackpot Master publicly as a free-to-play "social casino" game and omitted that Jackpot Master provided illegal games of chance and slot machines under California law.

330.  These representations and omissions were false because Jackpot Master violates California's gambling laws.

331.  On information and belief, ZGG knew, actually or constructively, that these representations and omissions were false following the Ninth Circuit decision in *Kater*.

332.  These representations and omissions were material to the decision of Ms. Ochoa and members of the Classes in downloading and playing Jackpot Master.

333.  Ms. Ochoa and members of the Classes had a reasonable expectation that ZGG and Jackpot Master complied with California law, because ZGG is headquartered in California, its parent company is headquartered in California and it distributes Jackpot Master through mobile devices and storefronts owned and operated by California entities.

334.  Ms. Ochoa and members of the Classes reasonably relied on these representations and omissions in deciding to download and play Jackpot Master.

335.  Had Ms. Ochoa and members of the Classes known Jackpot

Master was engaging in illegal gambling, they would not have downloaded and played Jackpot Master.

336.  Ms. Ochoa and members of the Classes were harmed, because if they had never downloaded and played Jackpot Master they would not have played its illegal slot machines, been subjected to its false advertising, induced into making purchases of virtual coins and lost those coins to the game's slot machines.

337.  ZGG is continuing to violate California's gambling laws through the Games and has introduced at least one new game that also violates California's gambling laws. ZGG's continuing and expanding activities exposes the general public to illegal and addictive games of chance that will irreparably harm those and future consumers. Ms. Ochoa and members of the Classes have an ongoing interest in the legal compliance of games openly distributed in mobile storefronts, particularly when exposing the public, including minors, to illegal and addictive games of chance without warning, adequate disclosure or safeguards.

338.  The public harm caused by the Games and ZGG's activities far outweigh any benefit.

339.  Ms. Ochoa enjoys playing mobile games and is continuously in the market for lawful mobile games. As such, she is likely to continue to encounter Defendant's unlawful Games absent injunctive relief.

340.  Ms. Ochoa, on behalf of herself, the Classes and the public, demand judgment against Defendants for equitable relief, including injunctive relief, disgorgement of profits and attorney's fees.

## SEVENTH CLAIM FOR RELIEF
**California Common Law Fraud**
**Ms. Ochoa – False Advertising**

341.  Plaintiffs incorporate by reference all allegations in this
Complaint and restate them as if fully set forth herein.

342.  ZGG represented to Ms. Ochoa and members of the Classes
when they began playing Jackpot Master that Super Sale offers in Jackpot
Master would be available for only a limited duration and that the stricken
prices in the Super Sale ads represented the ordinary, normal and
prevailing price for the listed quantity of gold coins offered in Jackpot
Master.

343.  These representations were false because the prevailing price
for the listed quantity of gold coins was lower than represented by ZGG in
the Super Sale offers presented to new users. These representations were
also false because the Super Sale offers would be offered repeatedly and
frequently, and are only unavailable for trivial periods of time, if any.

344.  ZGG knew these representations were false, because it had
knowledge of and control over Jackpot Master's advertisements and offers
for coins.

345.  ZGG designed the graphical images of the advertisements in a
way that intentionally attracted Ms. Ochoa and the members of the Classes
to the enticing but false claims regarding gold amounts, pricing and the
duration of sales.

346.  Ms. Ochoa and the putative Classes reasonably relied upon the
claims made in the advertisements in deciding to purchase the
aforementioned coin bundles.

347.  Ms. Ochoa and the putative Classes were harmed because,

had Ms. Ochoa and class members known the claims were false, they
would not have made some or all of those purchases.

348.  Ms. Ochoa's and class members' reliance on ZGG's
misrepresentations in its advertisements was a substantial factor in causing
harm to Ms. Ochoa and the putative Classes.

349.  ZGG is continuing to deploy misleading Super Sale offers in
Jackpot Master and Cash Tornado and using the same misleading Super
Sale offers in a recently released game. Unless enjoined, ZGG will continue
engaging in this false and misleading business practice, which induces
users to spend money in ZGG's games as early as possible and become
trapped in an addictive compulsion loop of spending. ZGG's ongoing
conduct creates a risk of irreparable harm to the general public. Ms. Ochoa,
members of the Classes and the public have an ongoing interest in
preventing games being openly distributed in mobile storefronts that they
continue to use from engaging in unfair and illegal business practices.

