# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 22-5896-GW-ASx | Date | September 16, 2025 |
|---|---|---|---|
| Title | *Sara Ochoa v. Zeroo Gravity Games LLC* | | |

Present: The Honorable  **GEORGE H. WU, UNITED STATES DISTRICT JUDGE**

| Javier Gonzalez | None Present | |
|---|---|---|
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| None Present | None Present |

**PROCEEDINGS:**    **IN CHAMBERS - TENTATIVE RULING ON PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS SETTLEMENT [147]; and PLAINTIFFS' MOTION FOR ATTORNEYS' FEES, COSTS, AND SERVICE AWARDS [148]**

Attached hereto is the Court's Amended Tentative Ruling on Plaintiffs' Motions [147, 148], set for hearing on September 18, 2025 at 8:30 a.m.

|  | : |
|---|---|
| Initials of Preparer | JG |

**_Sara Ochoa v. Zeroo Gravity Games LLC_**; 2:22-cv-05896-GW-(ASx)
Tentative Ruling on Motion for Final Settlement Approval; Motion for Attorney Fees and Costs

      Plaintiffs Sara Ochoa and Kimberly Brown (collectively, "Plaintiffs"), on behalf of themselves and a putative class of similarly situated individuals, sued Defendant Zeroo Gravity Games, LLC ("ZGG") for claims related to ZGG's mobile casino games.  *See generally* Fourth Amended Complaint ("4AC"), Docket No. 54.  The parties reached a settlement agreement (the "Settlement," Docket No. 139-2)[1] to resolve those claims on behalf of the putative class.  The Court preliminarily approved the Settlement.  *See* Preliminary Approval Order, Docket No. 141.[2] Plaintiffs have now filed a Motion for Final Approval of the Class Action Settlement (the "Motion," Docket No. 147-1) and a Motion for Attorneys' Fees, Costs and Service Awards (the "Fees Motion," Docket No. 148-1).  The Court has considered both Motions, the Amicus Brief of Amicus Curiae Attorney General of Washington State ("Washington") in opposition to the Motion ("Amicus," Docket No. 155), Plaintiffs' Reply to the Amicus ("Plaintiffs' Reply," Docket No. 156), ZGG's Reply to the Amicus ("ZGG Reply," Docket No. 157), and Washington's Reply ("Wash. Reply," Docket No. 159).  For the reasons stated herein, the Court would **GRANT** the Motion and reserve judgment on the Fees Motion.[3]

I.    <u>Background</u>

    **A. Factual Background**

    ZGG operates mobile slot machine casino games, including "Cash Tornado Slots-Casino," "Jackpot Master Slots-Casino," and "Jackpot Friends Slots Casino" (collectively, the "ZGG Games").  4AC ¶¶ 1, 208.  Plaintiffs and the putative class they seek to represent are (or were) users of the ZGG Games.  *Id.* ¶¶ 38-39.  The crux of Plaintiffs' allegations is that the ZGG Games are illegal forms of gambling under various state laws and that certain advertisements deployed within the ZGG Games are false and misleading.  *See generally id.*

    As originally set up, after downloading the games, users are allotted an amount of virtual

---

[1] The Court uses the term "Settlement" to refer to what it identified as the "Amended Settlement" in its preliminary approval order to distinguish the operative settlement agreement from an earlier iteration.  *See* Docket No. 141 at 1 n.1.

[2] Docket No. 141 is the Court's tentative ruling which was subsequently adopted as final.  *See* Docket No. 142.

[3] The Court does, however, provide tentative rulings on the costs and service awards sought in the Fees Motion.

coins with which to play the game.  *See* 4AC ¶ 65.  When users run out of coins or attempt to make a spin on the slot machine for a bet amount exceeding their balance of virtual coins, they are presented with three options: (1) one or more pop-ups appear onscreen offering the sale of virtual coins in exchange for real world currency, which results in virtually no interruption of the games playing; (2) users may view advertisements with virtual coins accumulating during that period; or (3) users may wait for a periodic reward of coins.  *Id*.

Plaintiffs allege that certain aspects of ZGG's solicitations within the ZGG Games as to the purchase of virtual coins for money are false and misleading.  Specifically, Plaintiffs contend that ZGG advertised the sale of its virtual coins deceptively because the advertisements use "strikethrough" pricing,[4] that is, offering the virtual coins for sale based on referenced prices that are rarely actually offered for sale.  *Id*. ¶¶ 29, 54.  This, Plaintiffs allege, deceived them into believing they were receiving a lower price for the virtual coins, when in reality there was no bargain.  *Id*.  Plaintiffs also allege that ZGG made false reference prices regarding its "Super Sale Offers" within the ZGG Games.  *Id*. ¶ 30.  Plaintiffs contend that the reference prices for the "Super Sale Offers" were false and misleading because they used a countdown timer ostensibly to show the expiration of the offer, but the sales were almost always available.  *Id*.  Aside from the allegedly false and misleading advertisements within the games, Plaintiffs also contend that the ZGG Games are themselves illegal because they violate "the gambling laws of multiple states including Washington, California and Arkansas."  *Id*. ¶¶ 15-27.

### B.  Terms of the Proposed Settlement

#### 1.  The Settlement Class

For purposes of settlement, the parties have agreed to certification of the following Class: "all individuals located within the United States who during the Class Period, made a purchase in the Zeroo Gravity Mobile Games, and who are not otherwise subject to the exclusions."  Settlement §§ II.B, III.1.  "Excluded from the Class are: (a) officers and directors of Zeroo Gravity and its corporate parents, subsidiaries, affiliates, or any entity in which Zeroo Gravity has a controlling interest, and the legal representatives, successors, or assignees of any such excluded persons or entities; (b) the Court; and (c) all individuals who have submitted a timely and valid Request for

---

[4] "Strikethrough" pricing is the marketing ploy of listing one higher price through which a line is drawn next to another lower or discounted price suggesting that the consumer is saving money by purchasing the item or service at the lower figure.

Exclusion to opt out of the Lawsuit, Settlement, and the Class." *Id*. § II.B.  The Class Period is defined as January 1, 2019 through the date of preliminary approval. *Id*. § II.E.

> 2. <u>In-Game Credits</u>

In lieu of cash payment, the Settlement provides the Settlement Class with in-game credits, virtual coins that are "usable to make purchases within the Zeroo Gravity Mobile Games" and are non-transferable. *See* Settlement § II.I. Class Members who purchased a Super Sale Offer would receive in-game credits "in an amount equivalent to two (2) times the dollar amount of the Super Sale Offer," which ZGG estimates has a value to the class of "approximately $3.56 million." *Id*. § VI.8.a.  For purchasers of "Special Offers," which were made available to purchasers of the Super Sale Offer (*see id*. § I.DD), Class Members would receive an amount equivalent to the dollar amount of their purchase, which ZGG approximates to a value of $1.47 million. *Id*. § VI.8.b. All other Class Members (*i.e.*, those who made a purchase during the Class Period but did not purchase a Super Sale Offer) would receive in-game credits "in an amount to the first purchase amount in the game," valued at approximately $1.71 million. *Id*. § IV.8.c. In-game credits would be automatically deposited into each user's account pursuant to a specified schedule following the closure of the opt-out period without requiring Class Members to submit a claim. *See* Motion at 2, 9.