350.  Ms. Ochoa enjoys playing mobile games and is continuously in
the market for lawful mobile games. As such, she is likely to continue to
encounter Defendant's unlawful Games absent injunctive relief.

351.  Ms. Ochoa, on behalf of herself, the Classes and the public,
demands judgment against ZGG for damages, injunctive relief, restitution
and attorney's fees.

## EIGHT CLAIM FOR RELIEF
### Negligent Misrepresentation
### Ms. Ochoa – Illegal Gambling

352.  Plaintiffs incorporate by reference all allegations in this
Complaint and restate them as if fully set forth herein.

353.  ZGG advertised Jackpot Master to Ms. Ochoa and members of
the Classes and omitted that Jackpot Master violated California's gambling

laws.

354.  ZGG presented Jackpot Master publicly as a free-to-play "social casino" game and omitted that Jackpot Master provided illegal games of chance and slot machines under California law.

355.  These representations and omissions were false because Jackpot Master violates California's gambling laws.

356.  ZGG has a duty to know whether its Games comply with California gambling laws.

357.  On information and belief, ZGG should have known that these representations and omissions were false following the Ninth Circuit decision in *Kater*. On information and belief, ZGG did not take reasonable steps to ensure that its Games complied with California gambling laws.

358.  These representations and omissions were material to the decision of Ms. Ochoa and members of the Classes in downloading and playing Jackpot Master.

359.  Ms. Ochoa and members of the Classes had a reasonable expectation that ZGG and Jackpot Master complied with California law, because ZGG is headquartered in California, its parent company is headquartered in California and it distributes Jackpot Master through mobile devices and storefronts owned and operated by California entities.

360.  Ms. Ochoa and members of the Classes reasonably relied on these representations and omissions in deciding to download and play Jackpot Master.

361.  Had Ms. Ochoa and members of the Classes known Jackpot Master was engaging in illegal gambling, they would not have downloaded and played Jackpot Master.

362.  Ms. Ochoa and members of the Classes were harmed, because

if they had never downloaded and played Jackpot Master they would not have played its illegal slot machines, been subjected to its false advertising, induced into making purchases of virtual coins and lost those coins to the game's slot machines.

363.  ZGG is continuing to violate California's gambling laws through the Games and has introduced at least one new game that also violates California's gambling laws. ZGG's continuing and expanding activities exposes the general public to illegal and addictive games of chance that will irreparably harm those and future consumers. Ms. Ochoa and members of the Classes have an ongoing interest in the legal compliance of games openly distributed in mobile storefronts, particularly when exposing the public, including minors, to illegal and addictive games of chance without warning, adequate disclosure or safeguards.

364.  The public harm caused by the Games and ZGG's activities far outweigh any benefit.

365.  Ms. Ochoa enjoys playing mobile games and is continuously in the market for lawful mobile games. As such, she is likely to continue to encounter Defendant's unlawful Games absent injunctive relief.

366.  Ms. Ochoa, on behalf of herself, the Classes and the public, demand judgment against Defendants for equitable relief, including injunctive relief, disgorgement of profits and attorney's fees.

## NINTH CLAIM FOR RELIEF
### Negligent Misrepresentation
### Ms. Ochoa – False Advertising

367.  Plaintiffs incorporate by reference all allegations in this Complaint and restate them as if fully set forth herein.

368.  ZGG represented to Ms. Ochoa and members of the Classes

when they began playing Jackpot Master that Super Sale offers in Jackpot Master would be available for only a limited duration and that the stricken prices in the Super Sale ads represented the ordinary, normal and prevailing price for the listed quantity of gold coins offered in Jackpot Master.

369.  These representations were false because the prevailing price for the listed quantity of gold coins was lower than represented by ZGG in the Super Sale offers presented to new users. These representations were also false because the Super Sale offers would be offered repeatedly and frequently, and are only unavailable for trivial periods of time, if any.

370.  ZGG should have known that these representations were false, because it had knowledge of and control over Jackpot Master's advertisements and offers for coins.