> 3. <u>Injunctive Relief</u>

Under the terms of the Settlement, ZGG has agreed to implement the following changes to the ZGG Games:

- ZGG has implemented "free virtual coins" mechanics within the ZGG Games. Each user who has run out of virtual coins or otherwise has a coin balance low enough to be unable to make another spin will be given a number of virtual coins sufficient to make another spin within the slot game the user is playing.

- The "free virtual coins" mechanics will apply to all slot-style games within the ZGG Games and not just the slot-style game that requires the lowest number of virtual coins to spin.

- The "free virtual coins" mechanics will continue to be offered each time a user runs out of coins or otherwise has a coin balance low enough to be unable to make another spin.

- ZGG will provide a link to gambling addiction self-help resources and establish and implement a self-exclusion policy that is consistent with other comparable games in the industry.

- ZGG has implemented and will continue a practice of not using "strikethrough" style price comparisons within the ZGG Games, including in the game stores

and pop-up ads.

- Super Sale Offers within the ZGG Games will include a pricing disclosure substantially similar to the following: "Virtual coin price discount refers to the virtual coin price currently available in the store. The virtual coin price in the store is dynamic and may vary over time and for different users" and ZGG's terms of service for the ZGG Games will feature a substantially similar pricing disclosure.

- ZGG will change the wording of the "1st Purchase Double Bonus" offers within the ZGG Games to state "1st In-Game Store Purchase Double Bonus" offer or make a substantially similar change to clarify the nature of the bonus.

- ZGG confirms that the "surge" dial mechanics in the game stores within the ZGG Games will continue not to function after the exercise of a "1st Purchase Double Bonus" offer or make a substantially similar change to clarify the function of the "surge" dial.

Settlement § V. Plaintiffs contend that the injunctive relief, because it provides Class Members with "free access" to ZGG Games and "eliminat[es] their need to spend money to continue playing . . . has a potential value of over $34 million." *See* Motion at 11; *see also* Declaration of Christian Tregillis ("Tregillis Decl."), Docket No. 90, ¶¶ 31-50.

4.  Attorney Fees, Costs, and Incentive Awards

The Settlement provides Class Counsel the right to seek attorney fees and costs, which ZGG may oppose. *See* Settlement § IX.16. The parties have also agreed that Ms. Ochoa may seek an incentive award not to exceed $10,000 and Ms. Brown may seek an incentive award not to exceed $7,500. *Id*. § IX.16.

5.  Release and Dismissal of Claims

ZGG denies all liability. Settlement § X. Settlement Class Members who do not opt out will agree to release their claims against ZGG. *Id*. § VIII. However, the Released Claims only include a release as to injunctive relief arising from claims that the ZGG Games constitute an illegal form of gambling. *Id*. Class Members may have claims for monetary relief under gambling laws in other states which are unaffected by the settlement. *See* Motion at 11-12.

## II.    **Legal Standard**

### A.  **Final Approval of Class Action Settlement**

A proposed class action settlement must be approved by the district court. *See* Fed. R. Civ. P. 23(e). "Approval under 23(e) involves a two-step process in which the Court first determines whether a proposed class action settlement deserves preliminary approval and then, after notice is given to class members, whether final approval is warranted." *Nat'l Rural Telecommc'ns Coop.*

*v. DIRECTV, Inc.*, 221 F.R.D. 523, 525 (C.D. Cal. 2004).  The first step is already complete.  The Court preliminarily certified the proposed class, finding that the requirements of Fed. R. Civ. P. 23(a) and (b)(3) were met; preliminarily determined that the proposed settlement was "fair, reasonable, and adequate" under Rule 23(e)(2); and approved of the Settlement's notice plan under Fed. R. Civ. P. 23(e)(2)(C)(ii).  *See* Preliminary Approval Order at 6-19.

    1.  <u>Class Certification</u>

To approve a class action settlement, a court must first "assess whether a class exists." *Staton v. Boeing Co.*, 327 F.3d 938, 952 (9th Cir. 2003).  The proposed class must meet the four requirements of Rule 23(a): numerosity, commonality, typicality, and adequacy of representation. Fed. R. Civ. P. 23(a).  Additionally, the class must fall into one of the categories within the subparagraphs of Rule 23(b).  *See* Fed. R. Civ. P. 23(b).  As relevant here, Rule 23(b)(3) authorizes a class action where "questions of law or fact common to class members predominate over any questions affecting only individual members" and a class action is the "superior" method of resolution.  Fed. R. Civ. P. 23(b)(3).

    2.  <u>Notice</u>

"For any class certified under Rule 23(b)(3) – or upon ordering notice under Rule 23(e)(1) to a class proposed to be certified for purposes of settlement under Rule 23(b)(3) – the court must direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort."  Fed. R. Civ. P. 23(c)(2)(B).  Rule 23(c)(2)(B) delineates appropriate means of communicating notice and certain information the notice must contain.  *Id.*

    3.  <u>Rule 23(e)</u>

Rule 23(e) requires a finding that the settlement is "fair, reasonable, and adequate," and instructs the court to consider:

> (A) the class representatives and class counsel have adequately represented the class;
>
> (B) the proposal was negotiated at arm's length;
>
> (C) the relief provided for the class is adequate, taking into account:
>
> > (i) the costs, risks, and delay of trial and appeal;

(ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;

(iii) the terms of any proposed award of attorney's fees, including timing of payment; and

(iv) any agreement required to be identified under Rule 23(e)(3); and

(D) the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2). Additionally, the Ninth Circuit has advised consideration of the following factors in assessing whether a proposed settlement is fair, adequate, and reasonable:

(1) the strength of the plaintiffs' case;

(2) the risk, expense, complexity, and likely duration of further litigation;

(3) the risk of maintaining class action status throughout the trial;

(4) the amount offered in settlement;

(5) the extent of discovery completed and the stage of the proceedings;

(6) the experience and views of counsel;

(7) the presence of a governmental participant; and

(8) the reaction of the class members to the proposed settlement.

*In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 946 (9th Cir. 2011) (quoting *Churchill Vill., L.L.C. v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004)).