371.  ZGG designed the graphical images of the advertisements in a way that intentionally attracted Ms. Ochoa and the members of the Classes to the enticing but false claims regarding gold amounts, pricing and the duration of sales.

372.  Ms. Ochoa and the putative Classes reasonably relied upon the claims made in the advertisements in deciding to purchase the aforementioned coin bundles.

373.  Ms. Ochoa and the putative Classes were harmed because, had Ms. Ochoa and class members known the claims were false, they would not have made some or all of those purchases.

374.  Ms. Ochoa's and class members' reliance on ZGG's misrepresentations in its advertisements was a substantial factor in causing harm to Ms. Ochoa and the putative Classes.

375.  ZGG is continuing to deploy misleading Super Sale offers in

Jackpot Master and Cash Tornado and using the same misleading Super Sale offers in a recently released game. Unless enjoined, ZGG will continue engaging in this false and misleading business practice, which induces users to spend money in ZGG's games as early as possible and become trapped in an addictive compulsion loop of spending. ZGG's ongoing conduct creates a risk of irreparable harm to the general public. Ms. Ochoa, members of the Classes and the public have an ongoing interest in preventing games being openly distributed in mobile storefronts that they continue to use from engaging in unfair and illegal business practices.

376.   The public harm caused by the Games and ZGG's activities far outweigh any benefit.

377.   Ms. Ochoa enjoys playing mobile games and is continuously in the market for lawful mobile games. As such, she is likely to continue to encounter Defendant's unlawful Games absent injunctive relief.

378.   Ms. Ochoa, on behalf of herself, the Classes and the public, demands judgment against ZGG for damages, injunctive relief, restitution and attorney's fees.

### TENTH CLAIM FOR RELIEF
**Arkansas Common Law Fraud**
**Ms. Brown – Illegal Gambling**

379.   Plaintiffs incorporate by reference all allegations in this Complaint and restate them as if fully set forth herein.

380.   ZGG advertised Cash Tornado to Ms. Brown and members of the Classes and omitted that Cash Tornado violates Arkansas and California gambling laws, in addition to other state's laws, such as Washington.

381.   ZGG presented Cash Tornado publicly as a free-to-play "social casino" game and omitted that Cash Tornado provided illegal slot machines

and games of chance under Arkansas and California law.

382.  These representations and omissions were false because Cash Tornado violates at least Arkansas and California gambling laws.

383.  On information and belief, ZGG knew, actually or constructively, that these representations and omissions were false following the Ninth Circuit decision in *Kater*.

384.  These representations and omissions were material to the decision of Ms. Brown and members of the Classes in downloading and playing Cash Tornado.

385.  Ms. Brown and members of the Classes had a reasonable expectation that ZGG and Cash Tornado complied with California law, because ZGG is headquartered in California, its parent company is headquartered in California and it distributes Cash Tornado through mobile devices and storefronts owned and operated by California entities.

386.  Ms. Brown and members of the Arkansas Classes further had a reasonable expectation that ZGG and Cash Tornado complied with Arkansas law.

387.  Ms. Brown and members of the Classes reasonably relied on these representations and omissions in deciding to download and play Cash Tornado.

388.  Had Ms. Brown and members of the Classes known Cash Tornado was engaging in illegal gambling, they would not have downloaded and played Cash Tornado.

389.  Ms. Brown and members of the Classes were harmed, because if they had never downloaded and played Cash Tornado they would not have played its illegal slot machines, been subjected to its false advertising, induced into making purchases of virtual coins and lost those coins to the

1    game's slot machines.

2    390.  ZGG is continuing to violate Arkansas and California gambling

3    laws through the Games and has introduced at least one new game that

4    also violates Arkansas and California gambling laws. ZGG's continuing and

5    expanding activities exposes the general public to illegal and addictive

6    games of chance that will irreparably harm those and future consumers.

7    Ms. Brown and members of the Classes have an ongoing interest in the

8    legal compliance of games openly distributed in mobile storefronts,

9    particularly when exposing the public, including minors, to illegal and

10   addictive games of chance without warning, adequate disclosure or

11   safeguards.

12   391.  ZGG's representations and omissions regarding Cash Tornado

13   and its non-compliance with gambling laws in Arkansas and California

14   constitute fraud under Arkansas common law. To the extent California fraud

15   law cannot apply to certain class members, Arkansas fraud law can apply,

16   because no differences in common law fraud under Arkansas and other

17   state laws are material to the claims here.