Where "a settlement agreement is negotiated *prior* to formal class certification," the court must not only review the proposed settlement pursuant to the aforementioned factors, but also ensure that the "settlement is not the product of collusion among the negotiating parties." *Bluetooth*, 654 F.3d at 946-47 (emphasis in original) (internal quotation marks and brackets omitted). Collusion may be indicated by (1) "counsel receiv[ing] a disproportionate distribution of the settlement;" (2) "a 'clear sailing' arrangement providing for the payment of attorneys' fees separate and apart from class funds;" and (3) "when the parties arrange for fees not awarded to revert to defendants rather than be added to the class fund." *Id.* at 947 (internal quotation marks omitted).

## B. Attorney Fees

"The touchstone for determining the reasonableness of attorneys' fees in a class action is the benefit to the class." *Lowery v. Rhapsody Int'l, Inc.*, 75 F.4th 985, 988 (9th Cir. 2023). A

court may calculate attorneys' fees in class actions under either the "lodestar" method or the
"percentage-of-recovery" method. *Id.* at 990. "Under the lodestar method, the court multiplies
the number of hours reasonably spent on the case by a reasonable hourly rate. Though the lodestar
amount is presumptively reasonable, the court can then apply a positive or negative multiplier to
that amount to ratchet the attorneys' fees up or down."[5] *Lowery*, 75 F.4th at 988 (citations
omitted). "[T]he percentage-of-recovery approach provides attorneys a percentage of the total
settlement fund or amount claimed by the class. The typical benchmark for the percentage-of-
recovery approach is 25%, but a court can – as in the lodestar method – adjust that benchmark up
or down." *Id.* (citations omitted).

"[B]ecause of the danger that parties will overestimate the value of injunctive relief in order
to inflate fees, courts must be particularly careful when ascribing value to injunctive relief for
purposes of determining attorneys' fees, and avoid doing so altogether if the value of the injunctive
relief is not easily measurable." *Roes, 1-2 v. SFBSC Mgmt., LLC*, 944 F.3d 1035, 1055 (9th Cir.
2019). Therefore, the lodestar method is appropriate in class actions such as those brought under
fee-shifting statutes where relief is "primarily injunctive in nature and thus not easily monetized."
*Bluetooth*, 654 F.3d at 941; *see also Hanlon*, 150 F.3d at 1029 ("In . . . injunctive relief class
actions, courts often use a lodestar calculation because there is no way to gauge the net value of
the settlement or any percentage thereof."); *Staton*, 327 F.3d at 946 (The "parties ordinarily may
not include an estimated value of undifferentiated injunctive relief in the amount of an actual or
putative common fund for purposes of determining an award of attorneys' fees.").

## III.   Discussion

### A.  Final Approval of Class Action Settlement

#### 1.  Legality of Settlement

Generally, the "decision to approve or reject a settlement proposal is committed to the
sound discretion of the trial judge." *Officers for Just. v. Civ. Serv. Comm'n of City & Cnty. of San
Francisco*, 688 F.2d 615, 625 (9th Cir. 1982). In evaluating the fairness of a settlement for
purposes of final approval, a district court should not "reach any ultimate conclusions on the

---

[5] Multipliers are determined by "a host of 'reasonableness' factors, 'including the quality of representation, the
benefit obtained for the class, the complexity and novelty of the issues presented, and the risk of nonpayment.'"
*Bluetooth*, 654 F.3d at 942 (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1029 (9th Cir. 1998)). "Foremost
among these considerations, however, is the benefit obtained for the class." *Id.*

contested issues of fact and law which underlie the merits of the dispute." *Id*.  A "district court abuses its discretion in approving a settlement only if the agreement sanctions *clearly* illegal conduct."[6]  *Fraley*, 638 F. App'x at 597 (emphasis in original) (internal quotation marks omitted).

Plaintiffs' Fourth Amended Complaint alleges that the ZGG Games violate the gambling laws of several states, including Washington (although Plaintiffs did not raise a cause of action under Washington law).  *See* 4AC ¶¶ 4, 15, 26.  The Court previously expressed concern over a settlement award involving virtual credits to play games credibly accused of violating the gambling laws of several states, *see* Docket No. 94 at 11-12, but without making a determination on the games' compliance with state gambling laws was persuaded that the Settlement's injunctive relief fundamentally changed the game mechanics such that they "would not subvert the public interest." Docket No. 117 at 1.  However, Washington, through its Attorney General, now contends that the Settlement would further activity unlawful under its laws and that the injunctive relief is insufficient to bring the ZGG Games within the law.  Washington asserts that the Settlement's award of virtual coins is unlawful because it views illegal gambling to occur *whenever* "players purchase virtual coins to place a bet at a slot machine or some other game of chance" online.  *See* Amicus at 7.  In other words, Washington's position is that even if "some people are playing games for free," the "ones who are not[] are unequivocally gambling in clear violation of Washington's gambling laws."  *Id*. at 8.  Additionally, Washington contends that the "implementation of purported 'free' or 'continuous play' features . . . do not stop or even dissuade players from making purchases of virtual currency in order to make illegal bets," because "the only meaningful way for

---

[6] ZGG suggests that the Court need not consider legality because it need only find the Settlement "fair, reasonable and adequate."  *See* ZGG Reply at 1 (citing *In re California Pizza Kitchen Data Breach Litig.*, 129 F.4th 667 (9th Cir. 2025)).  Potential illegality was not at issue in *California Pizza Kitchen*, and when potential illegality has been raised, the Ninth Circuit has indicated that a settlement must "not violate the law or public policy."  *Sierra Club, Inc. v. Elec. Controls Design, Inc*., 909 F.2d 1350, 1355 (9th Cir. 1990) (evaluating whether proposed consent judgment violated Clean Water Act).  The Ninth Circuit has not articulated how a district court should review a settlement for legality, although has indicated that a district court may approve a settlement "in the face of [] uncertainty."  *Fraley v. Batman*, 638 F. App'x 594, 597 (9th Cir. 2016).  *Fraley* cites two out-of-circuit cases that more specifically hold "that a settlement that authorizes the continuation of clearly illegal conduct cannot be approved, but a court in approving a settlement should not in effect try the case by deciding unsettled legal questions."  *Robertson v. Nat'l Basketball Ass'n*, 556 F.2d 682, 686 (2d Cir. 1977) (approving settlement where "challenged practices ha[d] not been held to be illegal per se in any previously decided case"); *see also Isby v. Bayh*, 75 F.3d 1191, 1197 (7th Cir. 1996) ("[A court] cannot approve a class action settlement which either initiates or authorizes the continuation of clearly illegal conduct," but "must not decide unsettled legal questions; any illegality or unconstitutionality must appear as a legal certainty on the face of the agreement before a settlement can be rejected on this basis," and "in determining whether to reject a settlement as initiating or authorizing a clearly illegal or unconstitutional practice, prior judicial decisions must have found that practice to be illegal or unconstitutional as a general rule." (internal quotation marks and citations omitted)).

a player to control the size of their bet is not to play in 'free virtual coins' mode." *Id*. at 9.