18   392.  Ms. Brown enjoys playing mobile games and is continuously in

19   the market for lawful mobile games. As such, she is likely to continue to

20   encounter Defendant's unlawful Games absent injunctive relief.

21

22   393.  The public harm caused by the Games and ZGG's activities far

23   outweigh any benefit.

24   394.  Ms. Brown, on behalf of herself, the Classes and the public,

25   demand judgment against Defendants under Arkansas common law fraud

26   for damages, restitution, equitable relief, including injunctive relief,

27   disgorgement of profits and attorney's fees.

28

# ELEVENTH CAUSE OF ACTION
## Arkansas Common Law Fraud
## Ms. Brown – False Advertising

395.   Plaintiffs incorporate by reference all allegations in this Complaint and restate them as if fully set forth herein.

396.   ZGG represented to Ms. Brown and members of the Classes when they began playing Cash Tornado that Super Sale offers in Cash Tornado would be available for only a limited duration and that the stricken prices in the Super Sale ads represented the ordinary, normal and prevailing price for the listed quantity of gold coins offered in Cash Tornado.

397.   These representations were false because the prevailing price for the listed quantity of gold coins was lower than represented by ZGG in the Super Sale offers presented to new users. These representations were also false because the Super Sale offers would be offered repeatedly and frequently, and are only unavailable for trivial periods of time, if any.

398.   ZGG knew these representations were false, because it had knowledge of and control over Cash Tornado's advertisements and offers for coins.

399.   ZGG designed the graphical images of the advertisements in a way that intentionally attracted Ms. Brown and the members of the Classes to the enticing but false claims regarding gold amounts, pricing and the duration of sales.

400.   Ms. Brown and the putative Classes reasonably relied upon the claims made in the advertisements in deciding to purchase the aforementioned coin bundles.

401.   Ms. Brown and the putative Classes were harmed because, had Ms. Brown and class members known the claims were false, they would not

1  have made some or all of those purchases.

2      402.  Ms. Brown's and class members' reliance on ZGG's

3  misrepresentations in its advertisements was a substantial factor in causing

4  harm to Ms. Brown and the putative Classes.

5      403.  ZGG is continuing to deploy misleading Super Sale offers in

6  Cash Tornado and using the same misleading Super Sale offers in a

7  recently released game. Unless enjoined, ZGG will continue engaging in

8  this false and misleading business practice, which induces users to spend

9  money in ZGG's games as early as possible and become trapped in an

10 addictive compulsion loop of spending. ZGG's ongoing conduct creates a

11 risk of irreparable harm to the general public. Ms. Brown, members of the

12 Classes and the public have an ongoing interest in preventing games being

13 openly distributed in mobile storefronts that they continue to use from

14 engaging in unfair and illegal business practices.

15     404.  ZGG's misrepresentations in Super Sale offers in Cash Tornado

16 constitute fraud under Arkansas common law. To the extent California fraud

17 law cannot apply to certain class members, Arkansas fraud law can apply,

18 because no differences in common law fraud under Arkansas and other

19 state laws are material to the claims here.

20

21     405.  Ms. Brown enjoys playing mobile games and is continuously in

22 the market for lawful mobile games. As such, she is likely to continue to

23 encounter Defendant's unlawful Games absent injunctive relief.

24     406.  The public harm caused by the Games and ZGG's activities far

25 outweigh any benefit.

26     407.  Ms. Brown, on behalf of herself, the Classes and the public,

27 demand judgment against Defendants under Arkansas common law fraud

28 for damages, restitution, equitable relief, including injunctive relief,

1  disgorgement of profits and attorney's fees.

2  **TWELFTH CLAIM FOR RELIEF**
3  **Arkansas Deceptive Trade Practices Act**
   **Ms. Brown – Illegal Gambling**

4  408.  Plaintiffs incorporate by reference all allegations in this
5  Complaint and restate them as if fully set forth herein.
6
7  409.  Arkansas Code §4-88-107(a) states that "[d]eceptive and
8  unconscionable trade practices made unlawful and prohibited by this
   chapter include, but are not limited to, the following…(10) Engaging in any
9  other unconscionable, false, or deceptive act or practice in business,
10 commerce, or trade…"
11
12 410.  Defendant engages in unconscionable, false, or deceptive acts
13 or practices in the Games by deploying games of chance that are illegal
14 under at least Arkansas, California and Washington law.