Plaintiffs and ZGG assert that the changed game mechanics take the virtual coins and the ZGG Games outside of Washington law's definition of gambling and point out that the Washington Attorney General has not objected to settlement agreements in prior cases involving similar games that effectuated similar changes to game mechanics to require continuous play as the Settlement does here. *See generally* Plaintiffs' Reply; ZGG Reply at 1-7. ZGG also argues that the Court "need not decide the ultimate merits of the Attorney General's position to grant final approval of the Settlement," because the Court's evaluation of the Settlement does not require it to reach conclusions on contested legal issues and the games at issue are not clearly illegal as altered.[7] ZGG Reply at 7-8. Washington replies by appealing to statutory interpretation of its gambling laws and arguing that past settlements and its own lack of prior enforcement are not dispositive. *See generally* Wash. Reply.

"All online or virtual gambling is illegal in Washington." *Kater v. Churchill Downs Inc*., 886 F.3d 784, 786 (9th Cir. 2018) (citing *Rousso v. State*, 170 Wash. 2d 70, 82 (2010)). Washington defines "gambling" as "staking or risking something of value upon the outcome of a contest of chance or a future contingent event not under the person's control or influence, upon an agreement or understanding that the person or someone else will receive something of value in the event of a certain outcome." Wash. Rev. Code § 9.46.0237. A "thing of value" is "any money or property, any token, object or article exchangeable for money or property, or any form of credit or promise, directly or indirectly, contemplating transfer of money or property or of any interest therein, or involving extension of a service, entertainment or a privilege of playing at a game or scheme without charge." *Id*. § 9.46.0285. Virtual coins or other forms of currency in mobile casino games constitute a "thing of value" under Washington law if "a user needs [them] in order to play," and if she "runs out" and "wants to continue playing . . . she must buy more," because

---

[7] Additionally, ZGG argues that "federal courts do not look to any Attorney General's position on state law as authoritative, particularly where the Attorney General's view would not be binding in the courts of its own state." ZGG Reply at 6. "Opinions of the attorney general construing the state constitution or interpreting a statute are generally entitled to great weight by [Washington] courts." *Greater Seattle Chamber of Com. v. City of Seattle*, 22 Wash. App. 2d 361, 373 (2022). Therefore, while an attorney general's opinions are "not binding," the Court finds that such opinions hold "considerable weight," *Woodward v. State*, 4 Wash. App. 2d 789, 800 (2018), particularly in this context. *See Gottlieb v. Tropicana Hotel & Casino*, 109 F. Supp. 2d 324, 330 (E.D. Pa. 2000) (placing "substantial weight" on the opinion of the New Jersey Attorney General to determine whether plaintiff paid or agreed to pay "something of value" under New Jersey state gambling law "because the state Attorney General is integrally involved in the administration of [New Jersey gambling law] and "the enforcement of gambling offenses in the state").

the currency thus by definition extends the "privilege of playing." *Kater*, 886 F.3d at 787.[8]

Importantly, virtual coins can still constitute a "thing of value" even if the game provides for periodic disbursals of free virtual coins or other means by which users receive some ability to continue play without paying. *See Fife v. Sci. Games Corp.*, Case No. 2:18-cv-00565-RBL, 2018 WL 6620485, at *4 (W.D. Wash. Dec. 18, 2018) ("Additional free coin allotments . . . do not remove [an] app from the 'thing of value' definition."); *Wilson v. Playtika, Ltd.*, 349 F. Supp. 3d 1028, 1041 (W.D. Wash. 2018) (finding additional free coin allotments did not "remove . . . virtual coins from the statutory 'thing of value' definition ); *Larsen v. PTT, LLC*, 737 F. Supp. 3d 1076, 1085 (W.D. Wash. 2024) (finding virtual coins in casino games were things of value despite free access to game, "free 'initial allotment' of virtual coins," and free distribution of coins through various other "mechanisms," including "a daily grant, every four hours, and random prize spins"). In other words, "the privilege of playing" need not be *permanently* lost" for a virtual coin that extends it to constitute a "thing of value." *Fife*, 2018 WL 6620485, at *4 (emphasis in original); *see also Wilson*, 349 F. Supp. 3d at 1041 (same). However, if virtual coins or currency serve only an enhancement function, such as unlocking additional levels of play, they "may in fact fall outside the 'thing of value' definition."[9] *Wilson*, 349 F. Supp. 3d at 1043.

The parties argue that the games here, as redesigned under the Settlement, are distinct from the games described above because continuous play is *always* available; therefore, the privilege of play is never withheld, even temporarily. *See* Plaintiffs' Reply at 2; ZGG Reply at 5; *cf. Larsen*, 737 F. Supp. 3d at 1085 ("If players lack coins to continue gameplay, they must either wait to receive free coins or spend real money to purchase more virtual coins."); *Wilson*, 349 F. Supp. 3d at 1041 ("It . . . does not matter that a player may obtain more free coins at some future time because, until then, they must pay to extend their privilege of playing."); *Fife*, 2018 WL 6620485,

---

[8] Washington asserts that "nowhere does the *Kater* court state that its decision is conditioned on this fact." *See* Wash. Reply at 9. On the contrary, this fact is fundamental to *Kater*'s explanation of why the "virtual chips extend the privilege of playing." *Kater*, 886 F.3d at 787 ("Without virtual chips, a user is unable to play Big Fish Casino's various games. Thus, if a user runs out of virtual chips and wants to continue playing Big Fish Casino, she must buy more chips to have 'the privilege of playing the game.'").

[9] ZGG cites other cases that more strongly take the position that "'enhancement' of gameplay does not amount to a thing of value.'" ZGG Reply at 6 (citing *Mai v. Supercell Oy*, 648 F. Supp. 3d 1130, 1137 (N.D. Cal. 2023) and *Coffee v. Google, LLC*, Case No. 20-cv-03901-BLF, 2022 WL 94986, at *13 (N.D. Cal. Jan. 10, 2022)). However, these cases interpret California law. *Id.* While some courts have applied *Kater* and its interpretation of Washington law to interpret California law, *see Mai*, 648 F. Supp. 3d at 1137, the Court is unaware of any authority indicating that the Court should consider interpretations of California gambling law in understanding Washington law.

at \*4 ("There is no indication that players can continue playing for free when they can no longer have enough coins to bet," and "[i]t therefore does not matter that a player may obtain more free coins after an hour because, until that time, they cannot play Scientific's games free of charge.").