15 411.  Arkansas Code §4-88-108 states: "(a) When utilized in
16 connection with the sale or advertisement of any goods, services, or
17 charitable solicitation, the following is unlawful: (1) The act, use, or
18 employment by a person of any deception, fraud, or false pretense; (2) The
19 concealment, suppression, or omission of any material fact with intent that
20 others rely upon the concealment, suppression, or omission…"

21 412.  Defendant utilizes in connection with the Games deception,
22 fraud, false pretense, concealment, suppression, or omissions of material
23 facts with the intent that others rely upon the concealment, suppression or
24 omission. Defendant omits, conceals or suppresses that Cash Tornado
25 violates at least Arkansas, California and Washington gambling laws.

26 413.  Arkansas Code §4-88-113(f) provides: "A person who suffers an
27 actual financial loss as a result of his or her reliance on the use of a
28

practice declared unlawful by this chapter may bring an action to recover
his or her actual financial loss proximately caused by the offense or
violation, as defined in this chapter… To prevail on a claim brought under
this subsection, a claimant must prove individually that he or she suffered
an actual financial loss proximately caused by his or her reliance on the use
of a practice declared unlawful under this chapter…A court may award
reasonable attorney's fees."

414.  Ms. Brown suffered an actual financial loss as a result of her
reliance of Defendant's unlawful business practices. Defendant's unlawful,
unconscionable and deceptive business practices and Defendant's
deception, fraud, false pretense, concealment, suppression, or omissions of
material facts were proximate causes of Ms. Brown's purchase and loss of
virtual coins in Cash Tornado.

415.  Ms. Brown seeks damages and attorneys' fees.

416.  Ms. Brown brings this claim on her own behalf and not on
behalf of any of the Classes.

### THIRTEENTH CLAIM FOR RELIEF
**Arkansas Deceptive Trade Practices Act**
**Ms. Brown – False Advertising**

417.  Plaintiffs incorporate by reference all allegations in this
Complaint and restate them as if fully set forth herein.

418.  Arkansas Code §4-88-107(a) states that "[d]eceptive and
unconscionable trade practices made unlawful and prohibited by this
chapter include, but are not limited to, the following…(10) Engaging in any
other unconscionable, false, or deceptive act or practice in business,
commerce, or trade…"

419.  Defendant engages in unconscionable, false, or deceptive acts

or practices in the Games by providing false and misleading Super Sale offers.

420.  Arkansas Code §4-88-108 states: "(a) When utilized in connection with the sale or advertisement of any goods, services, or charitable solicitation, the following is unlawful: (1) The act, use, or employment by a person of any deception, fraud, or false pretense; (2) The concealment, suppression, or omission of any material fact with intent that others rely upon the concealment, suppression, or omission…"

421.  Defendant utilizes in connection with the Games deception, fraud, false pretense, concealment, suppression, or omissions of material facts with the intent that others rely upon the concealment, suppression or omission. Defendant utilize deception, fraud and false pretense in connection with Super Sale offers in Cash Tornado.

422.  Arkansas Code §4-88-113(f) provides: "A person who suffers an actual financial loss as a result of his or her reliance on the use of a practice declared unlawful by this chapter may bring an action to recover his or her actual financial loss proximately caused by the offense or violation, as defined in this chapter… To prevail on a claim brought under this subsection, a claimant must prove individually that he or she suffered an actual financial loss proximately caused by his or her reliance on the use of a practice declared unlawful under this chapter…A court may award reasonable attorney's fees."

423.  Ms. Brown suffered an actual financial loss as a result of her reliance of Defendant's unlawful business practices. Defendant's unlawful, unconscionable and deceptive business practices and Defendant's deception, fraud, false pretense, concealment, suppression, or omissions of material facts were proximate causes of Ms. Brown's purchase and loss of

virtual coins in Cash Tornado.

424.  Ms. Brown seeks damages and attorneys' fees. Ms. Brown brings this claim on her own behalf and not on behalf of any of the Classes.