Because virtual coins are always replenished under the redesigned games such that users are never required to choose between waiting for free additional coins or purchasing additional coins, it is not evident that the virtual coins in the redesigned games fall under *Kater* and its progeny. The holdings in those cases are highly dependent on the fact that a user is deprived of continuous play, at least temporarily, without making a purchase of virtual currency. *See, e.g.*, *Kater*, 886 F.3d at 787. The Court appreciates that Washington defines a thing of value "very broadly," and does not rule out the possibility that Washington gambling laws may be interpreted to encompass ZGG's virtual coins as things of value because game incentives encourage virtual coin purchases even if continuous play is available.[10] *See* Amicus at 4, 9. However, the operation of virtual coins in this way may also be construed as enhancement, which does not necessarily implicate § 9.46.0285. *Wilson*, 349 F. Supp. 3d at 1043. The Court finds decisive the apparent lack of prior judicial decisions interpreting virtual currency to constitute a thing of value under Washington law when the immediate ability to continue play is not dependent upon its purchase.[11]

In the absence of such authority, and in the face of legal uncertainty, the Court does not find that the Settlement is *clearly* illegal under Washington law such that the Court must reject the Settlement.[12] *See Fraley*, 638 F. App'x at 597; *Isby*, 75 F.3d at 1197. However, given

---

[10] The Court further notes the additional arguments based on statutory interpretation Washington raised in its reply brief. *See* Wash. Reply at 2-8. However, for a settlement to further a "clearly illegal . . . practice, *prior judicial decisions* must have found that practice to be illegal." *Isby*, 75 F.3d at 1197 (emphasis added) (internal quotation marks omitted). Washington has not cited the Court to a prior judicial decision in which a game that was free to access and free to play continuously, with purchase merely offered, was found to constitute gambling under Washington law. The two cases Washington cites did not consider such facts. *See Kater*, 886 F.3d at 787 (presuming that a user was required to purchase "virtual chips" to keep playing game and therefore finding they extended the privilege of playing); *Bullseye Distrib. LLC v. State Gambling Comm'n*, 127 Wash. App. 231, 235-36, 241-42 (2005) (finding "play credits" constituted things of value under Washington law where they were required to play game and could be acquired only through purchase, a "promotional play voucher" that was "limited to one per person per day per location," or winning).

Additionally, it is recognized by the Court that its focus might perhaps be too narrow. While the revised games may allow for continuous play, it may be argued that – for the user – it is the continuous play *at the level* he/she was engaged in that should be the focus. *See* footnote 17, *infra*.

[11] Notably, the Settlement does not preclude criminal enforcement actions by the State of Washington, or monetary claims by Washington class members to recover gambling losses, either of which would be more appropriate vehicles to define the outer bounds of Wash. Rev. Code § 9.46.0285 as applied to mobile casino games than final approval of the settlement of this case.

[12] While the Court places substantial weight on the position of Washington regarding its own laws, *see supra* note

Washington's strong objections to the Settlement, the Court would like the parties to address at the hearing the possibility of excluding Washington citizens from the Class.

### 2. Class Certification

The Court analyzed the proposed class at length in its Preliminary Approval Order under the requirements of Rule 23(a) and (b) and issued a preliminary certification. *See* Preliminary Approval Order at 6-9. All facts bearing upon numerosity, commonality, typicality, and adequacy of the class, as well as predominance of common questions and superiority of a class action, remain unchanged. *See* Motion at 15. "Accordingly, the Court need not find anew that the settlement class meets the certification requirements of Rule 23(a) and (b)." *Gonzalez v. BMC W., LLC*, No. 17-cv-00390-JGB-(RAOx), 2018 WL 6318832, at *5 (C.D. Cal. Nov. 19, 2018) (internal quotation marks omitted). "All the criteria for class certification remain satisfied," and as such "the Court hereby confirms its order certifying the Settlement Class." *Id.*

### 3. Notice

The Court found the notice plan procedurally adequate and that the proposed notice satisfactorily apprised Class Members of their rights at the preliminary approval stage. *See* Preliminary Approval Order at 17-18. The Court is satisfied that the notice plan was carried out as approved and that notice to Class Members was proper under Fed. R. Civ. P. 23(c)(2)(B). *See generally* Declaration of Baro Lee ("Lee Decl."), Docket No. 147-2; Motion at 30.

### 4. Collusion

The Court analyzed the Settlement in detail at the preliminary approval stage and ultimately found that it was not the product of collusion. *See* Preliminary Approval Order at 13. Notably, while the Plaintiffs' counsel indicated that they would seek attorney fees, which the Court noted invites scrutiny given that the Settlement does not provide for actual monetary relief to the Class, the Court was satisfied that the Settlement does not award a particular fee amount such that any award received by Plaintiffs' counsel was subject to the Court's discretion and approval. *Id.*

---

7, the Court observes that Washington did not object to the legality of earlier settlement agreements, including in *Kater*, that imposed similar alterations to game mechanics to provide for continuous play to resolve similar claims. *See* Plaintiffs' Reply at 2-3; ZGG Reply at 3-4; *Kater v. Churchill Downs Inc.*, Case No. 2:15-cv-00612-RBL (W.D. Wash.); *Wilson v. Huuuge, Inc.*, Case No. 3:18-cv-05276-RSL (W.D. Wash.); *Wilson v. Playtika, Ltd.*, Case No. 3:18-cv-05277-RSL (W.D. Wash.); *Reed v. Light & Wonder, Inc.*, Case No. 2:18-cv-00565-RSL (W.D. Wash.). While these previous settlement agreements and Washington's lack of objection to them or prior enforcement efforts do not prove that such games comply with Washington law, *see* Wash. Reply at 9-10, the Court does find the fact that numerous other courts have approved similar settlements without incident to be a relevant consideration in evaluating whether approving this one would sanction clearly illegal conduct.

The Court remains satisfied that no obvious signs of collusion preclude final approval of the Settlement.

    5.  <u>Rule 23(e)(2) Factors</u>

The Court analyzed whether the Settlement met the Rule 23(e)(2) factors at length at the preliminary approval stage and found that each was satisfied, though "[took] issue with the parties' valuation" of the in-game credits and injunctive relief. *See* Preliminary Approval Order at 13-17. As the facts underlying the Court's analysis remain unchanged, the Court incorporates by reference and reaffirms that analysis here.[13] The Court is further satisfied that the relief is adequate and that Class Members are treated equitably under the Settlement by the lack of any objection to the Settlement award or allocation. *See* Motion at 28; Lee Decl. ¶ 29.