## FOURTEENTH CLAIM FOR RELIEF
### Arkansas Common Law Unjust Enrichment
### (Ms. Brown)

425.  Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

426.  By their wrongful acts and omissions, ZGG was unjustly enriched at the expense of and to the detriment of Ms. Brown and the Classes.  ZGG received something of value to which ZGG is not entitled and which should be restored.

427.  ZGG were unjustly enriched as a result of the compensation it received from owning, operating, entering into agreements relating to and profiting from products and services that violate Arkansas and California gambling laws and from operating a gambling enterprise without proper public notice, safeguards or licenses.

428.  ZGG was unjustly enriched as a result of the compensation it received from the misleading marketing and sale of virtual coins in Cash Tornado to Ms. Brown and the members of the Classes.

429.  ZGG employed false and misleading advertising to induce players into making purchases they otherwise would not have made. Requiring ZGG to repay these ill-gotten monies is reasonable and fair.

430.  It is also reasonable that if Cash Tornado employ an element of gambling to make money illegally, ZGG should not be allowed to enjoy profits from that illegal activity.

431.  Ms. Brown on behalf of herself and the Classes seeks

1  restitution from ZGG and an order of this Court disgorging all profits,

2  benefits, and other compensation obtained by ZGG from its wrongful

3  conduct.

4      432.  Ms. Brown and the Classes have no adequate remedy at law.

5  **PRAYER FOR RELIEF**

6  Plaintiff prays for relief and judgment against Defendant as follows:

7    A. Certifying the proposed Classes defined herein;

8    B. Appointing Plaintiffs as Class Representatives;

9    C. Appointing counsel for Plaintiffs as Class Counsel;

10   D. Declaring Defendants' conduct to be unlawful;

11   E. Awarding Plaintiff and members of the Classes compensatory

12     damages and actual damages in an amount to be determined by

13     proof;

14   F. Awarding Plaintiff and members of the Classes actual and statutory

15     damages;

16   G. Disgorging Defendants of its unjust profits;

17   H. For punitive damages;

18   I.  For civil penalties;

19   J.  For declaratory and equitable relief, including restitution and

20     disgorgement;

21   K. For an order enjoining Defendants from continuing to engage in the

22     wrongful acts and practices alleged herein;

23   L. Awarding Plaintiffs the costs of prosecuting this action, including

24     expert witness fees;

25   M. Awarding Plaintiffs reasonable attorney's fees and costs as allowable

26     by law;

27   N. Awarding pre-judgment and post-judgment interest; and

28

O. Granting any other relief as this Court may deem just and proper.

DATED: June 6, 2023                    THE RYAN LAW GROUP

                                       /s/ Andrew T. Ryan
                                       Andrew T. Ryan
                                       Attorney for Plaintiff

FOURTH AMENDED COMPLAINT

## **JURY DEMAND**

Plaintiff hereby demands a jury trial on all issues and claims so triable.


DATED: June 6, 2023                    THE RYAN LAW GROUP

                                       /s/Andrew T. Ryan
                                       Andrew T. Ryan
                                       Attorney for Plaintiff

FOURTH AMENDED COMPLAINT

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**Ochoa, et al. v. Zeroo Gravity Games, LLC, et al.**

Case No. 2:22-cv-05896

### CERTIFICATE OF SERVICE

I, Andrew T. Ryan, certify that I am an attorney licensed to practice before all Courts in the State of California and United States District Court for the Central District of California. On this date, I served the foregoing documents (s):

**PLAINTIFF'S FOURTH AMENDED COMPLAINT**

A true and correct copy of the above entitled document(s) was sent via electronic mail to the email addresses listed below:

Michael A. Berta
Email: michael.berta@arnoldporter.com
Joseph Farris
Email: joseph.farris@arnoldporter.com
Estayvaine Bragg
Email: estayvaine.bragg@arnoldporter.com
Arnold & Porter Kaye Scholer LLP
Three Embarcadero Center, 10th Floor
San Francisco, CA 94111-4024
Telephone: (415) 471-3100
Facsimile: (415) 471-3400

Attorneys for Defendants


I declare the foregoing to be true and correct under penalty of perjury under the laws of the United States and the State of California.


Dated: June 6, 2023

/s/ Andrew T. Ryan

Andrew T. Ryan