    6.  *Churchill* Factors

The Court likewise incorporated several of the *Churchill* factors applicable at the preliminary approval stage into its analysis at that stage and found that most supported approval.[14] *See* Preliminary Approval Order at 12 n.8, 13-17. The facts regarding the strengths and weaknesses of the case, costs and risks of further contested litigation, risks associated with maintaining a class action, the amount offered in settlement, and the extent of discovery remain

---

[13] The parties have defended their valuation in the Motion, in part by claiming that there is "entertainment value" to the coins in addition to the value previously associated with extending play such that "there is no basis to assume any reduction in value for those coins from the face value of the credits." *See* Motion at 24-25. The "entertainment value" of the virtual coins still does not persuade the Court that the price at which consumers previously purchased the virtual coins in an earlier version of ZGG Games when presented with a fundamentally different choice allows the parties to use revenues elicited from advertisements during the Class Period as a proxy for value of the in-game credits in the redesigned games. *See* Preliminary Approval Order at 15-16. Even if the "entertainment value" of the virtual coins remained constant, the primary value of the coins in the original version of the ZGG Games was its ability to extend play, which the parties concede has depreciated. *See* Motion at 24-25. Moreover, non-transferable nonmonetary relief generally has less value than the same quantity in cash. *See* Preliminary Approval Order at 16.

The parties further argue that the Court should not consider actions ZGG took prior to preliminary approval of the Settlement as "voluntary" because they were taken in anticipation of Settlement and after extensive motion practice. Motion at 25-26. The Court described actions ZGG took to abandon strikethrough pricing practices as "voluntary" to mean that it was taken outside of "'any court- or settlement-imposed obligation.'" Preliminary Approval Order at 16-17 (quoting *Koby v. ARS Nat'l Servs., Inc*., 846 F.3d 1071, 1080 (9th Cir. 2017)). The Court understands ZGG to have ceased advertising with strikethrough pricing prior to any legal obligation to do so.

Finally, the parties argue that "any increase in sales [ZGG] may derive from the reengagement of players will likely be more than offset by the reduction in purchases resulting from game changes." *See* Motion at 26. Regardless, the Court finds the possibility of reengagement and further purchases to be a relevant factor in assessing the value of the relief to the Class. Therefore, the Court's position – that the relief provided by the Settlement has actual value to the Class but not at the value the parties have assessed – remains unchanged.

[14] The only factor that weighed against settlement was the strength of the case, because "Plaintiffs claims' are relatively strong." *See* Preliminary Approval Order at 14.

unchanged since this Court reviewed them in issuing preliminary approval. *See generally* Motion. Therefore, the Court incorporates by reference and reaffirms those findings. The Court further notes the experience and support of Plaintiffs' counsel. *See* Declaration of Andrew Ryan ("Ryan Decl."), Docket No. 88, ¶¶ 4-9.

"The participation of a government agency serves to protect the interests of the class members, particularly absentees, and approval by the agency is an important factor for the court's consideration." *Marshall v. Holiday Magic, Inc.*, 550 F.2d 1173, 1178 (9th Cir. 1977). A lack of any governmental objection also "favors settlement." *Knapp v. Art.com*, *Inc.*, 283 F. Supp. 3d 823, 833 (N.D. Cal. 2017). When the Court issued its Preliminary Approval Order, no governmental entity had objected, but since then, the Washington Attorney General has registered its objection. *See* Amicus. The Court finds Washington's objection to weigh against the Settlement, but for the reasons discussed *supra*, does not find its objection dispositive.

Finally, the reaction of the class supports final approval. No objections were raised by Class Members and only two exclusions were requested. Lee Decl. ¶ 29. "[T]he absence of any objections to the Settlement Agreement among Class Members supports final approval." *In re Aftermarket Auto. Lighting Prods. Antitrust Litig.*, No. 09 MDL 2007-GW-(PJWx), 2014 WL 12591624, at *3 (C.D. Cal. Jan. 10, 2014); *see also DIRECTV*, 221 F.R.D at 529 ("[T]he absence of a large number of objections to a proposed class action settlement raises a strong presumption that the terms of a proposed class settlement action are favorable to the class members.").

On balance, the majority of the *Churchill* factors therefore support final approval. Having found all requirements met, the Court would therefore **GRANT** final approval of the Settlement.

**B. Attorney Fees, Costs, and Incentive Awards**

1. <u>Attorney Fees</u>

Plaintiffs seek $1,480,992.48 in fees, which they contend represents 22% of the monetary value of the Settlement and a multiplier of 1.41 of the lodestar. *See* Fees Motion at 1.

*a. Percentage Method*

"The percentage method is . . . appropriate in common fund cases[] where 'the benefit to the class is easily quantified.'" *Ontiveros v. Zamora*, 303 F.R.D. 356, 372 (E.D. Cal. 2014) (quoting *Bluetooth*, 654 F.3d at 942). As discussed below, because the benefit to the class is entirely nonmonetary, variable, and difficult to quantify, the Court is unable to assess either an estimate of the value to the Class or calculate an attorney fee amount based on a percentage of it.

14

Plaintiffs based their 22% estimate off a $6.7 million valuation of the in-game credits that the Court has already rejected and which itself is based upon past ZGG revenues. *See* Fees Motion at 8-9. The Court has explained that the $6.7 million figure overvalues the credits both by using ZGG's revenues as a direct proxy for the credits' value, treating credits as equivalent to user purchases made in cash,[15] and by failing to account for the depreciation in value of the in-game currency in a fundamentally altered version of the game. *See supra* note 13; Preliminary Approval Order at 15-17. Moreover, Christian Tregillis, Plaintiffs' expert, has stated that "it is unlikely" that ZGG will forgo its entire in-game purchase revenue, in part because of "churn" on mobile gaming apps such that many Class Members no longer play ZGG Games and the credits "would not supplant payments that those Class members will make to ZGG in the future," and moreover that "by giving away credits," users may "make additional purchases that would not have been made." *See* Tregillis Decl. ¶¶ 26, 30. Because the Court does not agree that "the total monetary benefit to the class is over $6.7 million," this figure does not provide a basis upon which the Court can calculate attorney fees via the percentage method. *See* Fees Motion at 6.

The above analysis – and the Court's corresponding inability to rely upon the $6.7 million valuation of the monetary benefit to the class based upon the in-game credits – applies whether or not the in-game credits are "coupons" under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1712, which would constrain the value of the credits to those credits actually redeemed for purposes of evaluating attorney fees. *See In re Easysaver Rewards Litig.*, 906 F.3d 747, 755 (9th Cir. 2018). However, on balance, the in-game credits are likely coupons under CAFA. To determine whether a credit is a "coupon" under CAFA, courts consider: "(1) whether class members have to hand over more of their own money before they can take advantage of a credit, (2) whether the credit is valid only for select products or services, and (3) how much flexibility the credit provides, including whether it expires or is freely transferable." *Id*. at 755 (internal quotation marks omitted). The credits do not expire and do not require additional purchases

---

[15] *See, e.g.*, *True v. Am. Honda Motor Co.*, 749 F. Supp. 2d 1052 (C.D. Cal. 2010) ("Courts have generally rejected the idea that the face value of coupons or rebates should be used for settlement valuation purposes; compensation in kind is worth less than cash of the same nominal value." (brackets and internal quotation marks omitted)); Tregillis Decl. ¶ 26 ("[I]t is likely that some discount should be applied to the face value of those credits, to account for the potential that Class members will not make use of the credits provided or the Class members may not value the credits at face value.").

because ZGG Games "offer in-game purchases starting at $0.99."[16]  *See* Fees Motion at 14. However, they do not afford Class Members "significantly more flexibility than typical coupons." *Easysaver*, 906 F.3d at 756.  Unlike a gift card at a large retailer that enables class members to purchase a wide variety of necessary products, the credits may be only used to "purchase items from a limited universe" of virtual items within ZGG Games.  *Id*. at 757; Motion at 25. Additionally, the non-transferable credits "only have value 'if a class member is willing to do business again with the defendant.'"  *Seegert v. Lamps Plus, Inc*., 377 F. Supp. 3d 1127, 1131 (S.D. Cal. 2018) (quoting *In re Sw. Airlines Voucher Litig*., 799 F.3d 701, 706 (7th Cir. 2015)).[17]

Moreover, Plaintiffs' counsel also appears to rely on a single estimate of the "price premia . . . received by ZGG as a result of the use of advertised reference prices" to conclude that the value of the injunctive relief to the Class exceeds $34 million.  *See* Tregillis Decl. ¶ 40; Fees Motion at 13.  However, the Court does not find that it can extrapolate from this figure the value to the Class of changes ZGG has made or is making to its advertisements.  To do so, the Court would have to make several assumptions, including, significantly, that the "use of an advertised reference price caused purchasers to pay 21% more than they would have" with respect to non-Super Sale Offers (the same as Super Sale Offers even though the Settlement itself treats Super Sale Offers and non-Super Sale Offers differently),[18] and that the revenues ZGG purportedly

---

[16] The Court notes that the game mechanics still likely create incentives for users to make additional purchases even if they are not required to do so in order to use their in-game credits.  *See* Amicus at 9 ("[C]asino apps . . . do not stop or even dissuade players from making purchases of virtual currency" because "players have an incentive to control the size of their bet because larger bets, if won, mean larger payouts and other bonuses"); Tregillis Decl. ¶ 30 ([I]t is possible that by giving away credits, ZGG will engage inactive users to play the ZGG Games, such that the users make additional purchases that would not have been made without the credits to be provided per the Settlement.").  This is consistent with the purpose of a coupon, which is to "facilitate a sale to a purchaser who would not otherwise purchase a product."  *True*, 749 F. Supp. 2d at 1075.

[17] *Seegert* provides a helpful distinction between coupons or vouchers and "cash-equivalent certificates" that are not coupons under CAFA as in *In re Online DVD-Rental Antitrust Litigation*, 779 F.3d 934 (9th Cir. 2015); unlike the Walmart gift card in *Online DVD* that "offered class members a choice from thousands of products for which ordinary consumers have need," vouchers to a specialty lamp and home décor store were "not everyday products required for purchase."  377 F. Supp. 3d at 1132.  Here, digital currency and other virtual items in mobile casino games are even more evidently outside of the realm of everyday items required by ordinary consumers.  Additionally, the option of cash in lieu of a gift card indicates a non-coupon cash equivalent because class members are not forced to continue doing business with the defendant.  *Id*.  Such an option is not available to Class Members here.

[18] The 21% differential comes from a 1998 study analyzing 38 other studies of comparative price advertising that generally concluded that "comparative price advertisements work," but noted several variables that may impact value and did not indicate that 21% is a firm estimate of the difference between consumer value with and without advertised reference prices across all products, brands, and advertisements.  *See* Larry D. Compeau & Dhruv Grewal, *Comparative Price Advertising: An Integrative Review*, 17 J. OF PUB. POL'Y & MKTG. 257, 262-64 (1998).

16

earned based on advertised reference prices represent the value of the injunctive relief to the Class.
*See id.* ¶¶ 37-38, 40.  Generally, Tregillis indicated that understanding the value of the injunctive
relief would best be understood with specific survey evidence and is a "fact-intensive exercise."
*Id*. ¶¶ 36, 43, 49 ("strongly suggest[ing] the use of a survey to estimate what the value to consumers
is of the elimination of the accused advertising" and observing that some Class Members will not
"change their behavior at all" while others "may receive and place great value from/on" respective
changes made to the game and its advertisements).

Tregillis also offered no estimate of the value to the Class of the free virtual coin mechanics
other than to aver that it "likely provides significant value," though acknowledged that "users
likely will not get as much enjoyment out of making [free] minimum bet spins compared to
wagering a greater quantity of coins."  *Id.* ¶ 42.  He also suggested that "approximately 50% of
mobile gaming revenue [is] generated from 10% of users" who make purchases, who themselves
only constitute "0.15% of all users," which may indicate that a significant amount of Class
Members may not be impacted either because they do not frequently play or make purchases or,
alternately, because they play so frequently and make so many purchases that they are unlikely to
take advantage of a less enjoyable albeit continuously free-to-play means of playing.  *Id.* ¶ 43.

The Court further observes that the possibility that some Class Members may still pursue
claims for monetary damages under state gambling laws further complicates the valuation of the
Settlement here.  Past such cases have resulted in substantial monetary settlements.[19]

In sum, the Court cannot satisfactorily establish a valuation of the relief afforded by the
Settlement.  Because of the Settlement award's entirely nonmonetary nature and the inherent
difficulties in ascribing a value to it, the Court finds that the percentage method is not appropriate
to calculate attorney fees here.

   *b.  Lodestar Method*

Plaintiffs' counsel has calculated the lodestar as $1,049,205.80 based upon 1,389.1 hours
spent on this litigation by attorney Andrew Ryan at a rate of $738 an hour and 48.1 hours spent by
attorney Jason Kayne at a rate of $500 an hour.  *See* Ryan Decl., Ex. 7, Docket No. 149-7.
Plaintiffs' counsel further anticipated an additional 200 hours "attending the Final Approval

---

[19] For instance, *Kater* settled for $155 million.  *See* Case No. 2:15-cv-00612-RBL (W.D. Wash.), Docket No.
218-1.

Hearing, responding to any objections to the Settlement, responding to amicus curie briefs, monitoring the administration of the In-Game Credits, responding to class member inquiries and responding to any appeals to approval of the Settlement." Ryan Decl., Docket No. 149, ¶ 11. Mr. Ryan has been in practice for sixteen years and has substantial experience in consumer class actions, including specifically cases involving mobile applications. *Id*. ¶ 14. No information was provided regarding Mr. Kayne's experience.

i.    Reasonable Rate

"The prevailing market rates in the relevant community set the reasonable hourly rate for purposes of computing the lodestar amount." *Gonzalez v. City of Maywood*, 729 F.3d 1196, 1205 (9th Cir. 2013) (internal quotation marks omitted). "Generally, when determining a reasonable hourly rate, the relevant community is the forum in which the district court sits." *Camacho v. Bridgeport Fin., Inc*., 523 F.3d 973, 979 (9th Cir. 2008). In general, "[t]he Court finds that the Real Rate Report provides objective empirical data that serves as a better benchmark of reasonableness than scouring a litany of cases from within and outside the judicial district." *Hernandez v. FCA US LLC*, No. 17-cv-5452-GW-(ASx), 2019 WL 2932637, at *3 (C.D. Cal. Jan. 4, 2019); *see* Wolters Kluwer/CEB, *2024 Real Rate Report* ("Real Rate Report").

Plaintiffs' counsel asserts a $738 reasonable hourly rate for Mr. Ryan based upon the median hourly rate for general litigation partners in Los Angeles in 2023 and a $500 hourly rate for Mr. Kayne "for associate work." *See* Fees Motion at 16. This Court has previously found a $738 hourly rate reasonable for Mr. Ryan in a case involving similar allegations. *See Molloy v. Triwin, Inc*., Case No. 2:23-cv-04317-GW-(ASx) (C.D. Cal.), Docket No. 115, at 12. Plaintiffs' counsel has not cited a basis for Mr. Kayne's rate, but it appears to the Court within the range of reasonability for an associate practicing consumer-related litigation in Los Angeles.[20]

ii.    Reasonable Hours

Plaintiffs' counsel asserts that 1,389.1 hours were spent on this matter since December 2021, the vast majority by Mr. Ryan. *See* Ryan Decl., Ex. 7. However, the entries are not only block-billed[21] but also further blocked together in monthly lump sums, *see id.*, leaving the Court

---

[20] The 2024 Real Rate Report provides that, nationally, associates practicing consumer-related general liability litigation charge between $325 and $676 with a median of $430. *See* Real Rate Report at 43. However, Los Angeles rates generally run higher than the national average. *See, e.g.*, *id.* at 137-38.

[21] "Block-billing is the practice of including various tasks within one time entry without specifying the time spent

no way of parsing how long was spent on any individual task, if that amount of time was reasonable, and if any work was duplicative.[22]  *See Welch v. Metro. Life Ins. Co.*, 480 F.3d 942, 948 (9th Cir. 2007).  A "fee applicant bears the burden of documenting the appropriate hours expended in the litigation and must submit evidence in support of those hours worked." *Id*.  Block billed time entries do not meet this burden.  *Id*.  Additionally, many of the time entries are vague and appear repetitive at least without further detail or context (*e.g.*, "[c]ollect evidence regarding Defendant's games and sales promotions" for 14.5 hours in January 2022 and then again for 14.6 hours in February 2022; over 84 hours collectively dedicated to "[r]esearch gambling laws of states" in June and July 2024).  *See* Ryan Decl., Ex. 7.  Accordingly, the Court cannot at this juncture find the amount of hours Plaintiffs assertedly spent reasonable based upon the information before it, nor can it calculate a lodestar or proceed to consider the propriety of any multiplier.

The Court thus reserves judgment on awarding attorney fees.  The parties shall come prepared to discuss this issue further at the hearing based upon the foregoing analysis.

    2.  Costs

Next, Plaintiffs seek $48,306.07 in litigation costs.  *See* Fees Motion at 1; Ryan Decl., Ex. 6, Docket No. 149-6.  Plaintiffs are entitled to "reasonable litigation costs."  *Carlin v. DairyAmerica, Inc.*, 380 F. Supp. 3d 998, 1023 (E.D. Cal. 2019).  Typical "reasonable and necessary" costs include "(1) meals, hotels, and transportation; (2) photocopies; (3) postage, telephone, and fax; (4) filing fees; (5) messenger and overnight delivery; (6) online legal research; (7) class action notices; (8) experts, consultants, and investigators; and (9) mediation fees." *Id*. at 1023-24 (internal quotation marks omitted).

The asserted costs all fall into the above categories and appear largely attributable to expert fees and mediation costs.  Ryan Decl., Ex. 6.  The Court therefore finds the asserted $48,306.07 in costs to be reasonable and would grant the Fees Motion to that extent.

Plaintiffs also, however, seek costs associated with settlement administration.  *See* Fees Motion at 1.  ZGG asserts that it has paid those costs pursuant to the terms of the Settlement.  *See* Docket No. 158 at 1 n.1.  The Court expects the parties to clarify this issue at the hearing and

---

on each task within an entry." *Banas v. Volcano Corp.*, 47 F. Supp. 3d 957, 966 n.9 (N.D. Cal. 2014).

[22] ZGG has asserted that some of the work asserted by Plaintiffs' counsel in this case may be duplicative with work done in a separate but "substantively extremely similar" matter before this Court, *Ballew v. Huuuge, Inc.*, Case No. 2:23-cv-04324-GW-(AGRx) (C.D. Cal.).  *See* Docket No. 158 at 1.

would not award any further costs associated with settlement administration under the understanding that such expenses have already been paid.

       3.  <u>Service Awards</u>

Finally, Plaintiffs seek service awards of $10,000 for Ms. Ochoa and $7,500 to Ms. Brown. *See* Fees Motion at 1. Service "awards are discretionary" and "are intended to compensate class representatives for work done on behalf of the class, to make up for financial or reputational risk undertaken in bringing the action." *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 958 (9th Cir. 2009). In evaluating whether a service award is reasonable, courts consider "the actions the plaintiff has taken to protect the interests of the class, the degree to which the class has benefitted from those actions, . . . the amount of time and effort the plaintiff expended in pursuing the litigation . . . and reasonable fears of workplace retaliation." *Staton*, 327 F.3d at 977 (internal quotation marks and brackets omitted). "In the Ninth Circuit, courts have found that $5,000 is a presumptively reasonable service award." *Carlin*, 380 F. Supp. 3d at 1024.

The aforementioned factors support the grant of service awards here. Ms. Ochoa and Ms. Brown have actively participated in the litigation, mediation, and settlement of this case and the Class has benefitted from their efforts. *See* Ryan Decl. ¶ 16. Ms. Ochoa also prepared and sat for a deposition, *id.*, and faced a sanctions motion directed at her personally. *See* Docket No. 19. While the requested service awards exceed the presumptively reasonable $5,000 benchmark, the Court finds an upward adjustment would not be unfair here, particularly since such an adjustment has no depleting effect upon the relief available to the rest of the Class. Therefore, the Court would grant the requested service awards.

**IV.**   **<u>Conclusion</u>**

Based on the foregoing discussion, the Court would **GRANT** the Motion and reserve judgment on the Fees Motion for the reasons previously indicated.